Michael B. Merchant, OSB No. 882680
mike.merchant@bhlaw.com
**BLACK HELTERLINE LLP**
805 S.W. Broadway, Suite 1900
Portland, OR 97205
Telephone: (503) 224-5560
Fax: (503) 224-6148

Adam M. Apton (admitted *pro hac vice*)
aapton@zlk.com
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Fax: (212) 363-7171

*Counsel for Lead Plaintiff and the Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CODY WILHITE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

EXPENSIFY, INC., DAVID BARRETT, RYAN SCHAFFER, BLAKE BARTLETT, ROBERT LENT, ANU MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY L. CHRISTEN, YING (VIVIAN) LIU, ELLEN PAO, J.P. MORGAN SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., BofA SECURITIES, INC., PIPER SANDLER & CO., JMP SECURITIES LLC, and LOOP CAPITAL MARKETS LLC,

Defendants.

Case No. 3:23-cv-01784-JR

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION....................1

II. JURISDICTION AND VENUE....................3

III. PARTIES....................4

A. Lead Plaintiff....................4

B. Defendants....................4

1. Expensify....................4

2. The Individual Defendants....................4

3. The Underwriter Defendants....................7

IV. CONFIDENTIAL WITNESSES....................7

A. CW1....................7

B. CW2....................8

C. CW3....................8

D. CW4....................9

E. CW5....................9

F. CW6....................10

G. CW7....................10

V. SUBSTANTIVE ALLEGATIONS....................11

A. Expensify – A Subscription-Based Expense Management Platform. ....................11

B. Expensify's Defining Viral "Bottom-up" Business Model....................12

C. Expensify's Decision to Double, and in Some Cases Triple, its Per Member Prices Negatively Impacted Customer Retention and Seat Expansion....................14

D. Defendant Barrett's Decision to Send Political Spam Mail Via Expensify's Professional Customer Database Caused the Company Severe Reputational Harm and Alienated its Customer Base....................17

E. With a Spoiled Reputation and Dissatisfied Customer Base, Expensify Materially Altered its Business Model. ....................23

F. Events and Disclosures Following the IPO....................27

VI. THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL INFORMATION....................34

A. Misstatements Related to the Company's May 2020 Price Increase....34

B. Misstatements Related to Barrett's October 2020 Political E-Mail....37

C. Misstatements Related to Expensify's Change in Business Model....41

VII. VIOLATIONS OF SEC REGULATION S-K....45

A. Item 101(a)....45

B. Item 303....46

C. Item 105....49

VIII. NO STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE....53

IX. CLASS ACTION ALLEGATIONS....54

X. CAUSES OF ACTION UNDER THE SECURITIES ACT....56

XI. PRAYER FOR RELIEF....60

XII. JURY TRIAL DEMAND....61

Lead Plaintiff, individually and on behalf of all others similarly situated, by and through his respective undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, review and analysis of: (a) public statements made by or on behalf of Expensify, Inc. ("Expensify" or the "Company"), including public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases; (c) reports of securities and financial analysts; (d) news articles; (e) interviews with former employees of Expensify; and (f) industry reports. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Expensify provides expense management software and related services to small and medium-sized businesses. On November 15, 2021, after more than a decade operating as a private company, Expensify went public selling 11.2 million shares of stock priced at $27.00 per share (the "IPO"). In connection with the IPO, the Company filed an initial registration statement on October 15, 2021, along with several amendments, and a final prospectus on November 12, 2021 (collectively, the "Registration Statement").

2. Expensify utilized a "bottom-up" business model that depended on organic growth through word-of-mouth recommendations and a sterling reputation amongst its customer base and channel partners. This "bottom-up" business model was integral to Expensify's growth and, according to the Registration Statement, provided the Company with access to a $16 billion total addressable market while at the same time avoiding millions of dollars in operating expenses ordinarily tied to traditional top-down marketing.

3. Unbeknownst to investors who purchased Expensify shares in the IPO, recent undisclosed events had irreparably damaged the Company's reputation forcing it to abandon its historical, lauded "bottom-up" business model. In May 2020, Expensify initiated a sharp price increase that doubled (and, in some cases, tripled) the price of subscriptions. This had a material negative impact on customer retention and member expansion. Then, in October 2020, Expensify's CEO David Barrett sent an email to the Company's nearly 10 million users threatening that a vote against President Joe Biden would be a "vote against democracy". The fallout from Barrett's political email was immediate and severe, resulting in many customers declaring their disgust with the Company and their plans to cancel (or not renew) their subscriptions. These events spoiled Expensify's reputation among its customers and partners, and in turn, the Company was forced to abandon its traditional growth strategy in favor of a traditional top-down marketing plan.

4. Expensify's Registration Statement did not disclose these events, the harm they caused, or the need to abandon its fundamental business model and growth strategy. Instead, the Registration Statement described Expensify's "bottom-up" strategy, brand, reputation, and market opportunity as if its customer base was completely intact. The detrimental effects of these decisions and actions came to light only after the IPO as customer contracts expired and were not renewed, and seat expansion (which refers to the number of users or licenses tied to a subscription) started decreasing. Analyst downgrades along with various revelations from Expensify's management signaled to investors that the business they invested in was much weaker than represented and differed in material ways from what Defendants had described in the Company's Registration Statement. Investors who purchased Expensify's stock pursuant to the IPO were unaware of the detrimental actions taken by the Company's management and the toll these actions had taken (and would continue to take) on operations and earnings going forward.

5. Expensify's investors sustained significant damages as a result of the material misrepresentations and omissions in the Registration Statement. From an IPO price of $27 per share, Expensify's stock has fallen to under $2 per share as of the date of this filing—***a decline of nearly 95%***. Lead Plaintiff, on behalf of himself and other investors who purchased Expensify stock in the IPO, brings this case to recover their losses under Sections 11 and 15 of the Securities Act of 1933. Defendants are liable and should be held accountable for the damage they caused.

## II. JURISDICTION AND VENUE

6. The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

7. This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

8. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because a substantial number of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false or misleading information, occurred in this District.

9. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

## III. PARTIES

### A. Lead Plaintiff

10. Lead Plaintiff Aleem Kanji, as set forth in his previously filed certification (ECF No. 13-1), purchased Expensify common stock pursuant and/or traceable to the Registration Statement, and was damaged thereby.

### B. Defendants

#### 1. Expensify

11. Expensify is a Delaware corporation with principal executive offices located at 401 SW 5th Ave, Portland, Oregon 97204. Expensify's securities trade on a domestic exchange, the Nasdaq Global Select Market ("NASDAQ"), under the ticker symbol "EXFY."

#### 2. The Individual Defendants

12. David Barrett ("Barrett") founded Expensify and has served as Chief Executive Officer ("CEO") and a member of the board of directors since 2009. Mr. Barrett signed the Registration Statement.

13. Ryan Schaffer ("Schaffer") has served as Expensify's Chief Financial Officer ("CFO") and a member of the board of directors since 2017. He previously served as Expensify's Director of Marketing and Strategy from 2013 to 2017. Mr. Schaffer signed the Registration Statement.

14. Blake Bartlett ("Bartlett") served as a member of Expensify's board of directors from January 2015 until his resignation contingent upon, and effective immediately prior to, the completion of the Offering. Mr. Bartlett signed the Registration Statement.

15. Robert Lent ("Lent") served as a member of Expensify's board of directors from 2012 to 2015 and again from February 2018 until his resignation contingent upon, and effective immediately prior to, the completion of the Offering. Mr. Lent signed the Registration Statement.

16. Anu Muralidharan ("Muralidharan") has served as Expensify's Chief Operating Officer ("COO") since January 2021, and consented to being named as a director nominee, contingent upon, and effectively immediately prior to, the completion of the Offering. She previously served as Expensify's Director of Product Operations from January 2018 to January 2021 and as Head of Payment Operations from August 2015 to January 2018.

17. Jason Mills ("Mills") has served as Expensify's Chief Product Officer ("CPO") since May 2021, and consented to being named as a director nominee, contingent upon, and effectively immediately prior to, the completion of the Offering. He previously served as Expensify's Director of Product and Customers from January 2013 to May 2021.

18. Danial Vidal ("Vidal") has served as Expensify's Chief Strategy Officer ("CSO") since May 2021, and consented to being named as a director nominee, contingent upon, and effectively immediately prior to, the completion of the Offering. He previously served as Expensify's Director of Corporate Development & Strategy from February 2019 to May 2021 and Head of Business Development from August 2013 to February 2019.

19. Timothy L. Christen ("Christen") was elected to Expensify's board of directors, contingent upon and effective immediately upon, the effectiveness of the Registration Statement.

20. Ying (Vivian) Liu ("Lui") consented to being named as a director nominee, contingent upon, and effectively immediately prior to, the completion of the Offering.

21. Ellen Pao ("Pao") consented to being named as a director nominee, contingent upon, and effectively immediately prior to, the completion of the Offering.

22. Defendants Barrett, Schaffer, Bartlett, Lent, Muralidharan, Mills, Vidal, Christen, Liu, and Pao are collectively referred to herein as the "Individual Defendants."

23. At all relevant times, the Individual Defendants served as hands-on executives, directors and/or members of the board of directors, overseeing Expensify's operations, finances, and business. Because of their position at Expensify, each of the Individual Defendants had in their possession or had access to material non-public information regarding core aspects of Expensify's financial and business operations. Each of the Individual Defendants possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, institutional and individual investors, and industry experts and/or practitioners at conferences and other events.

24. Each of the Individual Defendants participated in the preparation, review, and/or presentation of the Registration Statement designed to induce investment in the Company. Moreover, each of the Individual Defendants planned or facilitated the IPO, determining, among other things: (i) the strategy to best accomplish the public listing of Expensify securities; (ii) the language to be used in the Registration Statement; (iii) what disclosures about the Company would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Registration Statement. Accordingly, the Individual Defendants are liable for the inaccurate statements and/or omission of material facts contained in the Registration Statement.

25. Expensify is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

### 3. The Underwriter Defendants

26. The following entities served as underwriters for Expensify's IPO: J.P. Morgan Securities LLC ("J.P. Morgan"); Citigroup Global Markets Inc. ("Citigroup"); BofA Securities, Inc. ("BofA"); Piper Sandler & Co. ("Piper Sandler"); JMP Securities LLC ("JMP"); and Loop Capital Markets LLC ("Loop").

27. Defendants J.P. Morgan, Citigroup, BofA, Piper Sandler, JMP, and Loop are collectively referred to herein as the "Underwriter Defendants." Expensify, the Individual Defendants, and Underwriter Defendants are collectively referred to herein as the "Defendants."

28. Expensify's IPO was a firm commitment underwriting, meaning that each of the Underwriter Defendants agreed to purchase a fixed number of Expensify shares which they would then in turn sell to the public. The table below provides the number of shares each Underwriter Defendant agreed to purchase and then sell in the IPO:

| Name | Number of shares |
|---|---|
| J.P. Morgan Securities LLC | 4,184,233 |
| Citigroup Global Markets Inc. | 2,140,771 |
| BofA Securities, Inc. | 2,140,771 |
| Piper Sandler & Co. | 510,866 |
| JMP Securities LLC | 462,212 |
| Loop Capital Markets LLC | 291,923 |
| Total | 9,730,776 |

## IV. CONFIDENTIAL WITNESSES

### A. CW1

29. CW1 worked as a sales manager and channel partner manager for Expensify from June 2020 to April 2023. Prior to that, CW1 worked in Expensify's strategic sales lead & lead department from March 2018 to June 2020, and an enterprise account executive from January 2016 to February 2018. CW1 was based in San Francisco, CA.

30. As a sales and channel partner manager, CW1 managed a team of roughly nine sales representatives responsible for customer onboarding and platform demonstrations. CW1 also managed relationships with some of the top 100 accounting firms partnering with Expensify.

**B. CW2**

31. CW2 worked as a business operations specialist and product operations associate at Expensify from March 2015 to October 2022. CW2 was initially based out of Expensify's Ironwood, MI office and then moved to the Company's Portland, OR headquarters.

32. As a business operations specialist at Expensify, CW2 created audit processes for connected business bank accounts and bank transactions, rescinded services for restricted businesses, created new processes for locking bank accounts, and oversaw a global team working on the same. CW2 also served as an administrator for Expensify's Lexis Nexis account, working with the company to develop a new fraud prevention system at Expensify. As a products operations associate, CW2 helped build the data entry system at Expensify, working with the Company's software engineers to build out its user interface and improve the platform's limitations. As a business operations specialist and product operations associate, CW2 managed more than 200 independent contractors across two vendors. During CW2's employment, CW2 also analyzed quantitative data and determined how to achieve better customer outcomes; helped develop Expensify's accounting partner onboarding processes and instructional documentation; and provided quality control and support for 1,200 agents.

**C. CW3**

33. CW3 worked as a marketing designer at Expensify from April 2019 to May 2022. CW3 was based in San Francisco, CA.

34. As a marketing designer at Expensify, CW3 worked on a brand refresh and various advertising campaigns. CW3 designed everything from brand merchandise to the look and feel of the Expensify credit card and mobile application. CW3 also designed the Company's Easy Money campaign, with large ads for the sides of buses, and created advance promotional materials for Expensify Lounge, a complimentary cocktail bar in San Francisco that operated from April 2023 to November 2023.

**D. CW4**

35. CW4 worked as the events marketing and operations project lead at Expensify from March 2018 to February 2024. While at Expensify, CW4 was based in Portland, OR. CW4 said that due to Expensify's flat corporate structure, CW4 did not have a designated supervisor, but CW4 stated that they regularly worked closely with Defendant Barrett.

36. As an events marketing and operations project lead, CW4 directed and executed multiple high-value third-party industry and partner conference sponsorships. During their employment, CW4 claimed to have cultivated strong relationships with key conference organizers from SuiteWorld, Quickbooks Connect, and Scaling New Heights on Expensify's behalf. Specifically, CW4 collaborated closely with external vendors such as Insight Exhibits, leading an overhaul of Expensify's conference presence. CW4 also developed a robust network in the event space and organized a strategic 24-month advertising campaign across 17 cities.

**E. CW5**

37. CW5 worked as the head of sales and sales enablement at Expensify from July 2014 to September 2023. While at Expensify, CW5 was based in San Francisco, CA.

38. As the head of sales and sales enablement, CW5 worked with the sales team and marketing team at Expensify. In this role, CW5 built the sales team and forged partnerships with Oracle and NetSuite.

**F. CW6**

39. CW6 worked as an accounts payable and payroll administrator, and compliance manager at Expensify from November 2021 to May 2023, and as a customer success manager from November 2014 to November 2021. While at Expensify, CW6 was based in Ironwood, MI. In CW6's most recent role at Expensify, CW6 regularly reported to Chief Compliance Officer, Cole Eason, and in CW6's previous role, Accounting Controller, Kortney (Wynn) Trasolini.

40. As an accounts payable and payroll administrator for Expensify, CW6 enhanced the bill coding process, automated the manual CAP review process, and programmed five unique revenue share calculations. CW6 also published and delegated seven SOX SOPs and administered payroll and benefits for 99 U.S. employees and 12 international contractors. As a compliance manager, CW6 started the compliance team and grew the team by 86% before CW6's departure; improved audit processing; and implemented findings from six audits. As a customer success manager at Expensify, CW6 spearheaded an "Unhappy Customers" project, established best practices for retention and recovery, and improved the quality assurance program.

**G. CW7**

41. CW7 worked as a customer success manager at Expensify from March 2021 to February 2023. At Expensify, CW7 worked as a remote contract employee covering the GMT time-zone, and reported to a team lead, EMEA Growth & Strategic Partnerships Supervisor, Tom Rhys Jones. CW7 was hired at Expensify through Instant Teams, where CW7 reported to Sales

and Onboarding team lead, Carla Maanao. As a customer success manager at Expensify, CW7 answered customer support calls from a queue.

## V. SUBSTANTIVE ALLEGATIONS

### A. Expensify – A Subscription-Based Expense Management Platform.

42. Expensify provides cloud-based expense management software and related services to small and medium-sized businesses ("SMBs"). As of December 2020, businesses with fewer than 1,000 employees accounted for over 95% of Expensify's customers by revenue and purportedly continued to represent their "largest greenfield opportunity" as of the IPO.

43. Expensify was presented as an expense management platform built for everyone in an organization, from employees to managers to the finance department. Expensify was marketed as a self-service platform, designed to be easily implemented and configured without the need to speak with a salesperson. Instead, Expensify's AI-powered customer support engine, Concierge, was purportedly designed to help new members set up an account, connect teammates, assign company policies and immediately sync the Company's platform with existing accounting, human resources and travel systems.

44. Expensify's expense management platform was offered as one platform, with tiered pricing that unlocked access to different features, from expense management to bill payment. Expensify's features were purportedly just different configurations of the same underlying tool and were not different products in some kind of combined suite. Expensify offered four distinct subscription-based plans—*Track*, *Submit*, *Collect*, and *Control*—each unlocking various features to meet the users' needs and size.

45. The *Track* plan offered users access to Expensify's SmartScan receipt scanning functionality, which allows users to scan and track receipts such as from flights, hotels, coffee

shops, office supplies and ride shares. The *Submit* plan included the same functionality in *Track*, with the additional ability to automatically submit expense reports to anyone for reimbursement. The *Collect* plan included everything in *Submit* and enabled users to integrate with popular small business accounting systems, configure simple expense report approval workflows, as well as reimburse employees, contractors and volunteers via Direct Deposit ACH. The *Control* plan included everything in *Collect* and offered users the ability to configure rules-based approval workflows, and integrate with financial, travel, human resources, and other internal systems commonly used by mid-market and enterprise companies.

46. Individuals or companies pay for subscriptions to Expensify's platform on behalf of themselves, their employees and contractors, who Expensify collectively refers to as "members." Expensify defines a "customer" as any member who pays for themselves and zero or more other members, grouped into one or more "expense policies." According to Expensify, this might be an individual, an entire company, or a department of a larger company. The Company excludes sole proprietors on its *Track* or *Submit* plans from its definition of a customer.

**B. Expensify's Defining Viral "Bottom-up" Business Model.**

47. When founded, Expensify adopted a viral "bottom-up" business model, which was highly dependent on customer satisfaction for continued and future engagement with the platform. This approach to generating revenue sought to take advantage of organic word-of-mouth adoption of the Company's purported easily accessible, easily configurable, simple to set up platform.

48. In practice, this viral "bottom-up" business model typically started with the adoption of Expensify's self-service platform by an individual employee within an organization. This individual employee would download Expensify's mobile application or sign up for free on the Company's website, and then use Expensify's platform to submit expenses to their manager. When an expense report is submitted, the manager who receives it also automatically becomes a

member. After the employee purportedly realized the benefits of Expensify's platform, they became a "champion" of Expensify and spread it internally to other employees. Then with multiple employees using Expensify and purported valuable features simplifying the manager's job, the decision maker within the customer organization would purchase a subscription to Expensify and become a paying customer with a few members.

49. The Registration Statement listed Expensify's ability to increase the number of paid members on its platform as one of two "key business metrics," the other being its non-GAAP revenue. Expensify defined "paid members" as the average number of users (employees, contractors, volunteers, team members, etc.) who are billed on *Collect* or *Control* plans during any particular quarter. For SMBs or sole proprietors with only one employee, the business owner may also be the only paid member.

50. Each of Expensify's subscription plans are billed monthly. Under the *Track* and *Submit* plans, Expensify members are billed a flat rate each month if they exceed the allotted 25 free scans using SmartScan. Under the *Collect* and *Control* plans, each Expensify customer has the option of a per member price to be billed under: (1) a "pay-per-use" rate, in which they are billed a flat rate for each active policy member in the previous month (with no minimum commitment); or (2) an "annual" rate where they commit to a minimum number of monthly seats for a full calendar year in exchange for a lower subscription rate (with any overage billed at the "pay-per-use" rate). For the quarter ended June 30, 2021, 95% of Expensify's revenue came from recurring, automated monthly payments made via credit cards (*i.e.*, subscription plans).

51. Given the outsized contribution of subscription-based fees to Expensify's bottom line, at all times, the Company's ability to maintain and grow its customer base—particularly on an annual rate—was essential to its financial success. As the Company advised in the Registration

Statement, "[o]ur success depends on converting users who try the free aspects of the Expensify platform into paid members. While our viral model means that employees or contractors often introduce Expensify into SMBs, companies subscribe and pay for the majority of our paid members."

52. In addition to "organic word-of-mouth adoption," the Company's viral "bottom-up" business model relied on channel partnerships to generate revenue growth. Of these channel partnerships, Expensify primarily relied on its accounting partners to refer their clients to the Company's expense management platform. Historically, 10% of Expensify's revenue came from its accounting channel.

53. Expensify's viral "bottom-up" business model had historically produced a steady growth rate. It also allowed the Company to avoid millions of dollars in advertising spend that it would have incurred had it marketed in a traditional manner. These savings lowered Expensify's total operating expenses and, in turn, improved the Company's bottom line, which was a significant positive for investors.

**C. Expensify's Decision to Double, and in Some Cases Triple, its Per Member Prices Negatively Impacted Customer Retention and Seat Expansion.**

54. Expensify's "happy customer" business model began to fail prior to the IPO due to management decisions that had a clear, adverse impact on the Company's underlying business. The first of these decisions came in April 2020 when Expensify announced that, effective May 1, 2020, it would be increasing its per member price for the first time since implementing its subscription-based fee model in 2009.

55. Following this price increase, the per member price for a *Collect* subscription went from $5/user/month to $10/user/month for members on an annual rate and $20/user/month for members on a pay-per-use rate. The per member price for a *Control* subscription went from

$9/user/month to $18/user/month for members on an annual rate and $36/user/month for members on a pay-per-use rate. The cost of *Track* and *Submit* remained the same at $4.99/month. Additionally, at the same time, Expensify changed its annual contract terms to be non-cancelable.

56. When discussing the Company's revenue recognition, the Registration Statement provided, in relevant part, that:

> During 2019, annual subscription customers who wished to terminate their contracts before the end of the term were required to pay the remaining obligation in full plus any fees or penalties set forth in the agreement. In May 2020, we updated our terms of service, which resulted in annual contracts becoming non-cancelable and a pricing change, which led to an increase in the per member price for paid members.
>
> We charge our customers subscription fees for access to our platform based on the number of monthly members and level of service. The contractual price per member is based on either negotiated fees or rates published on our website. Our contracts with our customers include two performance obligations: access to the hosted software service (SaaS), inclusive of all features available within the platform, and related customer support. We account for the SaaS and the support as a combined performance obligation because they have the same pattern of transfer over the same period and are therefore delivered concurrently. We satisfy our performance obligation overtime each month as we provide the SaaS and support services to customers and as such generally recognize revenue monthly based on the number of monthly members and contractual rate per member.

57. At no point did the Registration Statement provide the actual per member prices, for any of the Company's subscriptions, on any rate, from before or after the May 2020 price increase. Furthermore, the Registration Statement explicitly instructed investors not to rely on the Company's website, stating that "[t]he information on or accessed through our website is not incorporated in this prospectus or the registration statement of which this prospectus forms a part, and potential investors should not rely on such information in making a decision to purchase our Class A common stock in this offering."

58. According to CW1, Expensify's decision to double, if not triple, its per member pricing outraged many customers, and cost the Company customers but the full extent of the

resulting loss was lagged because of their contractual commitments. Nevertheless, for the first time since its inception, Expensify saw a decrease in paid members during the three-month period ended June 30, 2020 ("Q2 2020")—from an average of 742,000 paid members at the three-month period ended March 31, 2020 (at date, the Company's highest recorded number of paid members) to an average of 630,000 paid members in Q2 2020, or a 15.09% decline.

59. When informing customers of the price change, Expensify claimed to offer reprieve from the steep increase by offering a 50% discount for members on an annual rate and a 75% discount to members on a pay-per-use rate if they "bundled" with the Expensify Card – *i.e.*, at least 50% of the customer's company expenses had to be paid for with an Expensify Card – which, in turn, would have allowed Expensify to monetize transactions from the Expensify Card by receiving a percentage of the interchange for all spend on the card. However, customers were slow and/or reluctant to adopt the Expensify Card. Indeed, according to the Registration Statement, monetizing Expensify Card activities reduced the Company's cost of revenue by just $0.03 million and $1.0 million for the fiscal years ended December 31, 2019 and 2020, respectively, and $1.1 million for the six months ended June 30, 2021.

60. Moreover, any hopes of improved customer support justifying the significant price increase were short-lived. CW7 said Expensify often made unexpected, sweeping changes to the process for handling customer accounts that upset customers and caused confusion and frustration for its employees. According to CW7, most of the calls made to customer support were from businesses seeking assistance with the implementation (or onboarding process) of Expensify as an expense management solution. CW7 said that when they first began working at Expensify (in March 2021), CW7 would assist the onboarding customer from start to finish, doing all their integrations, creating a customer portal on the Company's platform, loading company data,

teaching them how to use it, giving a demonstration of the account, etc. But shortly thereafter the role of customer support changed into something much messier and more chaotic, CW7 said.

61. Expensify's competitors, such as Ramp, Brex, and bill.com (later merged with Divvy), also emerged with similar expense management platforms that did not charge a subscription-based fee. According to CW5, these new competing solutions exacerbated the adverse effects of Expensify's new pricing (*e.g.*, subscription cancellations and/or non-renewals), given that the new products were available for free.

62. Accordingly, the Company's May 2020 price increase, and subsequent failure to make necessary product improvements to meet customer satisfaction and remain competitive in the marketplace, negatively impacted customer retention and net seat expansion. In other words, existing customers were no longer "happy" with Expensify's product, or the price in which it was offered and were choosing to terminate their subscriptions or, at the very least, reduce the rate at which they expanded paid memberships.

### D. Defendant Barrett's Decision to Send Political Spam Mail Via Expensify's Professional Customer Database Caused the Company Severe Reputational Harm and Alienated its Customer Base.

63. Expensify's business was under pressure in the wake of the Company's May 2020 price increases. Business conditions worsened however when, in October 2020, Defendant Barrett sent a politically charged and divisive email to Expensify's then-current 10 million users concerning the upcoming presidential election.

64. On October 22, 2020, Defendant Barrett sent an email via Expensify's professional customer database, entitled "Protect democracy, vote for Biden." Barrett's email stated, in part:

> I know you don't want to hear this from me. And I guarantee I don't want to say it. But we are facing an unprecedented attack on the foundations of democracy itself. If you are a US citizen, **anything less than a vote for Biden is a vote against democracy.** …

(emphasis in original).

65. Defendant Barrett's email caused severe reputational harm amongst the Company's channel partners and alienated a significant portion of Expensify's customer base, and as a result, negatively impacted the Company's organic word-of-mouth platform adoption, customer retention, and revenue growth.

66. For example, in October 2020, Ken McKibben, a business owner, and recipient of Barrett's email, said the email "betray[ed] all trust" and was an "abuse of [his] employee's emails." Mr. McKibben further expressed that, "[he] never would have imagined when we signed up for the service that the CEO would be so irresponsible and self-absorbed that he would use those emails to promote a specific political candidate" and said it "must never happen again."

67. Similarly, in October 2020, Expensify customer "Darla" responded to the receipt of Barrett's email by saying, "[f]rankly that is just unacceptable behavior to use your customer database to solicit votes for your personal agenda. In my opinion it doesn't matter who you support, it's just not appropriate to use the platform in that regard. **I pay you for a SERVICE and not to hear your political opinions!** There are other forums to discuss politics and your personal opinions. A customer service forward company should respect its customers more. You've stepped over the line here and frankly that's just uncool!" (emphasis in original).

68. Customers who had, in fact, been a "champion" of Expensify felt responsible for Barrett's damaging and unprofessional email because they had shared the platform with their co-workers (as the Company's historical "bottom-up" model had intended). For example, in October 2020, customer "Julia" responded to receiving Barrett's email by saying, "[t]his literally just ruined my whole weekend, and there is going to be so much fallout from it. Everyone in my company thinks I had some kind of control over this. I am so embarrassed and just want to crawl in a hole."

69. According to CW4, Barrett's October 2020 political spam email was known internally as "The Email" and was infamous. As discussed above, Expensify's largest retail channel was accountants, who steered their clients to Expensify for its expense management platform. CW4 said there was significant effort on Expensify's part to get these accountants to recommend the Company's platform to their clients. CW4 recalled how quickly that all went out-the-window following "The Email". According to CW4, Expensify's accounting partners found Barrett's political email especially offensive. CW4 said that the impact of Barrett's email dragged on for years. According to CW4, the Company made efforts to mend these relationships, taking accounting partners out to dinners, but they just got "reamed" instead. Indeed, CW4 said the Company was still experiencing blowback from "The Email" as late as May 2023.

70. For example, in October 2020, in response to receiving Barrett's email, a retail partner and Expensify customer known as "Travis_W" stated, in relevant part:

> I have, for years, recommended Expensify as a great platform for managing expenses to my clients. I have spent hours and hours of my time getting clients set up and trained to use the platform. Like many other long-time users, I have been less than impressed with many of the recent changes to the platform, while other issues (hello, G/L codes with account names?) remain unresolved. Overall it has made the platform more unwieldy to use for managing credit card transactions in an organization. Now, I am going to have to explain to my clients why a vendor thought it would be a good idea to send out a blast email to endorse a particular political candidate 10 or so days before what promises to be an emotional election.
>
> . . .
>
> All that to say is that I will no longer be recommending Expensify to my clients. I am also prepared to have many of my existing clients cancel their service, and I can't say I blame them. Mr. Barrett, while I can respect that you are willing to utilize your First Amendment rights to say what you will on this topic, you forgot to respect your actual customers who don't really care, one way or the other, about your political views.

71. Likewise, CW1 stated that Barrett's October 2020 political email offended many customers, causing a catastrophe and exodus from the Company's customer base. CW1 explained

that almost immediately, messages began pouring in from customers who were incredulous or angry about Barrett's political spam email. CW1 estimated that Barrett's email offended about 5 million of the 10 million recipients. CW6 echoed CW4 and CW1 stating, Barrett's email hurt the business, Expensify experienced a huge backlash from customers, and said it lost quite a bit of customers, in the small and midmarket group, because of it.

72. For example, Charles Hoskinson, founder and CEO of the blockchain infrastructure research and engineering company, IOHK, which has more than 400 employees, received Barrett's October 2020 political spam email. According to Mr. Hoskinson, he initially thought Barrett's email had been hacked but then learned all of IOHK's employees received the email and realized that it was intentional. On October 23, 2020, Mr. Hoskinson confirmed that he (on behalf of his 400+ employees) intended to sever all ties with Expensify in response to Barrett's email.

73. Similarly, the day after receiving Barrett's email (October 23, 2020), Expensify customer "jcdav" responded by saying "[o]ur company of 120 employees are dropping Expensify. This is sickening."

74. Likewise, in October 2020, Customer "RJRIley" responded to receiving Barrett's email by stating, "[d]oing something about it, over 20 user accounts canceled."

75. Also, in October 2020, in response to receiving Barrett's email, customer "Portland" said they "cancelled service th[at] morning, sent Barrett an email and reviewed the app strongly." This former customer deemed Barrett's email a failure to respect the business and political opinion barrier expected of product and service providers.

76. That same month, customer "DCChristopher" responded to Barrett's email by instructing their company administrator to "immediately close out our current expenses and leave Expensify," adding that "[t]his has no place whatsoever in a business environment."

77. Customer "WAB" responded in October 2020 by saying Expensify could "move forward with one less stream of revenue as our company will be terminating business with them. Hopefully the other 9 million plus companies will VOTE with their wallets and move to an expense platform that promotes free thought and accepts views different than that of expensify management."

78. CW4 added that Barrett's political spam email was seen as a persistent hassle from an employee perspective. CW1 said many employees, including CW1, felt alienated by Barrett's political spam email. According to CW4, following "The Email" and resulting blowback from retail partners and other customers, Expensify circulated an internal brief and logic tree, with a guided line for employees to say, "We stand behind it," if the email came up. CW1 also stated that employees were instructed to say very little to the customers who were offended by Barrett's political spam email. CW5 echoed CW4 and CW1 stating that, as an employee in sales and marketing, managing the angry aftermath of the email was a real headache. When asked to elaborate on the severity of the backlash following Barrett's email, CW5 said you have no idea (indicating that the backlash was far more significant and severe than anyone outside the Company could reasonably imagine).

79. According to CW1, because many of Expensify customers were under annual contracts that were non-cancelable, the impact of defections stemming from Barrett's October 2020 political spam email, like those following the Company's May 2020 price increase, was delayed. CW4 echoed CW1 stating, larger accounts were reluctant to terminate outside of the annual timeframe due to the expense, adding that the only impetus to stay was if they were already six months in. According to CW4, eventually lots of customers paying for 10-to-20-person annual subscriptions left Expensify. CW4 added that the only reason Expensify did not see a comparable

churn of enterprise customers (Fortune 500 companies) was because changing expense reporting products for a such big companies is a significant undertaking, it cannot happen overnight.

80. For example, in October 2020, after receiving Barrett's email and contacting the Company to cancel their subscription, customer "jwc123gty" said "Expensify expects me to continue to pay until July 2021… after they violated the trust (and PII)." This customer went on to say that because of this they would continue to use Expensify until July 2021 because "they are continuing to bill me until July 2021."

81. In December 2020, customer "KimT" responded to the receipt of the email stating, "Barrett violated our company policies with his political solicitation. He upset our employees AND investors. … We are attempting to cancel our subscription but are having difficulty getting a response from Expensify to do this. We were horrified to receive the political email from the CEO of Expensify and want nothing to do with a company such as theirs." In addition to viewing Barrett's email as "absolutely insulting and unprofessional," this customer also based their decision to leave on pricing stating, "[Expensify's] rates are way too expensive."

82. That same month, another Expensify customer said "[a]dd us to the list of a rapidly growing companies that will be leaving by the end of Q1 2021" claiming to have "negotiate[d] that timetable back from IMMEDIATELY [with company] leadership back in November."

83. In January 2021, customer "burbanite" responded to the receipt of Barrett's political email and the Company's early acknowledgment of customer reaction by saying, "[t]hey seem to think that they mainly lost a small number of non-paying customers. Maybe that is correct but pretty soon they are going to feel the effect when the company I work for dumps them" adding that Barrett's email prompted a "companywide email apologizing for it" and notified employees of the company's "displeasure" with Expensify and their plans to "replace them as a vendor." This

customer explained that at their company, “the search began to find an alternative” in October 2020, “but given the fact that there are more than 31,000 employees I’m sure it takes time.”

84. Accordingly, Barrett’s decision to send a politically divisive spam email to the Company’s then-current 10 million users by way of its professional database, which intrinsically held uniquely private information relating to individual and company expenses, finances, travel, etc., and was seen by its customers as an extension of their internal operations, obliterated the Company’s defining “bottom-up” business model dependent on organic word-of-mouth adoption and channel partnerships. In other words, Expensify users and partners were no longer “happy” with the Company as a professional service provider and were choosing to terminate their subscriptions and no longer willing to “champion” Expensify, which materially negatively impacted net seat expansion and/or new customer acquisition.

### E. With a Spoiled Reputation and Dissatisfied Customer Base, Expensify Materially Altered its Business Model.

85. Expensify’s customer retention and seat expansion were negatively impacted following the May 2020 price increase and Defendant Barrett’s October 2020 political email. To combat the decline, the Company instituted a significant shift in marketing strategy that deviated materially from its historical operations.

86. According to the Registration Statement, gross logo retention and net seat retention were important indicators of customer satisfaction and usage of the Company’s platform. Expensify calculates its gross logo retention rate as of the end of a period by using (a) the number of distinct companies who have ever had 5 or more paid members paying for a subscription during the period ending one year prior as the denominator and (b) the number of those same companies that are still paying for at least 1 subscription during the more recent period as the numerator. Expensify calculates its net seat retention rate as of the end of a period by using (a) the number of

paid member seats from companies who have ever had 5 or more paid members paying for a subscription during the period ending one year prior as the denominator and (b) the number of paid member seats at those same companies during the more recent period as the numerator.

87. The chart below demonstrates the Company's gross logo retention and net seat retention at the end of a particular fiscal year:

| **Fiscal Year** | **Gross Logo Retention** | **Net Seat Retention** |
|---|---|---|
| 2019 | 88% | 119% |
| 2020 | 86% | 96% |
| 2021 | 83% | 93% |

88. Expensify historically relied on its "happy customer" model (*i.e.*, "bottom-up" strategy) for marketing its platform—directly correlating with the Company's primary revenue growth drivers being existing customer retention and net seat expansion. The only advertising support utilized by Expensify was general brand content to generate market confidence in the Company's software. Indeed, the Registration Statement specifically harped on the Company's disdain for traditional marketing methods and claimed these traditional means of generating new user activity were not Expensify's approach to a successful business.

89. However, with the Company's viral "bottom-up" business model negatively impacted by the May 2020 price increase and reputational damage caused by Barrett's October 2020 political email, so too was its revenue.

90. According to CW2, Expensify held monthly "All Hands" meetings via Google Meet, where Company executives and directors would share information about Expensify's financial health. The Company also maintained a "DEFCON" system to indicate Expensify's financial condition to employees. CW2 said that, throughout 2020, Company executives regularly elevated Expensify's "DEFCON" status, which meant they were strapped for cash.

91. With Expensify's viral "bottom-up" business model no longer supporting its growth strategy, Expensify made the decision to materially change its business model ***before*** the IPO to a more traditional outbound or go-to-market and sales approach to stimulate growth of its paid members and revenue.

92. CW4 said that around March 2021, for the first time in CW4's tenure with Expensify (hired in March 2018), the Company engaged in discussions about hiring sales development representatives ("SDRs"). According to CW4, these conversations led to Expensify hiring 60 SDRs ***before*** the IPO because the Company wanted to build up its customer base before going public. For context, as of June 30, 2021, Expensify had 140 full-time employees.

93. In addition to hiring SDRs to generate new user acquisition, CW7 said that when they first started working in customer support for Expensify (in March 2021), the Key Performance Indicator (KPI) was a specific number of calls per hour—*i.e.*, a focus on efficient and effective support to promote existing customer retention and expansion—but shortly thereafter it shifted to the number of people they could get onboarded that month—*i.e.*, new user acquisition on any plan, at any rate.

94. Further, as a marketing designer at Expensify, CW3 was tasked with numerous projects leading up to the IPO. CW3 said that there was a big push in new advertising before the IPO, claiming Expensify created an especially large amount of content in the lead-up to the IPO. In addition, according to CW3, there was a notable downward shift in demand for brand content after the Company went public, signifying a further departure from its original business model.

95. According to the Registration Statement, the Company's sales and marketing primarily consisted of personnel-related expenses, advertising expenses, branding and public relations expenses, referral fees for strategic partnerships and other benefits that Expensify

provides to its referral and affiliate partners. The Company expenses the costs of sales and marketing, including promotional expenses, as incurred.

96. The chart below provides Expensify's quarterly spend on sales and marketing:

| **Quarter ended** | **Sales and Marketing** (in thousands) |
|---|---|
| March 31, 2019 | $14,662 |
| June 30, 2019 | $6,809 |
| September 30, 2019 | $2,586 |
| December 31, 2019 | $3,131 |
| March 31, 2020 | $3,349 |
| June 30, 2020 | $2,974 |
| September 30, 2020 | $1,491 |
| December 31, 2020 | $2,074 |
| March 31, 2021 | $3,077 |
| June 30, 2021 | $3,870 |
| September 30, 2021 | $7,608 |
| December 31, 2021 | $13,109 |
| March 31, 2022 | $13,372 |
| June 30, 2022 | $12,244 |
| September 30, 2022 | $12,342 |
| December 31, 2022 | $11,918 |
| March 31, 2023 | $9,183 |
| June 30, 2023 | $14,714 |
| September 30, 2023 | $12,860 |
| December 31, 2023 | $7,595 |

97. Notably, as indicated in the Registration Statement, the increase in Expensify's sales and marketing expenses during the first two quarters of 2019 reflects an increase in costs associated with its Super Bowl campaign. Following this out-of-character advertising expense, the Company scaled back to its more traditional "bottom-up" model throughout the second half of 2019, the full fiscal year of 2020, and the first half of 2021. It then doubled in the third quarter of 2021 and then nearly doubled again in the fourth quarter of 2021.

98. As such, unbeknownst to investors, at the time of the IPO, Expensify business model had changed, its total mix of paid members had already begun to shift towards a greater

number of subscriptions billed on a pay-per-use rate versus an annual rate causing significant volatility in the Company's paid member rates from month-to-month, and as a result, the sustainability of Expensify's revenue growth was negatively impacted.

**F. Events and Disclosures Following the IPO.**

99. On October 15, 2021, Expensify filed an initial registration of new securities on Form S-1 with the SEC, as amended on Form S-1/A and filed on October 18, 2021, November 1, 2021, and November 8, 2021, and was declared effective by the SEC on November 9, 2021. On November 12, 2021, Expensify filed its final prospectus for the IPO on Form 424(b)(4), which was incorporated by reference into the initial registration statements and subsequent amendments. The initial registration statement together with the amendments and the final prospectus comprise the Registration Statement (as previously defined).

100. On or about November 11, 2021, the Company commenced the IPO of Expensify Class A common stock listed on the Nasdaq under the ticker "EXFY." Specifically, the IPO consisted of 2,608,696 shares of Class A common stock sold by Expensify and an additional 7,122,080 shares of Class A common stock sold by selling stockholders. Pursuant to the Registration Statement, the Underwriter Defendants had the option to buy up to 1,459,616 additional shares of Class A common stock from certain selling stockholders.

101. On November 15, 2021, Expensify announced the closing of its IPO of 11,190,392 shares of common stock priced at $27.00 per share, including the shares sold by certain selling stockholders pursuant to the full exercise of the underwriters' option to purchase additional shares.

102. The Registration Statement used by Expensify to conduct its IPO contained untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading concerning: (1) the May 2020 price

increase; (2) Defendant Barrett's October 2020 political spam email; and (3) Expensify's decision to abandon its defining "bottom-up" growth strategy. The truth concerning the fallout of these actions and/or decisions came to light over the course of time, first, in the form of analyst downgrades and, later, through admissions and revelations from the Company.

103. On June 12, 2023, market analyst Morgan Stanley downgraded Expensify to Underweight from Equal-weight, citing structural headwinds and the Company's risk-reward profile. Specifically, analyst James Faucette of Morgan Stanley stated, "We expect EXFY to face challenges near-term as the core business works through structural and macro-related headwinds, and new product contribution remains highly uncertain." In addition, Morgan Stanley cut its estimates for Expensify's 2023/2024 revenue to $163.4M/$175.1M from $183.4M/$203.9M. And cut its stock price target for Expensify to $5 from $9, implying a 30.3% potential downside to the Company's last close.

104. On this news, Expensify's stock price fell $0.45 per share, or 6.28%, to close at $6.72 per share on June 12, 2023.

105. On August 1, 2023, Expensify's competitor, Ramp, the finance automation platform focused on corporate cards and bill payment, announced that its Ramp Plus expense management SaaS offering will be complementary to all existing SMBs/mid-market customers for one year. Ramp Plus offered similar, if not superior, capabilities to Expensify's expense management platform. That same day, another competitor to Expensify's expense management platform and Expensify Card, Brex, the global spend platform, launched Brex payables—an AI-enabled Accounts Payable (AP) solution, combining enhanced bill pay capabilities and controlled purchase cards that offered the flexibility and security of a credit card with the transaction-specific controls required of high-balance spend.

106. On this news, Expensify's stock price fell $1.65 per share, or 20.47%, to close at $6.41 per share on August 1, 2023.

107. Then, after the market closed on August 8, 2023, Expensify issued a press release announcing its financial and operating results for the quarter ended June 30, 2023 ("Q2 2023"). Among other items, Expensify reported GAAP EPS of -$0.14, missing consensus estimate of -$0.07. In addition, the press release stated, in relevant part:

> **<u>Second Quarter 2023 Highlights</u>**
>
> **Financial:**
>
> • ***Revenue was $38.9 million, a decrease of 10% compared to the same period last year***.
>
> • Utilized $0.4 million cash in operating activities and generated $1.1 million of free cash flow.
>
> • ***Net loss was $11.3 million, compared to $8.0 million for the same period last year.***
>
> • ***Non-GAAP net loss was $1.0 million***.
>
> • Adjusted EBITDA was $2.2 million.
>
> • Interchange derived from the Expensify Card grew to $2.7 million, an increase of 56% compared to the same period last year.
>
> **<u>Business</u>**
>
> •**Paid members –** ***Paid members were 742,000, a decrease of 2% from the same period last year.***

(Emphasis added).

108. That same day, Expensify hosted an earnings call with investors and analysts to discuss the Company's Q2 2023 financial and operating results. During the Q&A portion of this call, when asked whether the Company intended to reaffirm its previously issued long-term 25%-35% revenue guidance, Defendant Muralidharan responded, in relevant part:

> [. . .] I'll say this for a few quarters now, since the day we went public really, we have not been in sort of normal or stable economic conditions.
>
> ***And for a few quarters now, we keep reaffirming that long-term guidance, and we keep getting questions all around and they're fair, when will this long-term***

> ***guidance actually be true since we haven't been close to the long-term guidance in terms of growth***.
>
> So we actually took all of your feedback and removed it because we just don't know what we don't know. We haven't been in stable condition since 2020 with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic.
>
> ***So we've removed it and then once we sort of hit stability again, we will be able to reaffirm it, but we don't want to keep giving you outdated long-term guidance, if you will. So that's the reason we took it away.***

(Emphasis added).

109. Following Expensify's disclosures, JMP issued an analyst report on August 9, 2023 titled, "Expensify, Inc. (EXFY) 'In a Bit of a Rebuilding Phase' with GAAP Revenue Down 10% Y/Y; Downgrading to MP." In this report, JMP downgraded the Company to Market Perform from Market Outperform citing the following reasons:

> 1) we do not see a clear inflection point for the business within the next year after revenue has shrunk in each of the last two quarters, both year over year and sequentially on a GAAP basis, with the declining top line affecting profitability and cash flow in 2Q; 2) our impression is the company remains in investment mode and is prioritizing the longer-term product roadmap, rather than incremental monetization in an increasingly competitive space, which is unlikely to get public market investors excited in the near term, in our opinion; and 3) the company disclosed that paid member count came in at 719K in July, down from the three-month average of 742K in 2Q.

110. In addition, JMP highlighted that, beginning in the three-month period ended September 30, 2021 ("Q3 2021") (just before the November 2021 IPO) and continuing through to the present day, Expensify's revenue growth has slowed dramatically. The following chart is from this report and shows the "trend" that started before the IPO and continued afterwards:




(Note – Counsel annotated the chart to reflect the quarter in which Expensify conducted its IPO.)

111. Similarly, on August 9, 2023, Loop issued an analyst report titled "Not Working Out Like We Hoped; Downgrade to Hold," in which Loop cited primary risks to investment to include *inter alia*, risks related to the Company's "pricing strategy to drive adoption of the Expensify Card," the change in Expensify's long-term revenue growth targets, and the Company's "change in the current go-to-market and sales strategies and inconsistent sales execution."

112. On this news, Expensify's stock price fell $1.69 per share, or 28.55%, to close at $4.23 per share on August 9, 2023.

113. On September 15, 2023, J.P. Morgan initiated coverage of Expensify assigning an "Underweight" rating, citing "limited differentiation vs. competitors that aid in easing expense management, bill paying, invoicing, etc." and "challenging revenue mix and distribution model." This J.P. Morgan analyst report titled, "Attractive fundamentals, but challenging business model; Initiate with Underweight," stated the following when discussing the Company's "challenging revenue mix and distribution model":

> Much of the EXFY customer acquisition model relies on existing customers spreading the word on EXFY value proposition to more senior officers with decision-making authority. Additionally, EXFY revenue model envisages having almost 1/3 of its revenue being generated from Pay-Per-Use contracts vs. a more predictable annual subscriptions. However, in a challenging macro environment the combination of the above factors lead to lower visibility into revenue trends and adversely impact paying customer growth as companies tighten expenses, while employees favor job security and are therefore not changing jobs as frequently to promote EXFY through the word-of-mouth model.

114. On this news, Expensify's stock price fell $0.35 per share, or 9.19%, to close at $3.46 per share on September 15, 2023.

115. Finally, after the market closed on November 7, 2023, Expensify issued a press release announcing its financial and operating results for the quarter ended September 30, 2023 ("Q3 2023"), stating, in relevant part, that:

> **Financial:**
>
> • ***Revenue was $36.5 million, a decrease of 14% compared to the same period last year.***
>
> • The Company utilized $5.1 million cash in operating activities.
>
> • Free cash flow was $(7.1) million.
>
> • ***Net loss was $17.0 million, compared to $8.2 million for the same period last year.***
>
> • ***Non-GAAP net loss was $6.7 million.***
>
> • Adjusted EBITDA was $(3.5) million.
>
> • Interchange derived from the Expensify Card grew to $3.1 million, an increase of 65% compared to the same period last year.
>
> • Immediately following the end of the current quarter, the Company deployed $36.0 million of available cash to further reduce outstanding debt by paying off its term loan in full.
>
> **<u>Business</u>**
>
> •**Paid members** - ***Paid members were 719,000, a decrease of 6% from the same period last year.***

(Emphasis added).

116. That same day, Expensify hosted an earnings call with investors and analysts to discuss the Company's Q3 2023 financial and operating results. During this call, Defendant Schaffer discussed the Company's quarterly revenue results, stating in relevant part:

> So revenue was $36.5 million, which is a 14% decrease from the same period last year. That's driven by a number of things. ***One is a decrease in activity and our user base.*** And Anu [Muralidharan] just spoke about user expansion being one of the biggest growth drivers for Expensify.
>
> ***And in recent periods, we've actually seen the growth expansion decrease, that's in the 12, 13-plus years of the company, that's really only happened twice and once with in COVID and once it's right now. So in the history of the company, generally, our customers once they onboard, they stay and they grow. What we're seeing now is a decrease in activity from our customers, which is causing a headwind to revenue***.

117. Following this announcement, Piper Sandler issued an analyst report on November 7, 2023 titled "Mired in Another Quarter of Execution Missteps; Lowering Estimates, PT of $2." Specifically, Piper Sandler lowered its target price to $2.00 from $4.00 based on "increasing execution risks and lower estimates." This report further explained that:

> Q3 revenue declined on a q/q and y/y basis for the third straight quarter to $36.5M, which was the lowest reported level in two years, resulting in a [Free Cash Flow] burn of $7M this quarter. Paid subscriber metrics declined q/q for the third straight quarter, in part exacerbated by an esoteric pricing policy where SMB customers are required to only pay for 'active' users in a given month. The number of active subscribers in a given quarter is roughly one-third of the total installed base.
>
> • **Ninth straight quarter of eroding growth**. Q3 revenue declined 14% y/y to $36.5M on a $2.7M top-line miss, negatively impacted by a 6% y/y decline in paid subscriber metrics (down 23K q/q to 719K paid members) and another double-digit decline in subscription ARPU. EBITDA margin contracted meaningfully to -9.7% (vs. 4-quarter avg: 18.5%).
>
> . . .
>
> • **Internal missteps exacerbated by external challenges.** Outsized exposure to SMBs and VSBs has led to a number of internal challenges that now appear to be exacerbated by external challenges. Paid subscriber count eroded for the third consecutive quarter driven by one-third of employees being active in a given month (pricing flaw = internal challenge). Additional macro pressures are now resulting in more SMB customers downsizing and in some cases going under (macro headwinds = external challenge).

118. On this news, Expensify's stock price fell $1.07 per share, or 36.89%, to close at $1.83 per share on November 8, 2023.

119. As of the filing date of the initial complaint in the above-captioned action, November 29, 2023, Expensify stock closed at $2.42 per share. Presently, Expensify's stock trades below $2 per share, representing a nearly ***95% decline*** from its $27 per share IPO price.

## VI. THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL INFORMATION

120. The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Registration Statement contained false and misleading statements and/or failed to disclose material information relating to: (1) the Company's May 2020 price increase; (2) Defendant Barrett's October 2020 political email; and (3) Expensify's change in business model.

### A. Misstatements Related to the Company's May 2020 Price Increase

121. The Registration Statement referenced the Company's May 2020 "pricing change" when discussing "revenue" and "quarterly results of operations." In pertinent part, the Registration Statement provided that:

> Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, ***primarily due to a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members*** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses and increased demand for business travel, which is a significant use case for our platform and drove an increase in the number of paid members, due to the lifting of travel restrictions within the United States and certain other countries and increased employers returning to the office as a result of the wide spread availability and distribution of COVID-19 vaccines.
>
> . . .

> Our revenue in each of the quarters presented predominantly increased consecutively over periods presented primarily due to increased demand for our platform from both new and existing customers as well as an increase in our average paid members and ***a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members*** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses. All new customers beginning on May 1, 2020, were subject to this pricing change. Our revenue was adversely affected by the COVID-19 pandemic in the quarter ended June 30, 2020, particularly due to the decrease in business travel, which is a significant use case for our platform, but this adverse impact was mitigated by the prevalence of our annual contracts and minimum user requirements in those contracts.

(Emphasis added.)

122. The foregoing statements were false and materially misleading because they failed to disclose the magnitude of the "pricing change" and that it had caused customers not to renew their contracts with Expensify and caused seat expansion rates to slow, halt, and/or decline. As described above in Section V.C., Expensify doubled and/or tripled its subscription prices in May 2020 and made its contracts non-cancelable. The pricing change was not "gradual" but instead implemented on less than 30 days' notice and effective immediately. The entrance of competitor products (some of which were free) further damaged customer retention and seat expansion for Expensify's annual subscription services.

123. In addition, the foregoing statements were false and materially misleading because they represented that revenue for the six-month period ended June 30, 2020 was "adversely affected" due to a "decrease in business travel" when, in fact, the Company's dramatic price increases announced in April 2020 and made effective as of May 1, 2020, also materially adversely affected revenues for the period. By identifying only the "decrease in business travel" as a negative factor impacting revenue, Expensify omitted the material effects of its May 2020 pricing change and modification to its contract cancellation policies. Indeed, for the first time in the Company's history, Expensify saw a decrease in paid members during the three-month period ended June 30,

2020—from an average of 742,000 paid members at the period ended March 31, 2020 to an average of 630,000 paid members.

124. The Registration Statement also referenced Expensify's May 2020 price increase when discussing potential "risks" faced by the Company. In pertinent part, the Registration Statement provided that:

> A majority of our subscriptions are driven by bottom-up adoption related to our expense management feature. Although we have added, and expect to continue to add, new features to expand our offerings, and all of our features are accessible under a single subscription, at least in the near term, we expect our expense management feature to continue to drive the majority of our subscriptions. As a result, market acceptance of our expense management feature is critical to our success. Demand for our expense management feature, as well as our other features, is affected by a number of factors, many of which are beyond our control, such as the adoption of our features by new and existing customers; the timing of development and release of upgraded or new features on our platform; products and services introduced or upgraded by our competitors or partners; our ability to determine optimal pricing for our platform, including in international markets; pricing offered by our competitors; technological change; and growth or contraction in our addressable market. ***We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business***. If we are unable to meet customer demand for our expense management feature; do not price our subscriptions optimally or make changes to our subscription or pricing models that are not accepted by the market; or fail to convert members of our free expense management feature or trial subscriptions to paying subscribers, our business, results of operations, financial condition and growth prospects will suffer.
>
> . . .
>
> We have in the past, and may in the future, need to change our pricing model from time to time. As the market for our platform matures, or as competitors introduce new solutions that compete with ours, we may be unable to attract new customers at the same prices or based on the same pricing models that we have used historically. While we do and will attempt to set prices based on our prior experiences and customer feedback, our assessments may not be accurate and we could be underpricing or overpricing our platform. In addition, if the offerings on our platform change, then we may need to revise our pricing strategies. Any such changes to our pricing strategies or our ability to efficiently price our offerings could adversely affect our business, operating results and financial condition. ***Pricing pressures and decisions could result in reduced sales, reduced margins, losses or the failure of our platform to achieve or maintain more widespread market acceptance, any of which could negatively impact our overall business,***

> ***operating results and financial condition***. Moreover, the organizations which we target may demand substantial price concessions. As a result, we may be required to price below our targets in the future, which could adversely affect our revenue, profitability, cash flows and financial condition.

(Emphasis added.)

125. The foregoing statements were false and/or materially misleading because they failed to disclose that Expensify's May 2020 price increase had already caused the Company to lose customers. Indeed, at the time of the IPO, the Company's May 2020 price increase and annual contract modification, and subsequent failure to make necessary product improvements to meet customer satisfaction and remain competitive in the marketplace, negatively impacted customer retention and net seat expansion. As a result, at the time of the IPO, Expensify had already failed to price its subscriptions optimally, these price increases had already adversely affected Expensify's business, and the Company was already failing to convert users from its free subscriptions to its paid plans. These adverse outcomes had already materialized and were not, as described in the Registration Statement, hypothetical possibilities.

**B. Misstatements Related to Barrett's October 2020 Political E-Mail**

126. The Registration Statement emphasized the benefits and success of Expensify's "bottom-up" business model, which depended squarely on the Company's reputation and brand among its customers, and enabled Expensify to "address a massive market opportunity . . . significantly underpenetrated" by the Company's competition. In pertinent part, the Registration Statement provided that:

> Our intense focus on improving the everyday experience of regular employees with an easy-to-use but powerful platform has enabled a viral, "bottom-up" business model that is capital efficient and extremely scalable. By allowing people to spend less time managing receipts and more time pursuing their real goals, our users (who we refer to as members) have adopted, championed and spread Expensify to their colleagues, managers and friends. We believe our happy members are the best form of marketing and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption. Underlying our platform is a secure, scalable and

> defensible technology and user-centric legal foundation that supports and fuels our viral growth. The combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods that focus solely on decision makers, and invest our time and resources on making features our members love. This has created a massive, untapped and growing market opportunity for us that we believe we are in prime position to capture.
>
> . . .
>
> We believe we address a massive market opportunity today that is significantly underpenetrated by modern solutions. We estimate our total addressable market ("TAM") was approximately $16.0 billion in the United States and $21.5 billion in our core geographies in 2020, which consisted of the United States, United Kingdom, Canada and Australia in 2020. To estimate our TAM in the United States, we identified the number of employees at SMBs with less than 1,000 employees based on data from the U.S. Bureau of Labor Statistics and segmented these companies into three cohorts based on number of employees: (1) companies with 1-9 employees, (2) companies with 10-499 employees, and (3) companies with 500-999 employees. We then multiplied the total number of employees in each cohort by our average revenue per paid member in each such cohort as of June 30, 2021.
>
> . . .
>
> We believe we are able to monetize approximately three times the amount of average revenue per user ("ARPU") in our target market of SMBs compared to some of our enterprise competitors' list prices. In addition to being able to monetize SMBs at a higher ARPU in comparison to enterprise competitors, SMBs by nature tend to grow at a faster rate than enterprises.

127. In addition, the Registration Statement described Expensify's "business model" as follows: "Our platform strategy enables a viral "bottom-up" business model that is capital efficient and extremely scalable. The adoption of Expensify within an organization often starts with the individual employee, who downloads our mobile application or signs up on our website for free and uses it to easily submit expenses to their manager with a few taps. After the employee realizes the benefits of our platform, they become a champion of Expensify and often spread it internally to other employees. With multiple employees using Expensify and valuable features simplifying the manager's job, the decision maker purchases a subscription to Expensify and becomes a paying customer with a few members."

128. The statements in the foregoing paragraphs were materially misleading because they described Expensify's traditional business model as enabling the Company to tap into a $16 billion total addressable market while, simultaneously, omitting that Defendant Barrett's October 2020 political email had irreparably damaged Expensify's ability to execute on its traditional "bottom-up" growth strategy, as described above in Section V.D. Investors reading these statements believed that Expensify's traditional growth strategy was continuing to produce successful results, including but not limited to realizing a $16 billion total addressable market for the Company. However, given the fallout that had occurred in the wake of Barrett's October 2020 email, these statements were no longer accurate and therefore untrue at the time of the IPO.

129. The Registration Statement also discussed the importance of Expensify's "reputation" and "brand" amongst its customer base. In pertinent part, the Registration Statement provided that:

> While we have designed our platform and features to be easy to adopt and use, once individuals and organizations begin using Expensify, they rely on our support services to resolve any related issues. High-quality member and customer education and customer experience have been key to the adoption of our platform and features and for the conversion of individuals and organizations using our free features and trial subscriptions into paying customers. The importance of high-quality customer experience will increase as we expand our business and pursue new customers. For instance, if we do not help organizations on our platform quickly resolve issues and provide effective ongoing member experience at the individual and organizational levels, our ability to convert organizations on our trial subscription into paying customers will suffer, and our reputation with existing or potential customers will be harmed. ***Further, the success of our "bottom up" business model is highly dependent on our business reputation and on word-of-mouth positive recommendations from existing individuals and organizations using our platform and features. Any failure to maintain high-quality customer experience, or a market perception that we do not maintain high-quality customer experience, could harm our reputation, our ability to sell our platform to existing and prospective customers and our business, results of operations and financial condition***.
>
> . . .

> We believe that the brand identity that we have developed has significantly contributed to the success of our business. We also believe that maintaining and enhancing the "Expensify" brand is critical to expanding our customer base and establishing and maintaining relationships with partners. ***Successful promotion of our brand will depend largely on the effectiveness of our marketing efforts, our ability to ensure that our platform remains high-quality, reliable, useful and competitively priced, the quality and perceived value of our platform, our ability to successfully differentiate our platform and features from those of our competitors and the ability of our customers to achieve successful results by using our platform and features***. Maintaining and enhancing our brand may require us to make substantial investments not just in our core expense management service but also in newer features, such as our travel concierge services, and to make substantial investments in foreign markets, and these investments may not be successful. We also plan to enhance our brand and drive interest in our overall platform by introducing certain consumer-focused features, which may not be successful. Substantial advertising expenditures may be required to maintain and enhance our brand, which may not prove successful. Advertising and other brand promotion activities may not generate customer awareness or increase revenue, and even if they do, any increase in revenue may not offset the expenses we incur in building our brand. Additionally, ***there could be a negative reaction to certain advertising campaigns and values-based activity and communications***. If we fail to promote and maintain the "Expensify" brand, or if we incur excessive expenses in this effort, we may fail to attract or retain customers necessary to realize a sufficient return on our brand-building efforts or to achieve the widespread brand awareness that is critical for broad customer adoption of our platform and features. We anticipate that, as our market becomes increasingly competitive, maintaining and enhancing our brand may become more difficult and expensive.

(Emphasis added.)

130. The foregoing statements were false and/or materially misleading because Expensify's "reputation," "market perception," and "brand" had already been severely damaged by Barrett's October 2020 political email. As described above in Section V.D., Barrett sent Expensify's approximately 10 million users a sharply worded, divisive political email threatening them that a vote for "anything less than a vote for Biden is a vote against democracy." This email had already caused severe reputational damage amongst Expensify's channel partners and alienated a significant portion of its customer base, and as a result, negatively impacted the Company's organic word-of-mouth platform adoption. As a result, at the time of the IPO,

Expensify had already failed to maintain a high-quality customer experience and irreparably spoiled its reputation and brand among its customer base.

### C. Misstatements Related to Expensify's Change in Business Model

131. The Registration Statement lauded Expensify's historical advertising and marketing strategy, describing it as a "bottom-up" approach that saved the Company millions of dollars in advertising expenses. In pertinent part, the Registration Statement provided that:

> ***Our intense focus on improving the everyday experience of regular employees with an easy-to-use but powerful platform has enabled a viral, "bottom-up" business model that is capital efficient and extremely scalable***. By allowing people to spend less time managing receipts and more time pursuing their real goals, our users (who we refer to as members) have adopted, championed and spread Expensify to their colleagues, managers and friends. ***We believe our happy members are the best form of marketing and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption.*** Underlying our platform is a secure, scalable and defensible technology and user-centric legal foundation that supports and fuels our viral growth. ***The combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods that focus solely on decision makers, and invest our time and resources on making features our members love.*** This has created a massive, untapped and growing market opportunity for us that we believe we are in prime position to capture.
>
> . . .
>
> • ***Viral, bottom-up business model driven by the employee.*** Our employee-focused platform strategy enables a viral, "bottom-up" adoption cycle that starts with an individual employee. After signing up for free on the website or downloading our free app to submit expenses and realizing the benefits of using Expensify, our enthusiastic members champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision makers to adopt Expensify company-wide. This enables us to focus our time and resources on making our features better for our members, and avoid the reliance on a costly, traditional top-down sales and marketing approach to attract and retain customers.
>
> • ***Word-of-mouth adoption supported by a market consensus approach.*** We believe that our happy members are the best form of marketing. We strive to build a superior platform that makes the lives of employees and admins easier so that they become our champions and promote us to other individuals and organizations. We deploy large scale brand advertising to build on this platform superiority and help create market consensus that Expensify is the category leader for expense management software. We believe this enables us to focus on creating great features

for our members rather than rely on the expensive and ineffective activities of traditional sales and marketing to drive customer acquisition.

. . .

***We also leverage partnerships with accounting and bookkeeping firms, who provide validation of our platform and refer customers to us.*** We partner with strategic accounting software partners such as Intuit, NetSuite, Xero and Intacct to integrate our software in their clients' back offices, and recognize us as a top expense tool when their clients are browsing and selecting integrated solutions. Additionally, our *ExpensifyApproved!* Partner Program trains and supports accountants to use our platform and encourages their customers to use Expensify. We work hard to maintain top expense partner status with all partners to support our market consensus strategy. The strength of our alliances is highlighted by frequent distinction by our partners, including being named NetSuite's Innovation Partner of the Year, Xero's App Partner of the Year and one of the most reviewed "Popular Apps" on the Intuit Quickbooks platform.

***We believe that our frictionless, viral and bottom-up business model and word-of-mouth adoption allows us to not rely on traditional outbound marketing efforts that are costly and often ineffective.*** As a result, we can dedicate our energy and resources on strengthening our brand, improving our features and making it easier for more people to adopt Expensify.

. . .

***The traditional approach for software sales has historically been "top-down," whereby software providers deploy costly, targeted ads and a legion of sales representatives focused on selling large, multi-year deals with vague product specifications to decision makers and business owners***. These solutions are specified, deployed and configured by siloed IT departments with little-to-no input from the main consumers of business software: everyday employees. This type of approach poses key challenges for traditional software providers, including:

• ***High cost of sale. The traditional top-down approach relies on an army of salespeople to sell, retain and upsell decision makers, requiring an ever-increasing pipeline of sales talent. This makes finding, recruiting and retaining sales talent a significant bottleneck for growth and results in a very high cost of sale -- and more importantly, limits growth to the small corner of the market that can sustain that high cost of sale***.

. . .

• **Viral, bottom-up business model.** ***We leverage an efficient, self-service business model driven by the viral, bottom-up adoption of our platform by employees.*** After the initial use of Expensify by employees, they realize time savings and improved productivity and recommend our platform to other colleagues and departments within their organization. ***Unlike the costly traditional***

> ***enterprise sales method that focuses on a smaller set of decision makers, our intense focus on the employee enables zero marginal costs for new leads, provides hundreds of entry points into every customer***, and allows us to profitably sell to large portions of the market, from one-person businesses to the largest organizations in the world.
>
> • **Recognized market consensus and efficient word-of-mouth. *Our members drive the adoption and expansion of Expensify within organizations, and our platform and business model are intensely focused on improving their everyday experience. This creates positive and powerful word-of-mouth that drives incredibly efficient and scalable organic customer acquisition and marketing.*** Every employee in every company in the world is a legitimate prospect to us, and since employees greatly outnumber managers in every business, we do not have to laser target our marketing to narrowly qualified decision makers. This means that we have access to exponentially more advertising inventory than traditional top-down sales models and a massive opportunity to create awareness.
>
> . . .
>
> We believe that these strengths set us apart from our competition and put us in a powerful position to maintain and expand our market leadership as we add new features and our industry grows.

(Emphasis added.)

132. The foregoing statements were false and materially misleading because Expensify had already abandoned its "bottom-up" marketing strategy at the time of the IPO and transitioned to a traditional top-down marketing strategy, *i.e.*, the type of strategy Expensify decried in the above statements. At the time of the IPO, the Company's "happy members" were ***not*** the best form of marketing because they were, in fact, ***not*** happy following Expensify's May 2020 price increase, subsequent failure to implement new or improved platform features, and Barrett's October 2020 political email. For substantially the same reasons, the Company's organic word-of-mouth adoption was, in fact, ***not*** "strong" and therefore, its self-service, bottom-up approach was ***not*** generating growth as intended. Consequently, as described in Section V.E., Expensify had already materially changed its business model to a more traditional outbound or go-to-market and sales approach, and therefore, were no longer avoiding the costly pitfalls of more traditional sales and

marketing methods and were not focusing time and resources to making or improving features already requested by customers.

133. Under the section titled "Recent developments", the Registration Statement provided preliminary consolidated financial results for the fiscal quarter ended September 30, 2021, including, in pertinent part:

> *Revenue*
>
> Our preliminary estimated revenue is expected to be between $36.6 million and $37.6 million for the fiscal quarter ended September 30, 2021, which represents a range of ***increase of approximately $14.9 million to $15.9 million compared to the fiscal quarter ended September 30, 2020, which was due to an increase in paid members***.
>
> . . .
>
> *Paid members*
>
> Our preliminary estimated number of average paid members as of September 30, 2021 are expected to be between 660,000 and 670,000, an increase of 21,000 to 31,000 from our average paid members as of June 30, 2021 and an increase of 27,000 to 37,000 from our average paid members as of September 30, 2020. ***Our preliminary estimated number of average paid members increased due to improving economic business conditions and our increased investments in sales and marketing.***

(Emphasis added.)

134. The foregoing statements were false and materially misleading because they failed to disclose that: (i) the Company's increase in paid members and resulting revenue increase were the result of a material change in the Company's business model leading up to the IPO; (ii) its total mix of paid members had already begun to shift towards a greater number of members billed under pay-per-use plans versus annual plans causing significant volatility in the Company's paid member rates from month-to-month; and (iii) as a result, the sustainability of Expensify's revenue growth was negatively impacted.

135. When discussing "key factors affecting our performance", the Registration Statement listed "Investing to Maintain Market Consensus", providing that:

> ***Our viral and word-of-mouth adoption model is effective in part because we have established ourselves as a recognized leader in expense management for SMBs.*** We deploy large scale brand advertising to promote our platform superiority and create market consensus that Expensify is the category leader for expense management software. We believe ***this enables us to focus on creating great viral features for our members rather than relying on low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition***.

(Emphasis added.)

136. The foregoing statements were materially false and misleading because the Company's "viral and word-of-mouth adoption model" was no longer producing the same rate of effectiveness because the market no recognized Expensify as a "leader in expense management for SMBs" and at the time of the IPO, Expensify had already begun to rely on "low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition."

## VII. VIOLATIONS OF SEC REGULATION S-K

### A. Item 101(a)

137. Item 101(a) of Regulation S-K requires that a registrant "[d]escribe the general development of the business of the registrant [and] its subsidiaries . . . during the past five years" and "[i]n describing developments, information shall be given as to matters such as . . . ***any material changes in the mode of conducting business***." 17 C.F.R. §229.101(a) (emphasis added). Furthermore, Item 101(c)(1) of Regulation S-K requires that a registrant provide a detailed description of the material aspects of the registrant's business including the "business done and ***intended to be done***" and "to the extent material to an understanding of the registrant's business taken as a whole, the description of each such segment shall include the information specified in paragraphs (c)(1)(i) through (x) of this section." 17 C.F.R. §229.101(c)(1) (emphasis added).

138. Defendants failed to disclose that at the time of the IPO, Expensify had already materially changed its business model to a more traditional outbound or go-to-market and sales approach to generate growth through new customer acquisition – contradicting its foundational viral, "bottom-up" business model geared toward organic word-of-mouth growth through existing customer retention and net seat expansion. Unlike ever before in the Company's history, at the time of the IPO, Expensify had already initiated a nationwide advertising campaign – beginning in 9 major markets, and as detailed in Section V.E., *supra*, only continued to ramp up its outbound sales and marketing efforts throughout the quarter ended December 31, 2021 ("Q4 2021") and into fiscal years of 2022 and 2023. According to CW4, pre-IPO, Expensify had already hired roughly 60 employees to perform traditional SDR tasks because the Company wanted to build up its customer base before going public. In addition, according to CW3, Expensify initiated a big push in new advertising, creating an especially large amount of content in the lead-up to the IPO.

**B. Item 303**

139. Item 303 of SEC Regulation S-K requires that a registrant "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

140. The failure of the Registration Statements to disclose the omitted material facts set forth in Sections V.C.-V.E. violated Item 303, because these undisclosed facts were known and were likely to (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. Moreover, even if Defendants were unable to determine the effect of any known trends or uncertainties on Expensify's future revenues, income, or financial position,

Defendants were still required under Item 303 to disclose the manner in which that uncertainty might reasonably be expected to materially impact Expensify's future revenues, income, or financial position.

141. For example, the Registration Statement described the Company's "key business metrics and non-GAAP financial measures" providing, in pertinent part, that:

> We review the following key metrics and non-GAAP financial measures to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions. Accordingly, we believe that these key business metrics and non-GAAP financial measures provide useful information to investors and others in understanding and evaluating our results of operations in the same manner as our management team. These key business metrics and non-GAAP financial measures are presented for supplemental informational purposes only, should not be considered a substitute for financial information presented in accordance with GAAP, and may be different from similarly titled metrics or measures presented by other companies.
>
> ***Paid members***
>
> We believe that our ability to increase the number of paid members on our platform will drive our success as a business. Companies pay for subscriptions on behalf of employees and contractors who use the platform, whom we refer to as paid members. We define paid members as the average number of users (employees, contractors, volunteers, team members, etc.) who are billed on *Collect* or *Control* plans during any particular quarter. For SMBs or sole proprietors with only one employee, the business owner may also be the only paid member.
>
> The number of paid members on our platform grew each quarter through March 31, 2020, when the COVID-19 pandemic severely impacted the operations of our customers and SMBs broadly, and greatly reduced business travel, which has traditionally been a significant driver of expenses on our platform. While the full lasting impact of the COVID-19 pandemic on the global economy and SMBs in particular remains uncertain, there have been signs of recovery as the economy has slowly reopened. See the section titled "Impact of COVID-19" below for additional information.
>
> The following table sets forth the average number of paid members for the quarters ended March 31, 2018 through June 30, 2021.

| Quarter ended | Paid members [1] (in thousands) |
|---|---|
| March 31, 2018 | 406 |
| June 30, 2018 | 447 |
| September 30, 2018 | 486 |
| December 31, 2018 | 535 |
| March 31, 2019 | 577 |
| June 30, 2019 | 623 |
| September 30, 2019 | 662 |
| December 31, 2019 | 714 |
| March 31, 2020 | 742 |
| June 30, 2020 | 630 |
| September 30, 2020 | 633 |
| December 31, 2020 | 645 |
| March 31, 2021 | 631 |
| June 30, 2021 | 639 |

142. What the Registration Statement did not disclose is that the Company's significant price increase in May 2020 and conversion of annual contracts to non-cancelable severely impacted its customer retention and seat expansion, which have traditionally been significant drivers of Expensify's revenue growth. In addition, Defendant Barrett's October 2020 political email had a materially adverse effect on existing customer retention and seat expansion and damaged the Company's relationship with retail partners. Moreover, pre-IPO there was a material change in the Company's customer base, encompassing a higher percentage of members billed under a pay-per-use per member pricing rate, which had and would continue to have a negative impact on the Company's revenue growth and sustainability.

143. When discussing "key factors affecting our performance", the Registration Statement listed "retaining existing customers", providing, in pertinent part, that:

> Expense management touches many functions across a company. To provide a seamless experience for our customers, we integrate with accounting, ERP and travel software used by SMBs and their employees every day. We also have frictionless integrations with many of the technology providers that generate the most receipts for our members, such as Uber and Lyft. Expensify delivers an expense management platform that we believe customers like, and that embeds us within organizations. Because of these two factors, we have historically enjoyed high customer retention rates that often outperform enterprise retention rates. ***We believe an additional factor that drives our retention rates is that SMBs generally re-evaluate their technology solutions less frequently, and as such, there is rarely a conscious choice to choose to continue using Expensify for another year***.

(Emphasis added.)

144. The Registration Statement failed to disclose, however, that as a result of the Company's material price increase and contract modification in May 2020, and Barrett's October 2020 political email, customers were choosing not continue using Expensify (which was effectively the opposite of not making a "conscious choice to choose to continue" using Expensify).

**C. Item 105**

145. Item 105 of SEC Regulation S-K requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." 17 C.F.R. § 229.105. The failure of the Registration Statements to disclose the omitted material facts set forth in Sections V.C.-V.E. violated Item 105, because the specific risks relating to these omissions were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Expensify speculative or risky. As alleged above in Section VI., certain Risk Factors provided in the Registration Statement were themselves materially false and misleading when made. Furthermore, other Risk Factors provided in the Registration Statement failed to adequately alert investors to the actual risks associated with an investment in Expensify.

146. For example, the Registration Statement warned that "We experienced rapid growth in recent periods prior to the COVID-19 pandemic, and those growth rates may not be indicative of our future growth, and we may not be able to maintain profitability." Under this "Risk Factor", the Registration Statement provided that:

> We experienced rapid growth in recent periods prior to the COVID-19 pandemic. Our business has been impacted by the COVID-19 pandemic, with declines in revenue and paid members due to government-imposed lock-downs, a decrease in

business travel and other expense-generating activity, and SMBs downsizing or going out of business, among other things. While we have seen an increase in paid members and improvements in revenue since the low point of the pandemic, our growth rate may not return to pre-pandemic levels. Even if our revenue and paid members continue to increase in the near term, we expect that our growth rate will decline as a result of a variety of factors, including the maturation of our business. Further, as we operate in a new and rapidly changing category of preaccounting software, widespread acceptance and use of our platform and features, particularly our expense management feature, is critical to our future growth and success. We believe our growth depends on a number of factors, including, but not limited to, our ability to:

• attract new individuals and organizations to use our features, particularly our expense management feature;

• convert individuals and organizations using our free features or trial subscriptions into paying customers;

• grow or maintain our gross logo retention rate and net seat retention rate, and expand usage within organizations;

• price our subscription plans effectively and competitively;

• retain our existing individual and organizational customers;

• achieve widespread acceptance and use of our platform and features, including in markets outside of the United States;

• continue to successfully advance our bottom-up sales strategy as well as strategic relationships with our channel partners;

• continue to maintain and build a platform and brand that drives word of mouth exposure to new potential members;

• grow or maintain our brand through marketing, advertising campaigns, partnerships and other methods;

• gain member traction for and generate revenue from our new features and services;

• grow or maintain current levels of consideration from a vendor and/or fees generated through transaction-based features;

• expand the features and capabilities of our platform and features;

• provide excellent customer experience and customer support;

• maintain the security and reliability of our platform and features;

• maintain the trust of our customers;

• successfully compete against established companies and new market entrants, as well as existing software tools;

• successfully respond to other competitive challenges in the United States and globally;

> • attract, hire and retain highly skilled personnel;
>
> • weather the impact of the COVID-19 pandemic and the end of the COVID-19 pandemic on our business;
>
> • obtain, expand, maintain, enforce and protect our intellectual property portfolio;
>
> • operate as a public company;
>
> • grow our member and customer base in new countries and/or markets, and increase awareness of our brand on a global basis; and
>
> • obtain and maintain compliance and licenses material to our current and future businesses, and comply with existing and new applicable laws and regulations including in markets outside of the United States.
>
> If we are unable to accomplish these tasks, our growth, including our revenue growth, would be harmed. We also expect our operating expenses to increase in future periods, and if our revenue growth does not increase to offset these anticipated increases in our operating expenses, our business, results of operations, and financial condition will be harmed, and we may not be able to maintain profitability.

147. The Registration Statement, however, failed to properly disclose "the most significant factors that make the offering speculative or risky" *i.e.*, the significant increase in its per member price, the reputational harm caused by Barrett's email, and the ongoing shift in Expensify's customer base from the stable annual subscription plan to the volatile pay-per-use customer plan, and therefore, the above mentioned "Risk Factor" failed to adequately describe the risk that Expensify's past revenue and paid member growth rates may not be indicative of its future growth.

148. The Registration Statement warned that "Any future litigation against us could be costly and time-consuming to defend." Under this "Risk Factor", the Registration Statement provided, in pertinent part, that:

> We have in the past and may in the future become subject to legal proceedings and claims that arise in the ordinary course of business. We could be subject to claims, lawsuits (including class actions and individual lawsuits), government investigations and other proceedings involving consumer protection, labor and employment, immigration, import and export practices, product labeling, competition, accessibility, securities, tax, marketing and communications practices, commercial disputes, defamation, civil rights infringement, negligence, intellectual

> property rights infringement, invasion of privacy, product liability, regulatory compliance, or other legal claims relating to information that is published or made available via our platform. For example, in November 2020, the Federal Election Commission ("FEC") notified us of a number of complaints filed against us in connection with David Barrett's email on October 23, 2020 urging customers to protect democracy. We responded to the complaints in November and December 2020, requesting dismissal of all complaints, and have not received a decision from the FEC on the matter. We cannot assure you that this matter will not result in further complaints, regulatory inquiries or future proceedings.
>
> The number and significance of our legal disputes and inquiries have increased as we have grown larger, as our business has expanded in scope and geographic reach, and as our features and services have increased in complexity, and we expect the potential for future legal proceedings, claims and disputes will continue to increase. Becoming a public company will raise our public profile, which may result in increased litigation.
>
> Regardless of the outcome, legal proceedings might result in substantial costs and may divert management and key personnel's attention and resources, which might seriously harm our business, results of operations and financial condition. Plaintiffs may seek, and we may become subject to, preliminary or provisional rulings in the course of litigation, including preliminary injunctions requiring us to cease some or all of our operations. We may decide to settle legal disputes on terms that are unfavorable to us; for example, we may be required to cease some or all of our operations or pay substantial amounts to the other party, which could materially and adversely affect our business. Furthermore, if any litigation to which we are a party is resolved adversely, we may be subject to an unfavorable judgment that we may not choose to appeal or that may not be reversed upon appeal. We may have to seek a license to continue practices found to be in violation of a third party's rights. If we are required, or choose to enter into, royalty or licensing arrangements, such arrangements may not be available on reasonable terms or at all and may significantly increase our operating costs and expenses. As a result, we may also be required to develop or procure alternative non-infringing technology or discontinue use of technology, and doing so could require significant effort and expense or may not be feasible. In addition, insurance might not cover these claims, might not provide sufficient payments to cover all the costs to resolve one or more such claims, and might not continue to be available on terms acceptable to us. A claim brought against us that is uninsured or underinsured could result in unanticipated costs and could have a material adverse effect on our business, results of operations and financial condition.

149. The Registration Statement, however, failed to properly disclose "the most significant factors that make the offering speculative or risky," *i.e.*, the reputational harm caused by Barrett's October 2020 political email. Indeed, Barrett's email damaged Expensify's business

and brand, and adversely affected the viability of its traditional “bottom-up” business model. This negatively impacted customer retention and net seat expansion. None of this was disclosed in the above “Risk Factor”. Instead, the risk factor merely referenced an October 2020 email “urging customers to protect democracy” while failing to disclose that the email was entirely one-sided and extremely divisive among the Company’s customer base. Further, the risk factor discusses responding to Federal Election Commission complaints but makes no reference to the complaints received from outraged customers cancelling (or not renewing) their subscriptions, as described above in Section V.D. Without question, the “most significant factor[] that make the offering speculative or risky” arising from Barrett’s October 2020 political email was the damage it did to Expensify’s customer base (and not the handful of complaints filed with the Federal Election Commission).

## VIII. NO STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

150. The Private Securities Litigation Reform Act’s statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements, under certain circumstances, do not apply to any of the untrue statements of material fact alleged herein.

151. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

152. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

153. To the extent that the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for any such statement because at the time such statement was made, the particular speaker actually knew that the statement was false or misleading, and/or the statement was authorized and/or approved by an executive officer of Expensify who actually knew that such statement was false when made.

154. Moreover, to the extent that any Defendant issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false or misleading when made because they did not disclose that the subject risks of such warnings had already materialized.

155. In addition, even if otherwise within the scope of the safe harbor provision, the identified misrepresentations and omissions were subject to an exception of the safe harbor provision. *See* 15 U.S.C. §77z-2(b)(2)(D).

## IX. CLASS ACTION ALLEGATIONS

156. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased Expensify's common stock pursuant and/or traceable to the Registration Statement, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

157. The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities have actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained

only through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Expensify and/or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in prosecuting class actions and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

160. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

161. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the alleged misstatements and omissions in the Registration Statement violated the Securities Act;

(b) Whether Defendants participated in and pursued the common course of conduct complained of herein;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d) The extent of damage sustained by Class members and the appropriate measure of damages.

162. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT I

### Violations of Section 11 of the Securities Act
**(*Against All Defendants*)**

163. Lead Plaintiff restates and realleges each and every allegation contained in the foregoing paragraphs. This claim is premised on the remedies available under Section 11 of the Securities Act, 15 U.S.C. § 77k, and therefore, Lead Plaintiff does not assert that any of the Defendants identified herein acted with fraudulent intent. This Count is brought by Lead Plaintiff, individually and on behalf of the Class, under Section 11 of the Securities Act against Expensify, the Individual Defendants, and the Underwriter Defendants.

164. The Registration Statement was declared effective by the SEC on November 9, 2021. Approximately 11.2 million shares of Expensify common stock were issued and sold in the Offering. All purchases of Expensify common stock by shareholders pursuant and/or traceable to the IPO were the result of the issuance of the Registration Statement and the shares registered thereunder. Each share of common stock sold to investors by Expensify or the Underwriter Defendants at the time of the closing of the IPO are traceable to the Registration Statement.

165. The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted facts necessary to make the statements made therein not misleading, and omitted facts required to be stated therein.

166. Each of the Defendants named in this Count had ultimate control and/or authority over the contents and dissemination of the Registration Statement, and therefore, is responsible for, and liable for, the untruths and/or omissions of material fact contained in therein.

167. As the registrant and issuer of the common stock sold pursuant and/or traceable to the IPO, Expensify is strictly liable to Lead Plaintiff and the Class for the untruths and/or omissions of material fact contained in the Registration Statement.

168. Each of the Underwriter Defendants consented to being named as underwriters in the Registration Statement, facilitated the filing of the Registration Statement, and served as the underwriters in connection with the Offering.

169. Defendants Barrett, Schaffer, Bartlett, and Lent were directors of Expensify prior to the IPO and each of these Defendants signed the Registration Statement and caused it to be declared effective by the SEC.

170. Defendants Muralidharan, Mills, Vidal, Christen, Liu, and Pao were named in the Registration Statement as director nominees of Expensify, contingent upon and immediately effective prior to, the completion of the IPO, and consented to being so named.

171. As such, each of the Underwriter Defendants and Individual Defendants had a duty to make a reasonable investigation into the statements contained in the Registration Statement, and other relevant offering materials, to ensure that said statements were true and that there was no omission of any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the

material misstatements and omissions contained in the Registration Statement. By reason of the conduct alleged herein, each of these Defendants are liable to Lead Plaintiff and the Class for the untruths and/or omissions of material fact contained in the Registration Statement.

172. Together, the Defendants named in this Count caused the Registration Statement to be filed with the SEC and to be declared effective, resulting in the issuance and sale of Expensify common stock, which was purchased or acquired by Lead Plaintiff and other members of the Class.

173. Lead Plaintiff and other members of the Class did not know, nor could they have reasonably discovered, that the Registration Statement contained untrue statements and/or omitted material facts necessary to make the statements therein not misleading when they purchased or acquired Expensify common stock pursuant and/or traceable to the Registration Statement.

174. As a direct and proximate result of the misconduct alleged in this Count, Lead Plaintiff and the other Class members suffered substantial damages in connection with their purchase or acquisition of common stock pursuant and/or traceable to Registration Statement.

175. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which the initial complaint filed in the above-captioned action is based and the time this Complaint was filed. Less than three years have elapsed between the time that the securities upon which this claim is brought, were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## COUNT II

### Violations of Section 15 of the Securities Act
### (*Against the Individual Defendants*)

176. Lead Plaintiff restates and realleges each and every allegation contained in the foregoing paragraphs. This claim is premised on the remedies available under Section 15 of the

Securities Act, 15 U.S.C. § 77o, and therefore, Lead Plaintiff does not assert that any of the Defendants identified herein acted with fraudulent intent.

177. This Count is brought by Lead Plaintiff, individually and on behalf of the Class, under Section 15 of the Securities Act against the Individual Defendants. These Defendants, in addition to their own primary liability under Section 11 of the Securities Act, are also secondarily liable for the primary violations of Expensify.

178. Each of the Individual Defendants was a control person of Expensify by virtue of his or her position as a director, senior officer, and/or authorized representative at Expensify. Each of these Defendants had the power to influence, and did, in fact, exercise control over the Company, to cause it to engage in the conduct complained of herein.

179. Each of the Individual Defendants directly participated in the control of Expensify by having participated in the preparation, review, and/or approval the Registration Statement, having signed, or authorized the signing of, the Registration Statement, and authorizing the sale of Expensify common stock to Lead Plaintiff and the Class.

180. As control persons, each of the Individual Defendants was involved with the day-to-day operations of Expensify prior to the IPO and was involved in reviewing and/or providing the description of Expensify's operations and business prospects in the Registration Statement, and therefore, had the ability to control the contents thereof.

181. Lead Plaintiff and other members of the Class purchased Expensify common stock without knowledge of the untruths and/or omissions alleged herein. Lead Plaintiff and the other members of the Class were thus damaged by the primary violations of Expensify. By virtue of the conduct alleged herein, and their status as control persons, each of the Individual Defendants are

jointly and severally liable pursuant to Section 15 of the Securities Act with and to the same extent as a primary violator under Section 11 of the Securities Act.

182. Less than one year elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which the initial complaint filed in the above-captioned action is based and the time that this Complaint was filed. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

## XII. JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: May 10, 2024

Respectfully Submitted,

**BLACK HELTERLINE LLP**

*/s/ Michael B. Merchant*
Michael B. Merchant, OSB No. 882680
805 S.W. Broadway, Suite 1900
Portland, OR 97205
Tel.: (503) 224-5560
Fax: (503) 224-6148
Email: mike.merchant@bhlaw.com

*Liaison Counsel for Lead Plaintiff and the Class*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (admitted *pro hac vice*)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that by doing so I served the foregoing on all parties in the record of the subject case via CM/ECF system transmission.

Dated: May 10, 2024.

BLACK HELTERLINE LLP

By: *\/s/ Michael B. Merchant*
Michael B. Merchant, OSB No. 882680
(503) 224-5560

*Liaison Counsel for Lead Plaintiff and the Class*