Michael B. Merchant, OSB No. 882680
**BLACK HELTERLINE LLP**
805 S.W. Broadway, Suite 1900
Portland, OR 97205
Tel.: (503) 224-5560
Fax: (503) 224-6148
Email: mike.merchant@bhlaw.com

Adam M. Apton (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Lead Plaintiff and the Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CODY WILHITE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXPENSIFY, INC., DAVID BARRETT, RYAN SCHAFFER, BLAKE BARTLETT, ROBERT LENT, ANU MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY L. CHRISTEN, YING (VIVIAN) LIU, ELLEN PAO, J.P. MORGAN SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., BofA SECURITIES, INC., PIPER SANDLER & CO., JMP SECURITIES LLC, and LOOP CAPITAL MARKETS LLC,<br><br>Defendants. | Case No.: 3:23-cv-01784-JR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**REQUEST FOR ORAL ARGUMENT** |

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     SUMMARY OF THE FACTS ...................................................................................2

      A.      Expensify's IPO and Registration Statement. ...........................................2

      B.      Price Increase................................................................................................4

      C.      Political Email. .............................................................................................5

      D.      "Bottom Up" Business Model. ....................................................................7

      E.      Expensify's Stock Price Post-IPO. ...........................................................10

III.    LEGAL STANDARD ............................................................................................11

IV.     ARGUMENT .........................................................................................................12

      A.      Plaintiff Adequately Pleaded Material Misrepresentations or Omissions in the Registration Statement to State a Claim under Section 11 of the Securities Act. ...............................................................................................................12

            1.      Price Increase. .................................................................................12

            2.      Political Email.................................................................................18

            3.      "Bottom-Up" Business Model. ......................................................22

      B.      Loss Causation Is Not a Section 11 Element..............................................29

      C.      The Complaint Adequately Pleads Control Person Liability Under Section 15. ..32

V.      CONCLUSION ......................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ...................................................................................13

*In re Amgen Sec. Litig.*,
  No. 07-cv-02536-PSG, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ..................................21

*In re Apple Sec. Litig.*,
  No. 19-cv-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020)....................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................11

*Azar v. Yelp, Inc.*,
  No. 18-cv-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)..................................23

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)..........................................................................14, 24

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ................................19, 28

*Brown v. Ambow Educ. Holding Ltd.*,
  No. 12-cv-5062-PSG, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014).........................................30

*In re CarLotz, Inc. Sec. Litig.*,
  No. 21-CV-5906 (AS), 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024)...................................26

*Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ........................................................................32

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
  701 F.Supp.2d 506 (S.D.N.Y. 2010) .....................................................................28

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
  302 F.Supp.3d 1028 (N.D. Cal. 2018)....................................................................24

*Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F.Supp.3d 1035 (D. Minn. 2015)......................................................................23

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.,*
  660 F.3d 1170 (9th Cir. 2011).............................................................................31

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F.Supp.2d 1044 (C.D. Cal. 2008) ........................................................................16, 29

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F.Supp.2d 1132 (C.D. Cal. 2008) ................................................................................29

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
  No. 99-cv-12046-WHP, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ..................................20

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)................................................................................. 11, 15, 21

*In re Dropbox Sec. Litig.*,
  No. 19-cv-06348-BLF 2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) .....................................14

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)..............................................................................................32

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .............................................................................27, 28

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023)...........................................................................................13, 20

*Ferris v. Wynn Resorts Ltd.*,
  No. 2:18-cv-00479-APG-DJA, 2021 WL 3216462 (D. Nev. July 28, 2021) ...........................19

*Franchi v. SmileDirectClub, Inc.*,
  633 F.Supp.3d 1046 (M.D. Tenn. 2022)..............................................................................28

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024).................................................................................. 23, 30, 32

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)..............................................................................................11

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023)..........................................................................................passim

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................................26

*Hemmer Grp. v. Sw. Water Co.*,
  527 F. App'x 623 (9th Cir. 2013).........................................................................................20

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983) ...................................................................................... 2, 11, 30

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013)....................................................................... 11, 20, 29

*Hoang v. ContextLogic, Inc.*,
   No. 21-cv-03930-BLF, 2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ............................25, 28

*In re Honest Co. Sec. Litig.*,
   615 F. Supp. 3d 1149 (C.D. Cal. July 18, 2022)........................................... 13, 15, 19

*Jaeger v. Zillow Grp., Inc.*,
   644 F.Supp.3d 857 (W.D. Wash. 2022).....................................................................15

*Johnson v. Riverside Healthcare Sys., LP*,
   534 F.3d 1116 (9th Cir. 2008)....................................................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)......................................................................................14

*Lau v. Opera Ltd.*,
   527 F. Supp. 3d 537 (S.D.N.Y. 2021) ......................................................................26

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
   No. 3:20-cv-1562-SI, 2021 WL 5530949 (D. Or. Nov. 24, 2021)............................16

*In re Lucid Grp., Inc. Sec. Litig.*,
   No. 22-cv-02094-AMO, 2024 WL 3745605 (N.D. Cal. Aug. 8, 2024) ....................15

*Luong v. Subaru of Am., Inc.*,
   No. 17-cv-03160-YGR, 2018 WL 2047646 (N.D. Cal. May 2, 2018)......................16

*In re Lyft Inc. Sec. Litig.*,
   484 F.Supp.3d 758 (N.D. Cal. 2020)..................................................................19, 31

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .....................................................................................................11

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008)...............................................................................21, 31

*Milman v. Box Hill Sys. Corp.*,
   72 F.Supp.2d 220 (S.D.N.Y. 1999) ..........................................................................28

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018)......................................................................................30

*Mingbo Cai v. Switch, Inc.*,
    No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591 (D. Nev. July 12, 2019)..........................27

*Mulligan v. Impax Labs., Inc.*,
    36 F.Supp.3d 942 (N.D. Cal. 2014)............................................................................15

*Murphy v. Precision Castparts Corp.*,
    No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) .........................................12

*Nguyen v. Radient Pharm. Corp*,
    No. 11-cv-0406-DOC, 2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ......................................22

*Ohman J v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023)......................................................................................12

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 Fed. App'x 480 (9th Cir. 2019) ....................................................................16, 19

*In re ON24, Inc. Sec. Litig.*,
    No. 4:21-cv-8578-YGR, 2024 WL 979951 (N.D. Cal. Mar. 5, 2024) ......................................17

*In re Orange 21 Inc. Sec. Litig.*,
    No. 05-cv-0595-JM, 2006 WL 8455352 (S.D. Cal. Mar. 30, 2006) .........................................29

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)......................................................................................27

*In re Plantronics, Inc. Sec. Litig.*,
    No. 19-cv-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ....................................13

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996)............................................................................22, 31

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017)....................................................................................19

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)................................................................................28, 29

*Robb v. Fitbit Inc.*,
    216 F.Supp.3d 1017 (N.D. Cal. 2016)..................................................................16, 21, 32

*Rubke v. Capitol Bancorp Ltd*,
   551 F.3d 1156 (9th Cir. 2009)..................................................................................28, 29

*Sanders v. Realreal, Inc.*,
   No. 19-cv-07737-EJD, 2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)....................................25

*Scheller v. Nutanix, Inc.*,
   450 F.Supp.3d 1024 (N.D. Cal. 2020)..................................................................................25

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016)..................................................................................23

*Schuh v. HCA Holdings, Inc.*,
   947 F.Supp.2d 882 (M.D. Tenn. 2013)..................................................................................28

*Schulein v. Petroleum Dev. Corp.*,
   No. 11-cv-1891-AG, 2012 WL 12884851 (C.D. Cal. June 25, 2012) ....................................21

*In re Shoretel, Inc. Sec. Litig.*,
   No. 08-cv-00271-CRB, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ......................................30

*In re Shoretel, Inc., Sec. Litig.*,
   No. 08-cv-00271-CRB, 2009 WL 2588881 (N.D. Cal. Aug. 19, 2009).................................29

*Sgarlata v. PayPal Holdings, Inc.*,
   No. 17-cv-06956-EMC, 2018 WL 6592771 (N.D. Cal. Dec. 13, 2018) ...............................22

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017)...............................................................................13

*In re Snap Inc. Sec. Litig.*,
   No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528 (C.D. Cal. June 7, 2018)......................20

*Sundaram v. Freshworks Inc.*,
   No. 22-cv-06750-CRB, 2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ...............................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...........................................................................................................11

*U.S. v. Romm*,
   455 F.3d 990 (9th Cir. 2006)..................................................................................32

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
   669 F. App'x 878 (9th Cir. 2016)..................................................................................11

*In re Velti PLC Sec. Litig.*,
  No. 13-cv-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ...................................30

*In re Violin Memory Sec. Litig.*,
  No. 13-cv-05486-YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ............................12, 29

*Wallace v. IntraLinks*,
  No. 11-cv-8861(TPG), 2013 WL 1907685 (S.D.N.Y. May 8, 2013) ......................................28

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996)....................................................................................................19

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)...................................................................................................17

## Regulations

17 C.F.R. § 229.101 ...................................................................................................................26

17 C.F.R. § 229.105 ...................................................................................................................27

17 C.F.R. § 229.303 ...................................................................................................................27

## I.    PRELIMINARY STATEMENT

Expensify launched as a public company in November 2021 raising over $300 million from investors through its initial public offering. Defendants, who include the company as well as its officers, directors, and the banks that underwrote the offering, promoted Expensify's innovative technology and savvy, cost-effective "bottom-up" business model. These positive statements were false or, at least, materially misleading in light of recent events that had occurred just prior to the IPO. These events included:

1)    Implementation of a massive price increase for its expense management subscription services resulting in the loss of significant customer contracts and worsening revenue mix;

2)    CEO David Barrett's unsolicited divisive political email to the company's 10 million users threatening that a vote against President Joseph Biden in the 2020 election would be a vote "against democracy" causing irreparable damage to the company's reputation and brand; and

3)    Due to the customer losses and strained partnerships caused by its change in pricing and political solicitations, Expensify abandoned its historical "bottom-up" growth model in favor of a traditional "top-down" approach resulting in further revenue mix volatility and unprecedented marketing expenses.

Between the price increase and political email, many of Expensify's customers decided not to renew their subscriptions. Furthermore, these customers included accounting firms that were highly valuable to Expensify given their ability to easily recommend and implement the company's expense management software with their clients. The fallout that ensued within Expensify's customer base was damning and, as customer contracts expired over the following quarters, the company's growth and earnings suffered. Expensify's stock price followed suit and investors who bought in during the IPO ultimately lost ***nearly 95%*** of their initial investments.

Plaintiffs allege that Defendants violated the Securities Act of 1933 for misrepresenting and concealing the internal impact of these issues during the IPO. Congress designed the Securities Act as a form of consumer protection "to assure compliance with the disclosure provisions . . . by

1

imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-82 (1983). The Securities Act purposefully replaces the rule of *caveat emptor* with a strict duty on the part of the issuer to accurately disclose relevant financial and operational information. Importantly, there is no requirement for a plaintiff to either allege or prove at trial that any defendant acted with a particular state of mind. Where a registration statement contains a misrepresentation or omits required information, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Id*. Accordingly, claims under the Securities Act are very different from fraud claims made pursuant to the Exchange Act and, as the Supreme Court has observed, pleading Securities Act claims "places a relatively minimal burden on a plaintiff." *Id*.

Plaintiff satisfied this minimal burden in the Complaint and Defendants' responses to his well-pled non-fraudulent allegations are meritless in light of the procedural posture of the case. At the pleading stage, Plaintiff as the non-moving party is entitled to have his allegations accepted as true and all inferences drawn in his favor. *See Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023). Consequently, factual disputes over how many customers cancelled in response to Barrett's political solicitations, the credibility of Plaintiff's confidential witnesses, or why Expensify's stock price currently trades at $2/share compared it its IPO price of $27/share must fail. As explained in more detail below, Defendants' motion should be denied.[1]

## II.    SUMMARY OF THE FACTS

### A.    Expensify's IPO and Registration Statement.

On November 15, 2021, Expensify initiated its IPO selling 11.2 million shares to investors

---

[1] The Underwriter Defendants (¶¶26-28) did not file their own motion to dismiss. They instead filed a "joinder" to Defendants' motion. ECF No. 57. Thus, the Underwriter Defendants' joinder should likewise be denied for the same reasons Defendants' motion should be denied.

at $27 per share. ¶¶1, 99-101.[2] Expensify sold these shares pursuant to a registration statement and prospectus (the "Registration Statement"). ¶¶1, 99. Defendant Barrett was Expensify's CEO at the time of the IPO and signed the Registration Statement on behalf of the company as did his fellow officers and directors. ¶¶12-21. A syndicate of investment banks led by J.P. Morgan underwrote the offering. ¶¶26-28.

Expensify's main product was a cloud-based expense management program for small- to medium-business. ¶¶42-43. Expensify sold its service through various subscriptions with different features and prices. ¶¶44-46. A key component of Expensify's business model was its "bottom-up" marketing strategy which entailed attracting lower-level employees within a company and having its product spread by "word-of-mouth." ¶¶47-48. This allowed Expensify to attract new customers without the costs normally associated with traditional "top-down" marketing. ¶53.

The Registration Statement contained material misrepresentations and omissions, meaning that Expensify along with its directors, officers, and underwriters are strictly liable for violating Sections 11 and 15 of the Securities Act. These misrepresentations and omissions concerned vitally important events that went to the core of Expensify's operations. They were: 1) Expensify's May 2020 decision to double and, in some cases, triple its per member price; 2) CEO David Barrett's October 2020 political email to Expensify's 10 million users threatening that a vote against President Joe Biden (and in favor of former President Donald J. Trump) would be a "vote against democracy"; and 3) Expensify's decision to abandon its historical "bottom-up" approach in favor of a conventional "top-down" marketing strategy as a response to or caused by the customer losses and reputational harm caused by the price increase and political email.

---

[2] Citations to "¶__" refer to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 32) (the "Complaint").

**B.      Price Increase.**

On May 1, 2020, Expensify doubled, and in some cases tripled, its per member prices for the first time since implementing its subscription-based fee model in 2009. ¶¶54-56, 59. Expensify offered four types of subscriptions for its expense management software. ¶44. For two of the tiers *i.e.*, *Collect* and *Control*), annual contract prices increased as follows:

|  | Old Price | New Price |
|---|---|---|
| *Collect* |  |  |
| **Annual Contract** | $5/user/month | $10/user/month |
| **No Contract (pay-per-use)** | $5/user/month | $20/user/month |
| *Control* |  |  |
| **Annual Contract** | $9/user/month | $18/user/month |
| **No Contract (pay-per-use)** | $9/user/month | $36/user/month |

¶55. Along with the price increases, Expensify also made its annual contracts non-cancelable. ¶55.

The extraordinary price increase caused many customers to stop using Expensify, and as a result, Expensify's revenue bottomed out in 2Q20. ¶¶58, 110. Indeed, Expensify's paid members declined by more than 15% in 2Q20, as compared to the previous quarter ended March 31, 2020. ¶58. Expensify tried to retain these customers by offering pricing promotions, but the promotions were contingent upon customers registering for the company's new "Expensify Card," which many customers rejected. ¶59. Customer retention issues worsened as Expensify reduced customer support following the price increases and competitors such as Ramp, Brex, Divvy introduced expense management platforms of their own that did not charge a subscription fee. ¶¶60-61. Consequently, Expensify's May 2020 price increase prompted an immediate decline in customers and negatively impacted both actual and projected growth in advance of the IPO. ¶62.

Expensify's Registration Statement, however, said nothing of this. At most, it disclosed the price increase in passing when stating that Expensify's revenue had increased for the six months ended June 30, 2021 compared to the same period in 2020, "primarily due to a ***pricing change***

4

*implemented in May 2020*." ¶121 (emphasis added). Similarly, without any acknowledgment or disclosure of the price increase's negative impact, Expensify's Registration Statement stated that "We *recently increased our subscription prices*, and we do not know if these price increases will adversely affect our business." ¶124 (emphasis added). As alleged, these statements were false and/or materially misleading because they did not disclose the severity of the price increase (*i.e.*, doubling and/or tripling prices) and, importantly, how the price increase negatively affected Expensify's customer retention and growth in advance of the IPO. ¶¶122-23, 125.

### C.    Political Email.

On October 22, 2020, Expensify's CEO, Defendant Barrett, sent a politically charged and divisive email to the company's then-existing 10 million users concerning the upcoming presidential election between President Joseph Biden and Former President Donald J. Trump. ¶¶63-64. The email, titled "*Protect democracy, vote for Biden*," stated: "I know you don't want to hear this from me. And I guarantee I don't want to say it. But we are facing an unprecedented attack on the foundations of democracy itself. If you are a US citizen, *anything less than a vote for Biden is a vote against democracy* . . . ." ¶64 (emphasis in original).

Barrett's email prompted an immediate, severe backlash within Expensify's customer base (which was already on edge from the May 2020 price increase). Individual users as well as those responsible for larger organizations objected to Barrett's email as an abuse of privacy and betrayal of corporate information, stating expressly that they would be cancelling their subscriptions in protest. For example:

- October 2020: Business owner Ken McKibben said the email "betray[ed] all trust," was an "abuse of [his] employee's emails," and reflected an "irresponsible and self-absorbed" CEO (¶66);
- October 2020: Expensify customer "Darla" referred to the email as "unacceptable behavior" to use the company's "customer database to solicit votes for your personal agenda" (¶67);

5

- October 2020: Expensify customer "Julia" complained she was at risk of "fallout" from the email after having recommended Expensify's product to her company (¶68);

- October 2020: Expensify retail partner "Travis_W" confirmed he would "no longer be recommending Expensify" to clients while at the same time preparing "many of [his] existing clients [to] cancel their service" in response to the "blast email to endorse a particular political candidate" (¶70);

- October 2020: Charles Hoskinson, founder and CEO of IOHK, cancelled subscriptions with Expensify on behalf of himself and his 400+ employees in response to Barrett's email (¶72);

- October 2020: Expensify customer "jcdav" confirmed that his company of 120 employees were "dropping Expensify" in response to Barrett's "sickening" email (¶73);

- October 2020: Expensify customer "RJRIley" confirmed he was canceling "over 20 user accounts" due to Barrett's email (¶74);

- October 2020: Expensify customer "Portland" cancelled service immediately in response to Barrett's email, which he regarded as a failure to respect the boundaries between business and politics (¶75);

- October 2020: Expensify customer "DCChristopher" immediately "close[d] out" his company's subscriptions with Expensify, stating that Barrett's email had "no place whatsoever in a business environment" (¶76);

- October 2020: Expensify customer "WAB" terminated his company's business with Expensify in favor of using another platform that "accepts views different than that of [E]xpensify management" (¶77);

- October 2020: Expensify customer "jwc123gty" attempted to cancel his subscription immediately but was forced to retain it under contract until July 2021 (¶80);

- December 2020: Expensify customer "KimT" canceled her company's subscriptions with Expensify because "Barrett violated our company policies with his political solicitation," "upset our employees AND investors," and "want nothing to do with a company such as [Expensify]" after such an "absolutely insulting and unprofessional" email (¶81);

- December 2020: Expensify customer confirmed his company would be leaving Expensify along with a "rapidly growing" list of other companies leaving "by the end of Q1 2021" (¶82); and

- January 2021: Expensify customer "burbanite" reported that his company of "more than 31,000 employees" was leaving Expensify in response to the "displeasure" over Barrett's email (¶83).

The severity of the fallout caused by Barrett's email prompted formal corporate action from within Expensify. Internally, Barrett's email was referred to as "The Email" and Expensify

6

developed strategies to minimize the harm it caused, especially among Expensify's accounting customers. ¶69. Accounting clients were extremely important to Expensify because they constituted 10% of the company's revenue and were uniquely positioned to recommend the company's platform to their respective clients, thereby having an exponential impact on the number of subscriptions Expensify could potentially sell. ¶¶52, 69. "The Email" was especially offensive to these accounting partners who, as a result, steadily left Expensify in its wake. ¶¶69, 71, 79. Expensify attempted to stem the fallout with internal briefs and logic trees providing employees with scripts designed to dissuade customers from canceling their subscriptions. ¶78.

Expensify's Registration Statement did not disclose Barrett's political email or the fallout it caused among the company's customer base. Instead, the Registration Statement only disclosed that complaints had been filed with the Federal Election Commission "in connection with David Barrett's email on October 23 [sic], 2020 urging customers to protect democracy." ¶148. Expensify's disclosure said nothing about the contents of Barrett's email, that it threatened users against voting for Former President Donald J. Trump, or that it effectively alienated at least half of Expensify's existing customer base and resulted in mass cancellations. ¶149. In the same vein, when discussing the historical success of Expensify's "bottom up" business model in terms of leveraging its "brand" and "reputation" with existing customers ("happy members") to obtain new members (through "organic word-of-mouth adoption"), the Registration Statement failed to disclose Barrett's political email and that it had harmed Expensify's ability to execute on its stated business model. *Compare* ¶¶126-27, 129 (statements about "bottom up" strategy, "reputation," and "brand") *with* ¶¶128, 130 (fallout caused by Barrett's email).

### D.    "Bottom Up" Business Model.

Expensify historically relied on a "bottom up" business model that, according to the

Registration Statement, leveraged the strength of its "brand" and "reputation" to grow organically by "word-of-mouth" promotion. ¶¶2, 47-48, 52. The "bottom up" model also carried the benefit of avoiding millions of dollars in advertising spend that companies ordinarily incur when using a traditional "top down" marketing strategy. ¶¶53, 88. By the time of the November 2021 IPO, however, Defendants knew the May 2020 price increase and October 2020 political email were already affecting Expensify's revenue and its ability to execute on its historical "bottom up" business model. ¶¶3-4, 62, 84, 89. Expensify conducted "All Hands" meetings attended by company executives and directors where they discussed Expensify's flagging financial condition throughout 2020. ¶90. This necessitated a shift in business strategy that, as alleged, was not disclosed in the Registration Statement. ¶¶85, 91.

In March 2021, contrary to its longstanding "bottom up" model, Expensify switched to a traditional "top down" marketing strategy and started hiring sales development representatives ("SDRs") to build its customer base before going public. ¶92.  By the time of the IPO, Expensify had hired 60 SDRs which was significant given that Expensify had only 140 full-time employees in total as of June 2021. ¶92. Expensify also changed key performance indicators for customer support staff and increased focus on the creation of advertising content. ¶¶93-94. Expensify's change in marketing strategy prompted an unprecedented increase in sales and marketing expenses, doubling quarter-over-quarter from 2Q21 to 3Q21 to 4Q21. ¶¶96-97 (table showing increase from $3.8 million to $13.1 million). As such, Expensify's business model had radically changed in the lead up to the IPO (in 4Q21) from its historical "bottom up" model to a traditional "top down" marketing strategy. ¶¶85, 98.

Expensify's Registration Statement did not disclose this change. Instead, it spoke only of the company's historical "bottom up" model and represented that was continuing to successfully

drive growth. Specifically, the Registration Statement provided that Expensify's platform enabled "a viral, 'bottom-up' business model that is capital efficient and extremely scalable," that the company's "happy members are the best form of marketing and our self-service, bottom-up approach takes advantage of strong, organic word-of-mouth adoption," and that "[t]he combination of these factors has allowed us to avoid the costly pitfalls of traditional, top-down enterprise sales and marketing methods." ¶131; *see also* ¶135. These statements were no longer true by the time of the IPO because, as alleged, Expensify had lost the key drivers behind its "bottom-up" model (*i.e.*, the strength of its reputation, brand, and "happy members") due to the May 2020 price increase and Barrett's October 2020 political email. ¶¶132, 136. The fallout caused by these events forced Expensify to abandon its historical "bottom up" growth model in favor of a traditional "top down" approach. ¶¶132, 136. These events, the fallout they caused, and the shift in business strategy that ensued should have been disclosed to avoid misleading investors about Expensify's true business model and financial viability at the time of the IPO.

Expensify should have also disclosed this information pursuant to its obligations under Regulation S-K (which requires companies to disclose specific material during IPOs). The shift in business strategy from "bottom up" to "top down" should have been disclosed under Item 101 of Regulation S-K as a "material change" in how Expensify conducts its business. ¶¶137-38. Likewise, pursuant to Item 303, Expensify should have disclosed how the price increase and political email behind the shift in business strategy had already impacted (and was indeed likely to continue impacting) its revenue; namely, that the two events drove down subscriptions thereby leaving Expensify more dependent on less stable revenue from pay-per-use customers. ¶¶142, 144. Finally, while Item 105 required Expensify to identify the "most significant factors that make the offering speculative or risky," the Registration Statement did not identify the fallout from the price

9

increase or the political email among those risks. ¶¶145-49.

### E.    Expensify's Stock Price Post-IPO.

Expensify's IPO stock price was $27 per share. ¶101. At the time of the Complaint, Expensify's stock price had fallen to under $2 per share—*a decline of nearly 95%*. ¶¶5, 119. The cause for this decline, as alleged, is the damage that ensued from the May 2020 price increase and October 2020 political email. These two events crippled Expensify's "happy customer" thesis, obliterated its historical "bottom up" business model, and irreparably altered the company's revenue mix yet the effects were not felt until well after the IPO due to the company's subscription contracts (which were not cancelable for months and/or years into the future). ¶¶4, 102. Consequently, it was never a matter of "if" the damage would materialize, but instead "when."

 Expensify's operational problems though eventually came to light as market analysts started to downgrade the company's stock. First, in June 2023, Morgan Stanley issued an "underweight" rating to Expensify citing "structural headwinds," lower revenue estimates, and increased competition. ¶103. Then, in August 2023, Expensify officially removed its long-term guidance from the company's revenue projections, prompting J.P. Morgan (among other analysts) to question Expensify's growth. ¶¶108-10. The following month, in September 2023, J.P. Morgan explicitly called out the viability of Expensify's historical "word-of-mouth model." ¶113. Finally, in November 2023, following Expensify's quarterly report for the third quarter of 2023, Piper Sandler lowered its price target for the company's stock to $2 per share, citing Expensify's "Ninth straight quarter of eroding growth" and "Internal missteps." ¶¶117. Following Expensify's quarterly report in November 2023, its stock price fell to less than $2 per share. ¶¶118-19.

## III.    LEGAL STANDARD

In assessing a Rule 12(b)(6) motion, courts consider the complaint in its entirety, "accept all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, a court must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact . . . . A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

To allege a claim under Section 11, a plaintiff must plead "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citation omitted); *see also In re Ubiquiti Networks, Inc. Sec. Litig.*, 669 F. App'x 878, 879-80 (9th Cir. 2016). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 44, 47 (2011). Once a material misstatement is shown "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman*, 459 U.S. at 382; *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013). As long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman*, 459 U.S. at 382.

11

Because scienter is not an element of a Section 11 claim, it is subject to the permissive notice pleading standards of Federal Rule of Civil Procedure 8(a). *See In re Violin Memory Sec. Litig.*, No. 13-cv-05486-YGR, 2014 WL 5525946, at \*8 (N.D. Cal. Oct. 31, 2014) (analyzing Section 11 claim under Rule 8(a) where, as here, "Plaintiffs have not expressly pleaded fraud, and have pleaded non-fraud bases for liability."). Pleading a claim under Rule 8(a) "is not an onerous burden" as "[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Id.* at \*28 (citing *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008)).

## IV.    ARGUMENT

### A.    Plaintiff Adequately Pleaded Material Misrepresentations or Omissions in the Registration Statement to State a Claim under Section 11 of the Securities Act.

#### 1.    Price Increase.

The Registration Statement referenced the May 2020 price increase in passing when discussing Expensify's revenue at the time of the IPO. ¶121. It said nothing about the extent of the price increase (double and/or tripling of prices) or the negative effects it caused (canceled subscriptions leading to increased reliance on pay-per-use users). ¶¶122-23, 125; *see also* ¶141-47 (failure to disclose price increase when discussing trends affecting revenue and factors making investment risky pursuant to Regulation S-K). Numerous courts throughout the Ninth Circuit have held defendants liable where, as here, their statements would "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918, 928-929 (9th Cir. 2023). For example:

- *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) *aff'd sub nom.* 2022 WL 2800825 (9th Cir. July 18, 2022). The defendants touted the company's ability to "generate sustainable organic growth" without disclosing that its recent growth was attributable to "pulling in sales to pursue

its quarterly goals[.]" *Id.* at \*8-\*9. "Although there is nothing inherently wrong with the practice of 'aggressively pursuing quarterly results' by pulling in sales . . . such a practice may be misleading to the extent it creates the impression of a sustainable demand for PCC's products." *Id.* at \*9.

- *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149 (C.D. Cal. July 18, 2022). The defendants "touted increased consumer demand for Honest products due to COVID-19" without disclosing that "COVID-19 related product demand was declining and "retailers were destocking COVID-19 products." *Id.* at 116.

- *In re Plantronics, Inc. Sec. Litig.*, No. 19-cv-07481-JST, 2022 WL 3653333 (N.D. Cal. Aug. 17, 2022). The defendants concealed sales practices that allowed the company "to realize higher revenues in each quarter than they otherwise would but at the expense of revenues in future quarters" which "misled investors into believing that the revenue results they touted were caused by other factors" and "created an inaccurate impression as to the financial health of the company in the minds of investors." *Id.* at \*11-\*13.

- *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017). The defendants provided positive information about "monthly active users" while omitting adverse information about "daily active users." *Id.* at 1135-40.

Defendants portrayed the price increase as a positive when discussing Expensify's year-over-year revenue growth. ¶121. However, similar to the above cases, Defendants misled investors by omitting adverse information concerning its effect on the company's ability to retain and grow its "happy customer" base. *See* ¶¶122-23, 125. In the same vein, although Defendants warned investors that "[w]e recently increased our subscription prices," they claimed to be unaware "if these price increases will adversely affect our business." ¶124. This was false because the fallout from the price increases had already materialized. ¶125; *see also* ¶¶146-47 (Regulation S-K violation). "[A] company may make a materially misleading statement when it 'speaks entirely of as-yet-unrealized risks' when the risks have 'already come to fruition.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023) (risk warning misleading where user data had already been stolen); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702-05 (9th Cir. 2021) (privacy risk that "could" or "may" happen had already materialized).

Defendants offer a litany of meritless arguments in response to these allegations. ***First***, they claim they were under no duty to disclose the amount of the price increases. Defs. Br. at 11-

13

12. That may be so had the price increases not adversely effected Expensify's "bottom up" business model, but it did. Defendants presented the price increase as a positive development in terms of its year-over-year revenue growth, thereby triggering a duty to disclose adverse information too, *i.e.*, the negative impact it had on customer retention. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) ("once Orexigen chose to tout the apparently positive 25 percent interim results, [it] had the obligation also to disclose that they were likely unreliable"). Defendants' omission in this regard left investors with no way of assessing the true benefits (or weaknesses) of the price increase, making this case very different than the ones cited by Defendants in their brief. Defs. Br. at 12 (citing *In re Dropbox Sec. Litig.*, No. 19-cv-06348-BLF 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020)), where defendants "regularly disclosed" information needed to calculate allegedly omitted user data).

*Second*, Defendants claim that the price increase did not adversely impact Expensify's business but that any downturn was instead caused by the Covid-19 pandemic. *See* Defs. Br. at 14-15. Defendants then go one step further and contest that a downturn even existed because paid members continued to increase. Defs. Br. at 15. These arguments are improper. Alternative sets of facts cannot be introduced at the pleading stage. *See Khoja*, 899 F.3d at 998 (". . . the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (factual "disputes must at least await discovery"). Plaintiff's allegations, which are meant to be accepted as true, show that the May 2020 price increases negatively affected Expensify's business by *inter alia* losing customers and slowing the rate of growth until eventually turning negative, proving that the company's historical "bottom up" was no longer working. *See* ¶¶58-62 (price increases negatively impacted customer

14

retention after Q3 and Q4 2020). As such, Defendants misled investors by omitting these facts from the Registration Statement. *See In re Lucid Grp., Inc. Sec. Litig.*, No. 22-cv-02094-AMO, 2024 WL 3745605, at \*16 (N.D. Cal. Aug. 8, 2024) (statements attributing production problems to "supply chain and logistics issues" actionable because they "concealed that Lucid's own internal operational failings had materialized, which was something instead unique to Lucid and unrelated to the pandemic"); *In re Honest*, 615 F.Supp.3d at 1155 (rejecting defendants' proposed counter-factual narrative where "online reviews excerpted in the Consolidated Complaint suggests that customer canceled subscriptions and stopped purchasing Honest products after the first quarter of 2021").

*Third*, Defendants take issue with the fact that Plaintiff sourced allegations from first-hand interviews with Expensify's former employees. *See* Defs. Br. at 15-17, 20, 23-24. Relying on "confidential witnesses is routine practice. Allegations from confidential sources are perfectly acceptable where, as here, the complaint describes them "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou*, 411 F.3d at 1015. This is not a high standard. In *Daou*, the plaintiffs met their burden by "number[ing] each witness and describe[ing] his or her job description and responsibilities." *Id*. at 1016; *Jaeger v. Zillow Grp., Inc*., 644 F.Supp.3d 857, 866 n.5 (W.D. Wash. 2022); *Mulligan v. Impax Labs., Inc.*, 36 F.Supp.3d 942, 963 (N.D. Cal. 2014).

Plaintiff easily meets this standard. Each confidential witness is numbered and described with sufficient detail to provide a reliable basis for crediting his/her allegations by, for example, providing dates of employment and job responsibilities. *See* ¶¶29-41 (providing foundation for confidential witness allegations). Moreover, Plaintiff's confidential witnesses corroborate one another and collectively tell a "plausible and coherent narrative." *Okla. Police Pension & Ret. Sys.*

15

*v. LifeLock, Inc.*, 780 Fed. App'x 480, 484 n.5 (9th Cir. 2019); *see also Forescout*, 63 F.4th at 772 (crediting CW allegations where there was "consistency between the [CW's] statements"). To be sure, CW3, CW4, and CW7 describe material changes in the way Expensify conducted business in the lead up to the IPO. ¶¶92-94. CW1, CW5, and CW7 speak to the customer dissatisfaction over Expensify's pricing model. ¶¶58, 60-61. CW1, CW4, CW5, and CW6 provide similar accounts of the grave negative reaction to Barrett's October 2020 email. ¶¶69, 71, 78-79. Their accounts are also corroborated by customer complaints. ¶¶66-68, 70, 72-77, 80-83. This level of corroboration by, between, and among Plaintiff's confidential witness allegations proves Defendants' argument is meritless. *See Luong v. Subaru of Am., Inc.*, No. 17-cv-03160-YGR, 2018 WL 2047646, at *6 (N.D. Cal. May 2, 2018) (finding "prior testing, analysis, and consumer complaints" supportive of the allegation that "Subaru had knowledge of the falsity of its representations"); *Robb v. Fitbit Inc.*, 216 F.Supp.3d 1017, 1029 (N.D. Cal. 2016) (finding "the customer complaints, studies, and confidential witness statements in the Amended Complaint" supportive of falsity); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F.Supp.2d 1044, 1058-59 (C.D. Cal. 2008) ("numerous confidential witnesses . . . span[ning] different levels of the Company hierarchy . . . remain consistent across different time periods . . . [and] tell what is essentially the same story").

Defendants' case law does not change the outcome on this issue. In *In re LexinFintech Holdings Ltd. Sec. Litig.*, No. 3:20-cv-1562-SI, 2021 WL 5530949, at *9 (D. Or. Nov. 24, 2021), "four anonymous Internet complaints, standing on their own, without any additional corroborating facts, are not sufficient . . . to demonstrate falsity." That is a long way from the Complaint at bar which incorporates detailed allegations from seven former employees, two named customer complaints, one confidential accountant complaint, and eleven confidential customer complaints.

16

*See* ¶¶29-41, 58, 60-61, 66-83, 90, 92-94. Likewise, in *In re ON24, Inc. Sec. Litig.*, No. 4:21-cv-8578-YGR, 2024 WL 979951, at *6-7 (N.D. Cal. Mar. 5, 2024), the court rejected "inconsistent[]" witness allegations that "varie[d] wildly" throughout the complaint. No such "inconsistency" exists here. And, finally, in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009), the court rejected allegations from (i) a human resources employee because the complaint failed to provide a reasonable basis for her supposed knowledge about the workings of the finance department and (ii) employees who were not employed at the company during the class period. All of Plaintiff's confidential witnesses worked at Expensify at the time of the IPO and, except for one, were employees at the time of the May 2020 price increase and October 2020 political email, thereby equipping them with direct knowledge of the allegations in the Complaint.

Take CW1 for instance. Defendants claim he was not in a position to know the information he provided, *i.e.*, customer reaction to the price increases and the effect it had on retention rates. Defs. Br. at 16. Yet CW1 worked in in the "strategic sales lead & lead department" from March 2018 to June 2020 and as a "sales manager and channel partner manager" until April 2023. ¶29. During his tenure, he managed a team of sales representatives responsible for customer onboarding and was responsible for relationships with some of Expensify's top 100 accounting clients ¶30. Accordingly, CW1 undoubtably communicated with existing customers and can plausibly speak to customers being "outraged" about the price change and the residual impact on retention rates and seat expansion. ¶¶30, 58.

Defendants also unreasonably take aim at CW5 whom they also claim "is not described with sufficient particularity to render their testimony reliable." *See* Defs. Br. at 17. But CW5 worked as "the head of sales and sales enablement" at Expensify from July 2014 to September 2023. ¶¶37-38. He therefore has every basis for speaking to customer dissatisfaction over the price

17

increases and the fallout that ensued in the wake of Barrett's political email; indeed, he personally had to deal with the mess it created on a daily basis. *See* ¶¶61, 78.

CW7 further proves Plaintiff's point. Defendants argue that the timing of CW7's employment renders him unreliable. Defs. Br. at 15-17. The fact that CW7 joined Expensify in March 2021 does not make the information he provided any less accurate. ¶41. CW7 did not need to be at the company for the May 2020 price increase or October 2020 political email to witness firsthand the trouble they caused. He was at the company prior to, during, and after the IPO and witnessed how Expensify's customer support operations changed over that time as the company's customer base shifted. ¶¶60, 93.

### 2.    Political Email.

On the eve of the 2020 election between President Joseph Biden and Former President Donald J. Trump, Expensify's CEO David Barrett sent a politically charged and divisive message to the company's entire customer base. Nearly 10 million users received an email threating them that "anything less than a vote for Biden is a vote against democracy." ¶¶63-64. The email had an immediate and catastrophic effect on Expensify's "reputation" and "brand," causing tens of thousands of customers to cancel their contracts in response to what they perceived was a wildly inappropriate use of corporate messaging and betrayal of personal data. ¶¶65-93 (listing customer complaints); *see also* ¶¶128, 130 (fallout caused by Barrett's email). Expensify's Registration Statement made no mention of this; instead, it created the false impression that the company's "happy customer" base was perfectly intact and business reputation untarnished (¶¶126-27, 129) without any disclosure as to the content or fallout caused by the email itself (¶148).

Once Defendants chose to tout Expensify's growth prospects and financial viability under a "bottom-up" business model contingent on brand recognition and reputation, they assumed a

duty to disclose material adverse information to the contrary. *See LifeLock*, 780 Fed. Appx. at 483 (statements about "'real-time' nature" of theft alerts misleading because they concealed the significant flaw of "stale" alerts); *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1142-44 (9th Cir. 2017) (finding statement about sales pipeline actionable where plaintiffs alleged sales opportunities were decreasing); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) (statement that "everything [was] going fine" with FDA approval misleading because it "contravened the unflattering facts in Xoma's possession" regarding "the possible hazards of E5 and the unlikelihood of FDA approval"). Numerous district court cases support Plaintiff's point on this issue. For example:

- *In re Lyft Inc. Sec. Litig.*, 484 F.Supp.3d 758 (N.D. Cal. 2020). Statements about brand reputation, *e.g.*, "[w]e believe that building a strong reputation and brand as a safe . . . platform are critical," and related litigation risk warnings were misleading because they omitted sexual assault incidents that had occurred before the IPO and jeopardized Lyft's brand reputation. *Id.* at 768-69.

- *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020). The company intentionally delayed layoffs and restructuring "it knew were inevitable" to mislead the markets in anticipation of its IPO. Thus, the defendants misled investors when discussing the company's potential financial strength because it omitted known adverse information in violation of Regulation S-K. *Id*. at *6-*7.

- *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479-APG-DJA, 2021 WL 3216462 (D. Nev. July 28, 2021). Defendants' statements casting allegations of sexual misconduct against company CEO, Stephen Wynn, as "preposterous" and as part of a "negative public relations campaign" to "tarnish" Wynn's reputation were materially misleading because "the Company had received multiple complaints about Wynn's sexual misconduct by that point and various Company executives were aware of that." *Id.* at *8.

- *In re Honest*, 615 F.Supp.3d 1149. The defendants misled investors when describing a product as a "strategic consumer acquisition tool" because it "misrepresented or omitted material facts concerning the *efficacy* of Honest diapers as a vehicle for customer acquisition given customers' negative response to Honest's new diaper product." *Id.* at 1154 (emphasis in original). The court credited the plaintiff's allegations where they were based on "dozens of examples of customers expressing negative sentiment about the product online and statements by a former employee indicating Honest internally acknowledged the negative sentiment." *Id.*

Defendants lauded Expensify's "bottom up" model and "happy customer" base all the

19

while omitting any mention of the catastrophe created by Barrett's October 2020 political email. *See* ¶¶126-30. Similar to the above cases, Defendants misled investors by holding back material adverse information bearing directly on the topics they were discussing in the Registration Statement. The mere mention of Barrett's October 2020 email in passing buried within a risk disclosure does not save Defendants from liability. In no way did that disclosure adequately inform investors of the email's contents or otherwise notify them of the damage it had caused. *See In re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) ("hypothetical risk disclosures . . . do not absolve Defendants of their duty to disclose known material" facts); *see also Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, No. 99-cv-12046-WHP, 2001 WL 300733, at *4 (S.D.N.Y. Mar. 28, 2001) ("A prospectus will violate the federal securities laws if material facts have been omitted or presented in such a way as to obscure or distort their significance, submerged in a flood of collateral data, or treated in a cavalier manner."). To characterize the prospect of a negative reaction to communications like Barrett's political spam email as something that "could" occur when it already did, "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *See Facebook*, 87 F.4th at 949-50 (alteration in original).

Defendants do not dispute these allegations but instead argue that disclosure was generally unnecessary. They assume incorrectly that the alleged omitted information must have been known by all investors because Plaintiff's attorneys were able to discover it through their investigatory efforts. Defs. Br. at 17-18. This argument disregards the strict liability nature of Plaintiff's claims. "Section 11 is a strict liability statute . . . ." *Hemmer Grp. v. Sw. Water Co.*, 527 F. App'x 623, 625-26 (9th Cir. 2013); *Hildes*, 734 F.3d at 859 ("[l]iability . . . is virtually absolute"). Thus, regardless of what information may have existed outside the Registration Statement, liability exists

20

so long as the information inside it was misleading. *See Daou*, 411 F.3d at 1027; *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008) ("[I]nvestors are not generally required to look beyond a given document to discover what is true and what is not.").

Defendants' argument is also undermined by the Registration Statement itself, which told investors to rely only on the information contained in the Registration Statement. ¶57. Defendants' argument also overlooks the fact that any publicity concerning the October 2020 political email did not disclose the internal fallout within the company that it caused. *See* ¶¶128, 130. "[T]he fact that some information . . . was publicized does not mean that all of the relevant. . . information was also made public." *Schulein v. Petroleum Dev. Corp.*, No. 11-cv-1891-AG, 2012 WL 12884851, at *6 (C.D. Cal. June 25, 2012) ("mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation . . . may be misleading."); *see also In re Amgen Sec. Litig.*, No. 07-cv-02536-PSG, 2014 WL 12585809, at *15 (C.D. Cal. Aug. 4, 2014) ("mere fact that the FDA posted its briefing book on its website . . . is not enough to shield Defendants from liability"). Plaintiff cites scores of customer complaints not reported in the media. ¶¶67-68, 70, 73-77, 80-83. Confidential witness allegations further detail the customer fallout caused by the email. ¶¶69, 71, 78-79.[3] This was not reported publicly and cannot be considered part of the public sphere at the pleading stage.

---

[3] Defendants dispute Plaintiff's confidential witness allegations on this topic. Defs. Br. at 20. Their argument fails for the same reasons as discussed above in connection with the price increase allegations. Plaintiff adequately described each confidential witness to lay a foundation for the information they provided. For instance, CW1 and CW4 were responsible for channel partner relationships both before and after Barrett's email (¶¶29-30, 35-36); CW6 had direct interaction with customers both before and after the email (¶¶39-40); and CW5 was responsible for sales and sales enablement both before and after the email (¶¶37-38). Consequently, these witnesses "held positions that exposed them directly to data" at issue. *See Fitbit*, 216 F.Supp.3d at 1032; *see also Forescout*, 63 F.4th at 771 (the adequacy of the complaint "does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made").

For Defendants' argument to pass muster (which is essentially a premature "truth-on-the-market" defense), they need to "prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). Defendants do not meet this burden. *See Nguyen v. Radient Pharm. Corp*, No. 11-cv-0406-DOC, 2011 WL 5041959, at \*7 (C.D. Cal. Oct. 20, 2011) ("the truth-on-the-market defense is intensely fact-specific" and "courts rarely dismiss on this basis"). The decision in *Sgarlata v. PayPal Holdings, Inc.*, No. 17-cv-06956-EMC, 2018 WL 6592771 (N.D. Cal. Dec. 13, 2018), is instructive. There, the defendants contended that "because they made assurances that the PayPal platform was secure but made no such assurances regarding TIO's platform, 'the obvious implication' was that 'TIO's customers' data did *not* 'remain secure.'" *Id.* at \*7 (emphasis in original). The court, however, found that "[t]his disclosure could plausibly have created an impression that only a potential vulnerability and not an actual breach had been discovered, and certainly not one which threatened the privacy of 1.6 million users." *Id.* Similarly, Defendants misled investors here by failing to disclose the fallout that ensued from the October 2020 email, creating the impression that none existed, or it was so minimal as to not even warrant mention.

### 3. "Bottom-Up" Business Model.

Expensify repeatedly lauded its "bottom-up" business model throughout the Registration Statement while at the same time failing to disclose that it was broken and already replaced by a traditional "top down" marketing strategy. ¶¶85, 89-98. The "bottom-up" model depended on Expensify's ability to maintain its strong "reputation" and "brand" among its "happy customer" base. ¶¶2, 47-48, 52. Following the May 2020 price increase and October 2020 political email,

those levers had all but vanished leaving Expensify in need of a new growth strategy. ¶¶3-4, 62,84, 89. The Registration Statement did not disclose this but instead created the false impression that the "bottom-up" strategy was intact and remained the cornerstone of Expensify's historical and future success. ¶¶131, 135. Defendants were required to discuss these items "in a manner that [would not] mislead investors." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (defendants required to disclose negative information about "Rat Study" once they told public that "animal studies supported [drug's] safety"); *see also In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1181-83 (9th Cir. 2024) (finding statements materially misleading because Genius affirmatively represented "it had not hired anyone to solicit its securities, when, in reality, it had compensated PennyStocks to publish favorable articles."); *Forescout*, 63 F.4th at 771 (concluding that "[w]hen Defendants 'repeatedly reassured investors during the class period that the number … of prospective sales in the pipeline was unchanged … and reassured them that the pipeline was full and growing,' they 'affirmatively create[d] an impression of a state of affairs.'").

Numerous district court cases support Plaintiff's point on this issue. For example:

- *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at \*13 (N.D. Cal. Nov. 27, 2018). The defendants "chose to tout Yelp's local advertising model as 'fairly proven'" while "omitting any mention of the churn issues that would likely significantly and negatively impact revenue."

- *In re Apple Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at \*10-11 (N.D. Cal. June 2, 2020). When discussing reasons for the company's positive revenue report, the defendants provided investors with "specific factors—such as high upgrade rates— that seem[ed] to require disclosure" of adverse information relating to the revenue factors identified.

- *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F.Supp.3d 1035, 1052- 53 (D. Minn. 2015). The defendants' statement that "'direct sourcing model remain[ed] a material competitive advantage over the other [industry] players'" constituted a "a factual statement" about the source of its success that, in turn, obligated them to disclose adverse information concerning related-party transactions. *Id.* at 1049.

Plaintiff's theory of falsity here is similar in concept to the misrepresentations discussed

23

above. Events had already transpired by the time of the IPO (*i.e.*, the May 2020 price increase and the October 2020 email) that damaged Expensify's "bottom up" business model. ¶¶85, 89-98. Yet instead of disclosing these adverse events, the Registration Statement portrayed the "bottom up" business model as fully intact and in use. ¶¶131, 135. "[O]nce [D]efendants chose to tout the company's ['bottom up' model], they were bound to do so in a manner that wouldn't mislead investors . . . ." *Berson*, 527 F.3d at 987. Defendants failed in this regard. Further, because the "bottom up" model had been harmed and subsequently abandoned in favor of a traditional "top down" marketing strategy, the Registration Statement was obligated to disclose that change under Regulation S-K. ¶¶137-38.

Defendants again offer a litany of meritless reasons why they should not be held accountable for violating Section 11. ***First,*** Defendants attempt to characterize Expensify's "bottom-up" strategy statements as referring only to marketing efforts rather than to its business model as a whole. Defs. Br. at 20-24. "However, this characterization fails to take into account the import of context." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F.Supp.3d 1028, 1042 (N.D. Cal. 2018) (rejecting defendants "attempt to characterize [their] market performance statements as referring only to customer demand rather than to [business] performance as a whole"). Defendants also incorrectly assert that the Registration Statement properly disclosed Expensify's shift in business strategy. *See* Defs. Br. at 21. Contrary to what Defendants cite in their brief, the actual (complete) passage from the Registration Statement reads as follows:

> We support this powerful word-of-mouth marketing with large-scale brand advertising to build market consensus that Expensify is the software of choice for expense management. This includes active participation in industry conferences, partnerships with industry influencers, partner marketing and hosting our own conference, ExpensiCon. We believe that these activities to drive awareness are crucial given our focus on individual employees and the fact that expense

management touches every employee and spans every layer of an organization. *See* Ex. 4 at 124. Notably absent from these "disclosures" is Expensify's shift to outbound marketing tactics, including *inter alia* the hiring of 60 SDRs before the IPO. ¶¶88, 91-97. Accordingly, Defendants' reliance on *Hoang v. ContextLogic, Inc.*, No. 21-cv-03930-BLF, 2023 WL 6536162, at *10-11 (N.D. Cal. Mar. 10, 2023), is inapposite. Defs. Br. at 21, 24. Plaintiff's theory of liability does not hinge on the allegation that Expensify *never* spent money on marketing, but instead that Expensify materially changed marketing in the lead up to the IPO, thereby signaling a shift in strategy away from its historical "bottom up" model. Likewise, in *Sanders v. Realreal, Inc.*, No. 19-cv-07737-EJD, 2021 WL 1222625, at *20 (N.D. Cal. Mar. 31, 2021), the defendants provided investors with a risk warning that addressed the precise piece of information that plaintiffs claimed had been omitted, thereby negating the inference that any investor had been misled. No such disclosure was made by Defendants in the Registration Statement.

*Second*, Defendants again attack Plaintiff's confidential witness allegations. For example, they claim CW3 lacked the experience necessary to provide the information attributed to him in the Complaint. Defs. Br. at 24. However, CW3 was a marketing designer that worked at Expensify throughout the price increases, political email, and IPO. ¶¶33-34. Logically, his role at the company made him privy to the "big push in new advertising before the IPO" and "creat[ing] an especially large amount of content in the lead-up the IPO." ¶94. Defendants raise similar attacks against CW2, CW5, and CW7. Defs. Br. at 23-24. For the same reasons discussed above, their arguments fail. Each witness is described adequately to provide a basis for their respective allegations. *See* ¶¶31-32 (CW2), ¶¶37-38 (CW5), ¶41 (CW7). This is starkly different from *Scheller v. Nutanix, Inc.*, 450 F.Supp.3d 1024, 1035 (N.D. Cal. 2020), which Defendants rely upon. In that case, the plaintiffs could not rely on "account managers" to make allegations about the defendants' "hiring polic[ies]." As the Ninth Circuit recently stated, confidential witnesses do not

25

need to possess "inside knowledge about corporate-level trends" only "knowledge about the specific statements he made." *Forescout*, 63 F.4th at 771 ("[t]hough the CWs, as individuals, might not have known about corporate-level trends, their statements combine to tell a plausible story").

***Third***, Defendants try to avoid liability under Item 101 of Regulation S-K by citing *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537 (S.D.N.Y. 2021). Defs. Br. at 25. Item 101 requires disclosure of "[a]ny material changes to a previously disclosed business strategy." 17 C.F.R. § 229.101(a)(1)(i). In *Opera*, the plaintiffs failed to allege adequately that "Opera entered the fintech business before it acquired OKash in December 2018, after Opera's IPO in August 2018, or had plans to enter the fintech market imminently." *Id.* at 555. Thus, the defendants' Item 101 disclosure obligations had not been triggered. Here, however, Plaintiff adequately alleges that beginning around Q2 2021— before the IPO—Expensify abandoned its historical "bottom-up" business model which, in turn, led to uncharacteristically high advertising costs typically associated with more traditional "top-down" approaches. ¶¶85-98, 138. Unlike *Opera*, these facts triggered Item 101. *See In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906 (AS), 2024 WL 1348749, at *12 (S.D.N.Y. Mar. 29, 2024) ("Plaintiffs plausibly allege that the majority of CarLotz, Inc.'s business was not on the consignment-to-retail model it had repeatedly emphasized, suggesting a disclosure was necessary. Because none was made, Plaintiffs plausibly allege an Item 101 violation."); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 841-42 (S.D.N.Y. 2019) (requiring disclosure of change in "seasonality" of business pursuant to 17 C.F.R. §229.101(c) because it was provided "understanding of [defendant's] business as a whole").

***Fourth***, Defendants also try to skirt liability under the other alleged Regulation S-K violations, *i.e.*, Items 105 and 303. Defs. Br. 26-27. Item 105 requires disclosure of the most salient risks concerning an investment and Item 303 requires disclosure of known trends or uncertainties

26

that are likely to affect an issuer's operations or financial earnings. *See* 17 C.F.R. §§ 229.105, 229.303. Plaintiff alleges undisclosed risks and trends—namely, that the price increases and political email had damaged Expensify's "reputation," "brand," and "happy customer" base thereby necessitating a change from its historical "bottom up" model to a traditional "top down" marketing approach. *See* ¶¶140, 145. These allegations triggered affirmative disclosure obligations under Regulation S-K. *See Pirani v. Slack Technologies, Inc.*, 445 F.Supp.3d 367, 386 (N.D. Cal. 2020) (violation of Item 303 were defendants did not disclose likely effects of failing to comply with "service level agreements" with its customers); *Mingbo Cai v. Switch, Inc.*, No. 2:18-cv-01471-JCM-VCF, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (registration statement did not disclose that "Switch had already changed its sales strategy to focus on hybrid cloud solutions" and that the "strategy presented a serious risk of diminishing revenue due to new complications and required engineering"); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 511 (S.D.N.Y. 2013) (defendants violated Item 303 by failing to disclose "the extent increasing mobile users would affect the Company's overall revenues at a time this trend was already affecting the Company's revenues as a result of the Company's product decisions").

Contrary to Defendants' claim, "'the case law is far from settled regarding the length of time necessary to constitute a 'trend' for the purpose of Item 303.'" *Sundaram v. Freshworks Inc.*, No. 22-cv-06750-CRB, 2023 WL 6390622, at *7 (N.D. Cal. Sept. 28, 2023) (finding one quarter of financial deceleration constituted an Item 303 trend). "Item 303's disclosure obligations . . . do not turn on restrictive mechanical or quantitative inquiries." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012). Indeed, adverse trends and uncertainties manifested within the same quarter as an IPO have been found to form the basis of an Item 303 disclosure obligation. *See*, *e.g.*, *Franchi v. SmileDirectClub, Inc.*, 633 F.Supp.3d 1046, 1066-67

27

(M.D. Tenn. 2022) (allegations of "sudden downward trend[s]" in three financial metrics in quarter in which IPO occurred were sufficient to plead a material omission under Item 303).[4]

Furthermore, Defendants are wrong to suggest that Plaintiff's Regulation S-K allegations are subject to a higher pleading standard. Defs. Br. at 9-10. Item 303's use of the term "known" when describing the events or uncertainties that must be disclosed does not inject an element of fraudulent intent into the analysis. *See Uber*, 2020 WL 4569846, at \*4 (Rule 9(b) not applied to complaint only alleging Section 11 strict liability and negligence claims). The intent to deceive is not an element of Plaintiff's claim nor is the underlying conduct alleged to be fraudulent. *See*, *e.g.*, *Hoang*, 2023 WL 8879263, at \*12 (applying Rule 8(a) to § 11 claim concerning what defendants knew at the time of the IPO); *Wallace v. IntraLinks*, No. 11-cv-8861(TPG), 2013 WL 1907685, at \*12 (S.D.N.Y. May 8, 2013) ("[T]he allegations that [defendant] failed to disclose a ***known*** uncertainty supports the claim of Section 11 and 12(a)(2) liability pursuant to Regulation S-K, which plaintiffs are able to allege without requiring the application of Rule 9(b).") (emphasis in original); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F.Supp.2d 506, 513 (S.D.N.Y. 2010) ("'[T]hat a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.'").

Defendants' reliance on *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012), *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156 (9th Cir. 2009), and *In re Orange 21 Inc. Sec. Litig.*,

---

[4] *See also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F.Supp.2d at 513 n.28 (finding Defendants had a duty to disclose a material negative impact to revenues which occurred ten days prior to the IPO); *Schuh v. HCA Holdings, Inc.*, 947 F.Supp.2d 882, 891-92 (M.D. Tenn. 2013) (recognizing "what may not constitute a trend in one industry may signal a trend in another" and rejecting that "a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303"); *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 231 (S.D.N.Y. 1999) (Item 303 required disclosure of known declining sales trend that occurred in the same quarter as the offering.).

No. 05-cv-0595-JM, 2006 WL 8455352, at *2 (S.D. Cal. Mar. 30, 2006), does not change the outcome on this issue. In *Rigel* and *Rubke*, the Ninth Circuit concluded that the complaint "sounds in fraud" where, unlike here, it "relies on the same alleged misrepresentations . . . that are central to Plaintiff's section 10(b) fraud claim," *Rigel*, 697 F.3d at 886, or "employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b)," *Rubke*, 551 F.3d at 1161. Plaintiff does not allege any Section 10(b) fraud claims. And in *Orange 21*, the court applied Rule 9(b) concluding plaintiffs' "allegations amount to a theory that Defendants intentionally withheld information in order to guarantee a successful IPO." 2006 WL 8455352, at *2. Plaintiff does not make any such allegation. *Cf. Violin Memory*, 2014 WL 5525946, at *8 (declining to infer allegations of fraud where, as here, there was no allegation that defendants "knowingly" or "intentionally" concealed information).[5]

## B.    Loss Causation Is Not a Section 11 Element.

"[L]oss causation is not a § 11 element." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1170 (C.D. Cal. 2008); *see*, *e.g.*, *Hildes*, 734 F.3d at 859-60 (collecting cases). "Rather, § 11(e) makes the absence of loss causation (or 'negative causation') an affirmative defense to reduce or avoid liability." *Countrywide*, 588 F.Supp.2d at 1170. The defendant "bears a 'heavy burden'" to establish the defense and must "show 'that the depreciation in value' of a plaintiff's stock 'resulted from factors other than the alleged material misstatement.'" *Hildes*, 734 F.3d at 860; *see also In re Shoretel, Inc., Sec. Litig.*, No. 08-cv-00271-CRB, 2009 WL 2588881, at *3 (N.D. Cal. Aug. 19, 2009) ("To dismiss a complaint based on negative causation, ***the complaint has to foreclose the possibility that defendants caused plaintiffs' losses***." (emphasis

---

[5] In any event, Plaintiff satisfies the Rule 9(b) particularity requirement for falsity by alleging the "who, what, when, where, and how" for each statement. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

29

added)).

Defendants mount an improper and premature negative causation defense, arguing Plaintiff "has not pled any connection between his alleged losses in 2023 and anything in the Registration Statement in 2021." Defs. Br. at 29-32. Plaintiff is not obligated to plead loss causation to establish his *prima facie* case. *Herman*, 459 U.S. at 382. But even so, Defendants are wrong. Expensify's May 2020 price increase and Barrett's October 2020 political email ruined the company's "brand" and "reputation" amongst its "happy customer" base, prompting an exodus of customers and effectively breaking the company's historical "bottom-up" growth model. ¶¶3-4, 102. The damage caused by these events came to light over subsequent quarters as customer contracts expired (and were not renewed), growth slowed, and analysts downgraded the stock before reaching its all-time low of less than $2/share. ¶¶103-19. These allegations more than suffice to defeat Defendants' negative causation defense, given that disclosures "need not 'precisely mirror' the misrepresentation." *Genius Brands,* 97 F.4th at 1184; *Mineworkers' Pension Scheme v. First Solar Inc*., 881 F.3d 750, 753 (9th Cir. 2018) ("plaintiffs need only show a 'casual connection between the [misconduct] and the loss").

Defendants' cases are not to the contrary. In *In re Velti PLC Sec. Litig*., No. 13-cv-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015), the plaintiffs sold their shares before any alleged corrective disclosure. *Id.* at *29. In *In re Shoretel, Inc. Sec. Litig.*, No. 08-cv-00271-CRB, 2009 WL 248326 (N.D. Cal. Feb. 2, 2009), the plaintiffs relied on disclosures that bore no relation to the misstatements or omissions in the registration statement. Similarly, unlike here, the plaintiffs in *Brown v. Ambow Educ. Holding Ltd*., No. 12-cv-5062-PSG, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014), relied on corrective disclosures that did not mention the alleged accounting misconduct at issue in the case. Plaintiffs' corrective disclosures are materially different than the ones in these

30

cases, given that they concern analyst downgrades arising from and/or concerning the omitted information. *See*, *e.g.*, ¶103 (Morgan Stanley downgrade over "structural headwinds"); ¶113 (J.P. Morgan downgrade in response to Expensify's "word-of-mouth model"); ¶117 (Piper Sandler downgrade following "Ninth straight quarter of eroding growth" and "Internal missteps"). "Accordingly, it is not clear on the face of the pleading that Plaintiff cannot show damages." *Lyft*, 484 F.Supp.3d at 778 (rejecting negative causation defense where reports of safety concerns caused stock price to decline).

Defendants also raise a "truth-on-the-market" defense by arguing that the omitted information was "publicly known" and "disclosed." Defs. Br. at 30. Similar to negative causation, "truth-on-the-market" should not be raised at the pleading stage. *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc.,* 660 F.3d 1170, 1177 (9th Cir. 2011) (this "truth-on-the-market" defense "is a merits issue to be reached at trial"), *aff'd,* 568 U.S. 455 (2013). "Before the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Provenz*, 102 F.3d at 1492-93. Defendants have not made this showing. They do not (and cannot) point to anything prior to the IPO disclosing how the May 2020 price increase or October 2020 political email were impacting Expensify's "bottom up" model behind closed doors. The mere mention of the price increase or email alone are not sufficient without further disclosing how they were impacting Expensify's operations. *See Miller*, 519 F.3d at 887 (Securities Act requires more than simply giving investors opportunity to "connect the dots").

Finally, while Defendants offer an alternative explanation for the decline in Expensify's stock price involving "overall market downturn" (Defs. Br. at 31-32), it has no bearing at the

pleading stage where "loss causation" is not even an element of the claim alleged. Indeed, even if it were, "[t]he plaintiff need not show 'that a misrepresentation was the *sole* reason' for a price decline, but rather that it was 'one substantial cause.'" *Genius Brands*, 97 F.4th at 1183 (emphasis in original); *see also Fitbit*, 216 F.Supp.3d at 1033 ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial…").

**C.**     **The Complaint Adequately Pleads Control Person Liability Under Section 15.**

Because Plaintiff adequately pled a primary liability under Section 11, he has rebutted Defendants only argument against Section 15 secondary liability (Defs. Br. at 32). *See*, *e.g.*, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009). Defendants cannot now contest this point. *See U.S. v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006).

**V.**     **CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[6]

Dated: September 6, 2024                    Respectfully Submitted,

                                    **BLACK HELTERLINE LLP**

                                    */s/ Michael B. Merchant*
                                    Michael B. Merchant, OSB No. 882680
                                    805 S.W. Broadway, Suite 1900
                                    Portland, OR 97205
                                    Tel.: (503) 224-5560
                                    Fax: (503) 224-6148
                                    Email: mike.merchant@bhlaw.com

                                    *Liaison Counsel for Lead Plaintiff and the Class*

---

[6] Alternatively, if the Court grants Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend the pleadings. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

**LEVI & KORSINSKY, LLP**
Adam M. Apton (admitted *pro hac vice*)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Lead Counsel for Lead Plaintiff and the Class*

33

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that by doing so I served the foregoing on all parties in the record of the subject case via CM/ECF system transmission.

DATED this 6th day of September 2024.

BLACK HELTERLINE LLP


By: s/ Michael B. Merchant
Michael B. Merchant, OSB No. 882680
(503) 224-5560

*Liaison Counsel for Lead Plaintiff and the Class*

1