IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CODY WILHITE, Individually and On Behalf of All Others Similarly Situated, | 3:23-cv-01784-JR |
| Plaintiff, | FINDINGS & RECOMMENDATION |
| v. | |
| EXPENSIFY, INC., DAVID BARRETT, RYAN SCHAFFER, BLAKE BARTLETT, ROBERT LENT, ANU MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY L. CHRISTEN, YING (VIVIAN) LIU, ELLEN PAO, J.P. MORGAN SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., BofA SECURITIES, INC., PIPER SANDLER & CO., JMP SECURITIES LLC, and LOOP CAPITAL MARKETS LLC, | |
| Defendants. | |

RUSSO, Magistrate Judge:

Lead plaintiff, Aleem Kanji, in this action on behalf of himself and all others similarly situated, alleges defendants Expensify, Inc., its officers and directors, and the banks that underwrote Expensify's initial public offering (IPO), violated the Securities Act. Defendants

Page 1 – FINDINGS & RECOMMENDATION

Expensify, Inc., David Barrett, Ryan Schaffer, Blake Bartlett, Robert Lent, Anu Muralidharan, Jason Mills, Danial Vidal, Timothy Christen, Ying (Vivian) Liu, and Ellen Pao move to dismiss the amended class action complaint. Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., BofA Securities, Inc., Piper Sandler & Co., Citizens JMP Securities, LLC, and Loop Capital Markets LLC join in the Expensify Defendants' motion to dismiss. For the reasons stated below, the motion is granted in part and denied in part.

## ALLEGATIONS

Lead plaintiff alleges Expensify provides expense management software and related services to small and medium-sized businesses. As of December 2020, businesses with fewer than 1,000 employees accounted for over 95% of Expensify's customers by revenue.  Amended Class Action Complaint (ECF 32) at ¶¶ 1, 42. Plaintiff asserts:

> Expensify was marketed as a self-service platform, designed to be easily implemented and configured without the need to speak with a salesperson. Instead, Expensify's AI-powered customer support engine, Concierge, was purportedly designed to help new members set up an account, connect teammates, assign company policies and immediately sync the Company's platform with existing accounting, human resources and travel systems.

Id. at ¶ 43.

Plaintiff alleges:

> When founded, Expensify adopted a viral "bottom-up" business model, which was highly dependent on customer satisfaction for continued and future engagement with the platform. This approach to generating revenue sought to take advantage of organic word-of-mouth adoption of the Company's purported easily accessible, easily configurable, simple to set up platform.
>
> In practice, this viral "bottom-up" business model typically started with the adoption of Expensify's self-service platform by an individual employee within an organization. This individual employee would download Expensify's mobile application or sign up for free on the Company's website, and then use Expensify's platform to submit expenses to their manager. When an expense report is submitted, the manager who receives it also automatically becomes a member. After the employee purportedly realized the benefits of Expensify's platform, they became a "champion" of Expensify and spread it internally to other employees. Then with

Page 2 – FINDINGS & RECOMMENDATION

multiple employees using Expensify and purported valuable features simplifying the manager's job, the decision maker within the customer organization would purchase a subscription to Expensify and become a paying customer with a few members.

Id. at ¶¶ 47-48.

Plaintiff alleges Expensify's "happy customer" business model began to fail prior to the IPO due to management decisions impacting the underlying business. Id. at ¶ 54. Plaintiff asserts in April 2020, Expensify announced, effective May 1, 2020, it would be increasing its per member pricing for the first time since implementing its subscription-based fee model in 2009. Id. Plaintiff alleges monthly subscriptions increases were from $5 to $10, $5 to $20, $9 to $18, and $9 to $16 depending on the type of subscription and whether the subscriber was contract or pay per use. Id. at ¶55.[1]  Plaintiff asserts:

> According to CW1, Expensify's decision to double, if not triple, its per member pricing outraged many customers, and cost the Company customers but the full extent of the resulting loss was lagged because of their contractual commitments. Nevertheless, for the first time since its inception, Expensify saw a decrease in paid members during the three-month period ended June 30, 2020 ("Q2 2020")—from an average of 742,000 paid members at the three-month period ended March 31, 2020 (at date, the Company's highest recorded number of paid members) to an average of 630,000 paid members in Q2 2020, or a 15.09% decline.[2]
> ….
> Moreover, any hopes of improved customer support justifying the significant price increase were short-lived. CW7 said Expensify often made unexpected, sweeping changes to the process for handling customer accounts that upset customers and caused confusion and frustration for its employees. According to CW7, most of the calls made to customer support were from businesses seeking assistance with the implementation (or onboarding process) of Expensify as an expense management

---

[1] Plaintiff also alleges Expensify changed its annual contract terms to be non-cancelable.  Plaintiff further alleges:
When informing customers of the price change, Expensify claimed to offer reprieve from the steep increase by offering a 50% discount for members on an annual rate and a 75% discount to members on a pay-per-use rate if they "bundled" with the Expensify Card – i.e., at least 50% of the customer's company expenses had to be paid for with an Expensify Card – which, in turn, would have allowed Expensify to monetize transactions from the Expensify Card by receiving a percentage of the interchange for all spending on the card. However, customers were slow and/or reluctant to adopt the Expensify Card.
Id. at ¶ 59.
[2] Plaintiff asserts revenue growth slowed dramatically after the third quarter of 2021 and revenues continue to decline to the present day. Id. at ¶ 110.

Page 3 – FINDINGS & RECOMMENDATION

> solution. CW7 said that when they first began working at Expensify (in March 2021), CW7 would assist the onboarding customer from start to finish, doing all their integrations, creating a customer portal on the Company's platform, loading company data, teaching them how to use it, giving a demonstration of the account, etc. But shortly thereafter the role of customer support changed into something much messier and more chaotic, CW7 said.
>
> ….
>
> Expensify's competitors, such as Ramp, Brex, and bill.com (later merged with Divvy), also emerged with similar expense management platforms that did not charge a subscription-based fee. According to CW5, these new competing solutions exacerbated the adverse effects of Expensify's new pricing (e.g., subscription cancellations and/or non-renewals), given that the new products were available for free.

Id. at ¶¶ 58, 60-61.

Plaintiff alleges the price increase and failure to make product improvements resulted in customers choosing to terminate their subscriptions.

Plaintiff alleges on October 22, 2020, Expensify's CEO, defendant David Barrett emailed Expensify's 10 million users an email entitled "Project Democracy, vote for Biden:"

> I know you don't want to hear this from me. And I guarantee I don't want to say it. But we are facing an unprecedented attack on the foundations of democracy itself. If you are a US citizen, **anything less than a vote for Biden is a vote against democracy.** …

Id. at ¶ 64.

Plaintiff asserts, citing several customers responses in October 2020, the email caused severe reputational harm amongst Expensify's channel partners and alienated a significant portion of its customer base. As a result, the email negatively impacted the Company's organic word-of-mouth platform adoption, customer retention, and revenue growth. Id. at ¶¶ 65-68., 70, 72-77, 80-82.

Plaintiff alleges:

> According to CW4, Barrett's October 2020 political spam email was known internally as "The Email" and was infamous. As discussed above, Expensify's largest retail channel was accountants, who steered their clients to Expensify for its

Page 4 – FINDINGS & RECOMMENDATION

expense management platform. CW4 said there was significant effort on Expensify's part to get these accountants to recommend the Company's platform to their clients. CW4 recalled how quickly that all went out-the-window following "The Email". According to CW4, Expensify's accounting partners found Barrett's political email especially offensive. CW4 said that the impact of Barrett's email dragged on for years. According to CW4, the Company made efforts to mend these relationships, taking accounting partners out to dinners, but they just got "reamed" instead. Indeed, CW4 said the Company was still experiencing blowback from "The Email" as late as May 2023.

Id. at ¶ 69.

Plaintiff further alleges:

CW4 added that Barrett's political spam email was seen as a persistent hassle from an employee perspective. CW1 said many employees, including CW1, felt alienated by Barrett's political spam email. According to CW4, following "The Email" and resulting blowback from retail partners and other customers, Expensify circulated an internal brief and logic tree, with a guided line for employees to say, "We stand behind it," if the email came up. CW1 also stated that employees were instructed to say very little to the customers who were offended by Barrett's political spam email. CW5 echoed CW4 and CW1 stating that, as an employee in sales and marketing, managing the angry aftermath of the email was a real headache. When asked to elaborate on the severity of the backlash following Barrett's email, CW5 said you have no idea (indicating that the backlash was far more significant and severe than anyone outside the Company could reasonably imagine).

According to CW1, because many of Expensify customers were under annual contracts that were non-cancelable, the impact of defections stemming from Barrett's October 2020 political spam email, like those following the Company's May 2020 price increase, was delayed. CW4 echoed CW1 stating, larger accounts were reluctant to terminate outside of the annual timeframe due to the expense, adding that the only impetus to stay was if they were already six months in. According to CW4, eventually lots of customers paying for 10-to-20-person annual subscriptions left Expensify. CW4 added that the only reason Expensify did not see a comparable churn of enterprise customers (Fortune 500 companies) was because changing expense reporting products for a such big companies is a significant undertaking, it cannot happen overnight.

Id. at ¶¶ 78-79.

Plaintiff asserts in March 2021, as a result of the fallout from the political email, there was

a price increase  necessitating a significant shift from the bottom-up model, and its resulting benefit

of the reduced need for advertising expenditures.  Plaintiff alleges Expensify then instituted a top-

Page 5 – FINDINGS & RECOMMENDATION

down strategy:

> CW4 said that around March 2021, for the first time in CW4's tenure with Expensify (hired in March 2018), the Company engaged in discussions about hiring sales development representatives ("SDRs"). According to CW4, these conversations led to Expensify hiring 60 SDRs before the IPO because the Company wanted to build up its customer base before going public. For context, as of June 30, 2021, Expensify had 140 full-time employees.
>
> In addition to hiring SDRs to generate new user acquisition, CW7 said that when they first started working in customer support for Expensify (in March 2021), the Key Performance Indicator (KPI) was a specific number of calls per hour—i.e., a focus on efficient and effective support to promote existing customer retention and expansion—but shortly thereafter it shifted to the number of people they could get onboarded that month—i.e., new user acquisition on any plan, at any rate.
>
> Further, as a marketing designer at Expensify, CW3 was tasked with numerous projects leading up to the IPO. CW3 said that there was a big push in new advertising before the IPO, claiming Expensify created an especially large amount of content in the lead-up to the IPO. In addition, according to CW3, there was a notable downward shift in demand for brand content after the Company went public, signifying a further departure from its original business model.

Id. at ¶¶ 92-94.

Plaintiff alleges the registration statement for the IPO (RS) contained material misrepresentations and omissions concerning the price increase, the political email, and the abandonment of its bottom-up marketing approach. Plaintiff alleges the November 2021 RS only disclosed the price increase in passing:

> Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, **primarily due to a pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members** from existing customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses and increased demand for business travel, which is a significant use case for our platform and drove an increase in the number of paid members, due to the lifting of travel restrictions within the United States and certain other countries and increased employers returning to the office as a result of the wide spread availability and distribution of COVID-19 vaccines.
>
> Our revenue in each of the quarters presented predominantly increased consecutively over periods presented primarily due to increased demand for our platform from both new and existing customers as well as an increase in our average paid members and a **pricing change implemented in May 2020, which led to a gradual increase in per member price for our paid members** from existing

Page 6 – FINDINGS & RECOMMENDATION

customers not using the Expensify Card in connection with our expense management platform for 50% or more of their approved expenses. All new customers beginning on May 1, 2020, were subject to this pricing change. Our revenue was adversely affected by the COVID-19 pandemic in the quarter ended June 30, 2020, particularly due to the decrease in business travel, which is a significant use case for our platform, but this adverse impact was mitigated by the prevalence of our annual contracts and minimum user requirements in those contracts.

Id. at ¶ 121.

Plaintiff alleges the statement was false and materially misleading because it failed to disclose the magnitude of the pricing change and that it had caused customers not to renew their contracts and caused expansion rates to slow or even halt. Id. at ¶ 122.  Plaintiff asserts Expensify falsely stated in the RS "[w]e recently increased our subscription prices, and we do not know if these price increases will adversely affect our business."  Id. ¶ 124.[3] Plaintiff also alleges the statement was materially misleading because:

they represented that revenue for the six-month period ended June 30, 2020 was "adversely affected" due to a "decrease in business travel" when, in fact, the Company's dramatic price increases announced in April 2020 and made effective as of May 1, 2020, also materially adversely affected revenues for the period. By identifying only the "decrease in business travel" as a negative factor impacting revenue, Expensify omitted the material effects of its May 2020 pricing change and modification to its contract cancellation policies. Indeed, for the first time in the Company's history, Expensify saw a decrease in paid members during the three-month period ended June 30, 2020—from an average of 742,000 paid members at the period ended March 31, 2020 to an average of 630,000 paid members.

---

[3] The RS went on to note:
While we do and will attempt to set prices based on our prior experiences and customer feedback, our assessments may not be accurate and we could be underpricing or overpricing our platform. In addition, if the offerings on our platform change, then we may need to revise our pricing strategies. Any such changes to our pricing strategies or our ability to efficiently price our offerings could adversely affect our business, operating results and financial condition. Pricing pressures and decisions could result in reduced sales, reduced margins, losses or the failure of our platform to achieve or maintain more widespread market acceptance, any of which could negatively impact our overall business, operating results and financial condition. Moreover, the organizations which we target may demand substantial price concessions. As a result, we may be required to price below our targets in the future, which could adversely affect our revenue, profitability, cash flows and financial condition.
Id. at ¶ 124.

Page 7 – FINDINGS & RECOMMENDATION

Id. at ¶ 123.

Plaintiff asserts the RS failed to disclose that the price increase had already caused loss of customers. Id. at ¶ 125.

Plaintiff alleges the RS did not disclose the political email or its fallout but, rather, only disclosed complaints received by the Federal Election Commission "in connection with David Barrett's email on October 23, 2020, urging customers to protect democracy." Id. at ¶ 148. Plaintiff asserts the RS failed to disclose the contents of the email, that it alienated at least half of its existing customers, and resulted in mass cancelations. Id. at ¶ 149.

Plaintiff alleges the RS was materially misleading in that it leveraged the strength of its brand and reputation to grow organically through word-of-mouth but failed to disclose a shift to a top-down strategy. Id. at ¶¶ 47-48, 52-53, 85, 99, 91, 95, 131-32, 135-36.

Plaintiff alleges on November 15, 2021, Expensify announced the closing of its IPO of 11,190,392 shares of common stock priced at $27.00 per share. Id. at ¶ 101. Plaintiff asserts the truth concerning the fall-out of the price increase, the political email, and abandonment of the bottom-up strategy came to light via analyst downgrades and then admissions and revelations by Expensify in 2023. Id. at ¶¶ 103-118. Plaintiff alleges that as of the filing of the initial complaint in this action on November 29, 2023, "Expensify stock closed at $2.42 per share. Presently, Expensify's stock trades below $2 per share, representing a nearly 95% decline from its $27 per share IPO price." Id. at ¶ 119.

Lead plaintiff alleges violation of Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants. Id. at ¶¶ 163-175. Plaintiff alleges violation of section 15 of the Securities Act, 15 U.S.C. § 77o, against the individual defendants. Id. at ¶¶ 176-182. Plaintiff seeks compensatory damages in favor of the lead plaintiff and other members of the class for damages sustained as a

Page 8 – FINDINGS & RECOMMENDATION

result the alleged Securities Act violations. Id. at p. 60.

JUDICIAL NOTICE

Defendants seek judicial notice of the following items for the Court to consider in connection to the motion to dismiss:

> 1. Exhibit 1 – a true and correct copy of the CBS News article entitled "CEO emails 10 million customers to tell them to vote for Biden," by Aimee Picchi, dated October 24, 2020, which is publicly available at https://www.cbsnews.com/news/expensify-ceo-david-barrett-emails-customers-vote-biden/.

> 2. Exhibit 2 – a true and correct copy of an October 2020 post on Expensify's community discussion forum entitled "VERY Disappointed with Expensify using customer email to express political opinions!," and comments from Expensify users related to the post, which is publicly available on Expensify's website at https://community.expensify.com/discussion.

> 3. Exhibit 3 – a true and correct copy of an October 2020 post on Expensify's community discussion forum entitled "David Barrett's email promoting Joe Biden violated our corporate policy on political lobbying," and comments from Expensify users related to the post, which is publicly available on Expensify's website at https://community.expensify.com/discussion.

> 4. Exhibit 4 – a true and correct copy of Expensify's Registration Statement on Form S-1, as amended, which was publicly filed with the United States Securities and Exchange Commission ("SEC") on November 8, 2021 and is publicly available on the SEC website at www.sec.gov/edgar.

> 5. Exhibit 5 – a true and correct copy of J.P. Morgan's analyst report entitled "Expensify: Attractive fundamentals, but challenging business model; Initiate with Underweight," dated September 15, 2023.

> 6. Exhibit 6 – a true and correct copy of Piper Sandler's analyst report entitled "Expensify, Inc. (EXFY): Mired in Another Quarter of Execution Missteps; Lowering Estimates, PT to $2," dated November 7, 2023.

Request for Judicial Notice (ECF 55) at p 1.

Generally speaking, "a district court may not consider materials beyond the pleadings in ruling on a Rule 12(b)(6) motion." Skilstaf, Inc. v. CVS Caremark Corp., 669 F.3d 1005, 1016 n. 9 (9th Cir. 2012). Among the exceptions to this general rule are the "court may take judicial notice

Page 9 – FINDINGS & RECOMMENDATION

of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute." Id. (citation omitted). Indeed, as the Supreme Court explained, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." In re Amgen Inc. Sec. Litig., 544 F. Supp. 2d 1009, 1023 (C.D. Cal. 2008).

A document may be incorporated by reference when "the plaintiff refers extensively to the document, or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (describing incorporation by reference may apply where, for example, "a plaintiff's claim about stock fraud is based on the contents of SEC filings").

Lead plaintiff does not object to the Court taking judicial notice of documents attached to defendants' request for judicial notice. Exhibits 2-6 are incorporated by reference in the amended complaint and form the basis of plaintiff's claims and, therefore, the Court takes judicial notice of these documents. Exhibit 1 is a publicly available news article about the political email that forms a basis for plaintiff's claims. It is offered for the purpose of showing the email was known to the public in October 2020. The article fits the narrow set of circumstances in securities litigation where judicial notice of newspaper articles is appropriate. See Gerritsen v. Warner Bros. Ent. Inc., 112 F.Supp.3d 1011, 1028 (C.D. Cal. 2015); Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 (9th Cir. 1999) (explaining that where the market has already been made aware of the

Page 10 – FINDINGS & RECOMMENDATION

purportedly concealed information "the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled."); Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P., 435 F.3d 396, 401 n. 15 (3d Cir. 2006) (affirming district court's decision to take judicial notice of news articles, explaining "[w]hether appellants read the articles or were aware of them is immaterial" because the articles "serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."); In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F.Supp.2d 416, 425 n. 15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment."). Accordingly, the request for judicial notice is granted.

DISCUSSION

To allege a claim under Section 11 of the Securities Act, plaintiff must plausibly plead facts demonstrating (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. See Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1161 (9th Cir. 2009). A fact is material when a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). A prima facie case is alleged merely by plausibly pleading a material misstatement or omission even for innocent misstatements. See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983). In addition, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. Brown v. Ambow Educ.

Page 11 – FINDINGS & RECOMMENDATION

Holding Ltd., 2014 WL 523166, at *14 (C.D. Cal. Feb. 6, 2014). However, if the facts as alleged by plaintiff and documents to which the court may take judicial notice, establish damages were not caused by the alleged misstatements and omissions (i.e., negative causation), then the complaint is properly subject to dismissal. In re Velti PLC Sec. Litig., 2015 WL 5736589, at *28 (N.D. Cal. Oct. 1, 2015). Thus, plaintiff must allege the stock price fall resulted from revelation of the asserted misrepresentation. Id.[4]

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Because Section 11 does not require fraudulent conduct, Rule 9(b) ordinarily does not apply to Section 11 claims. See Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir. 1994). However, Rule 9(b)'s heightened pleading requirements apply to Section 11 claims that are "grounded in fraud," notwithstanding the fact that no scienter is required to state a claim. Anderson v. Clow (In re Stac Elecs. Sec. Litig.), 89 F.3d 1399, 1404-05 (9th Cir. 1996). Where the "gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus," even the plaintiff's "nominal efforts" to disclaim the fraud allegations will not prevent the application of Rule 9(b). Id. at 1405 n.2; see Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103-05 (9th Cir. 2003).

At heart, lead plaintiff alleges Expensify and its IPO underwriters promoted Expensify's false innovative technology and savvy, cost-effective bottom-up business model to mislead potential investors. Plaintiff asserts the following events prior to the IPO demonstrate the

---

[4] Although loss causation is not an element of a Section 11 cause of action, defendants are nevertheless afforded an affirmative defense to avoid liability if they can show that, on the face of the complaint, the absence of loss causation is apparent. See, e.g., In re Countrywide Sec. Litig., 588 F.Supp.2d. 1132, 1170–171 (C.D.Cal.2008); see also In re WorldCom, Inc. Sec. Litig., 388 F.Supp.2d 319, 346 n. 39 (S.D.N.Y.2005) (loss causation in Section 11 is the "mirror image" of the plaintiffs' burden on loss causation in Section 10(b)). While the loss causation analysis is fact intensive and often more appropriate at the summary judgment phase, courts in the Ninth Circuit routinely apply Rule 12(b)(6) when the face of the complaint demonstrates that the plaintiff cannot establish loss causation. See, e.g., In re Shoretel Inc., Sec. Litig., 2009 WL 248326, at *4–6 (N.D.Cal. Feb.2, 2009).

Page 12 – FINDINGS & RECOMMENDATION

materially misleading nature of the promotion of the IPO:

> 1) Implementation of a massive price increase for its expense management subscription services resulting in the loss of significant customer contracts and worsening revenue mix;
>
> 2) CEO David Barrett's unsolicited divisive political email to the company's 10 million users threatening that a vote against President Joseph Biden in the 2020 election would be a vote "against democracy" causing irreparable damage to the company's reputation and brand; and
>
> 3) Due to the customer losses and strained partnerships caused by its change in pricing and political solicitations, Expensify abandoned its historical bottom-up growth model in favor of a traditional "top-down" approach resulting in further revenue mix volatility and unprecedented marketing expenses.

Plaintiff contends that concealing the internal impacts of these issues from IPO investors led to a 95% loss of their initial investment. Defendants argue the allegations work backward from a 2023 decline in stock prices to tie the decline to the November 2021 RS's purported failure to fully elucidate the fallout from the 2020 price increase, political email, and supposed transition to a top-down marketing strategy. Defendants assert the Securities Act does not permit a challenge based on hindsight and plaintiff fails to allege a materially false statement or omissions at the time of the RS and fails to allege a plausible connection between the statements/omissions in the 2021 RS and any stock price decline in 2023.

A.    Price Increase

Plaintiff alleges the RS references to the May 2020 price increase were misleading because it said nothing about the extent of the increase doubling and tripling prices, or the negative consequences such as canceled subscriptions leading to increased reliance on pay-per-use members.  Plaintiff asserts defendants portrayed the price increase as a positive but omitted adverse information concerning Expensify's ability to retain and grow its happy customer base. Plaintiff further asserts Expensify falsely claimed to be unaware if the price increase would adversely affect

Page 13 – FINDINGS & RECOMMENDATION

the business because the fallout from the price increase had already materialized.

The RS disclosed:

> Business travel, traditionally a significant driver of expenses on our platform, has been severely curtailed during the pandemic with complex regional effects as lockdowns were put in place and altered rapidly. As a result of the pull-back in travel related expenses and other expenses that were not generated in a work from home environment, many of our customers that remained on our platform had fewer employees incurring expenses on a monthly basis in 2020. After a steady increase in paid members over multiple years (see figure below), **the average number of paid members on our platform declined 15% from 742,000 in the quarter ended March 31, 2020 to 630,000 in the quarter ended June 30, 2020 and we have rebounded to 639,000 paid members in the quarter ended June 30, 2021. Our activity is still recovering from May 2020 as the United States and certain other parts of the world continue to rebound from COVID-19.** The amount of expenses incurred by the paid members remaining on our platform has also declined as a result of the factors stated above. While activity decreased and remains at lower levels than pre-pandemic, **our revenue only declined until the quarter ended June 30, 2020. This initial adverse impact on revenue was mitigated by** the prevalence of our annual contracts and minimum user requirements in those contracts **as well as a price change that became effective in May 2020**. We introduced the Expensify Card in 2020, immediately before the pandemic. Given the decline in the volume of expenses and potential customers' reluctance to adopt a new card in this unusual environment, growth from monetizing the transactions from the Expensify Card has taken longer than anticipated, but the rate of adoption is increasing despite the COVID headwinds.
> **While the full lasting impact of the COVID-19 pandemic on the global economy and SMBs in particular remains uncertain, we believe that use of our platform will increase as economies reopen and business travel resumes.**
> While uncertainty remains on many fronts, we are confident that the pandemic has also had a positive impact on the way we operate our business. We have fully embraced the distributed workforce and reimagined how we use our existing office space. As demand for expense management slowed during the pandemic, we invested in building our platform outside of our core expense management features, which will result in a more diversified range of use cases that is better insulated against similar shocks in the future.

RS at p. 85 (ECF 54-4 at p. 99) (emphasis added).

The RS only explained the amount of the price increase as: "The contractual price is based on either negotiated fees or rates published on our website." Id. at p. 87 (ECF 54-4 at p. 101).

The RS also indicated the price increase was a key driver of revenue increases: "Revenue

Page 14 – FINDINGS & RECOMMENDATION

increased $24.4 million, or 60%, for the six months ended June 30, 2021, compared to the same period in 2020, primarily due to a pricing change implemented in May 2020, which led to a gradual increase in per member price …. All new customers beginning on May 1, 2020, were subject to this pricing change. Our revenue for the six months ended June 30, 2020, was adversely affected by the COVID-19 pandemic." Id. at p. 91 (ECF 54-4 at p. 105). However, the RS also noted that the number of customers and paid members had declined as noted above and warned:

> Our business is subscription-based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire. **We cannot ensure that customers will renew subscriptions with the same or greater number of members or for the same level of subscription plan** or that they will upgrade to use features such as bi-directional accounting sync and invoicing features or the Expensify Card. **Customers may or may not renew their subscriptions as a result of a number of factors, including their satisfaction or dissatisfaction with our platform; changes we may implement in our pricing or structure, such as the pricing change implemented in May 2020**; the pricing or capabilities of the products and services offered by our competitors; the effects of general economic conditions; or customers' budgetary constraints. If customers do not renew their subscriptions, renew on less favorable terms, or fail to add members, or if we fail to convert individuals and organizations into paying members, or expand the adoption of our platform within their organizations, our revenue may decline or grow less quickly than anticipated, which would harm our business, results of operations and financial condition.

Id. at p. 27 (ECF 54-4 at p. 41).

Defendants argue that in light of theses disclosures, the omission of the exact dollar amount did not create a materially different state of affairs differing from that one that actually existed. However, the alleged price increase in some cases was as much as 300% and while exact numbers may not need to be provided, the substantial percentages allegedly should have been. At this stage of the litigation, the Court cannot find that the alleged omission is not so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

Page 15 – FINDINGS & RECOMMENDATION

Brown v. Ambow Educ. Holding Ltd., 2014 WL 523166, at *14 (C.D. Cal. Feb. 6, 2014).[5]

Defendants also contend that plaintiff merely offers a conclusory assertion that any customers actually left Expensify at the time of the IPO. However, plaintiff alleged, and the RS noted, that contracts became non-cancelable at the time of the price increase allowing for the plausible inference of a delay of the full impact of the increase. See RS at p. 87 (ECF 54-4 at p. 101) ("In May 2020, we updated our terms of service whereby annual contracts became non-cancelable."). While the RS also notes somewhat of a rebound following the initial dip in subscribers, the Court is not in a position to weigh the materiality of the alleged omission at this stage.[6]

B.    Political Email

Plaintiff alleges, as noted above, that the CEO emailed Expensify's 10 million users on October 22, 2020, saying that anything less than a vote for Joe Biden is a vote against democracy. Plaintiff asserts the email had a catastrophic effect on Expensify's reputation and brand leading to mass subscription cancelations. Plaintiff further asserts the RS failed to mention this and created the false impression that the "happy customer" base was intact and reputation untarnished. Plaintiff

---

[5] Moreover, because Expensify highlighted the prince increase as positively impacting profits, the plausibility of materiality increases. Cf. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1010 (9th Cir. 2018) (a surprising 25 percent interim result appeared more promising than the company making the IPO allegedly knew they were and failure to disclose the unreliability interim results was misleading).

[6] Defendants note the increased revenue in the leadup to the IPO in June 2021 compared to the same period in 2020 right after the price increase. However, as noted, the price increase itself increased revenues and the locked in contracts plausibly had the effect of delaying defections. Plaintiff alleges CW testimonials of adverse impacts on customer retention. While defendants take issue with the credibility and reliability of the witnesses, the complaint alleges witnesses in positions within the company such that, though not having been in the best position to know about customer retention, it is not implausible they would have sufficient information. See Robb v. Fitbit Inc., 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (confidential witnesses must be described with sufficient particularity to establish their reliability and personal knowledge). For example, there are witnesses who asserted they were in a position to speak with existing customers outraged by the price increase. See, e.g., Amended Complaint (ECF 32) at ¶¶ 30, 58 (witness who managed relationships with some top 100 accounting firms partnering with expensify noted outraged customers but the full extent of the resulting loss was lagged because of their contractual commitments). To what extent the initial drop was from the pandemic, or the March 2020 price increase is not for the Court to weigh at this stage.

Page 16 – FINDINGS & RECOMMENDATION

alleges the RS omitted any fallout caused by the email.

> The November 2021 RS discussed complaints to the October 2020 email:
>
> in November 2020, the Federal Election Commission ("FEC") notified us of a number of complaints filed against us in connection with David Barrett's email on October 23, 2020 urging customers to protect democracy. We responded to the complaints in November and December 2020, requesting dismissal of all complaints, and have not received a decision from the FEC on the matter. We cannot assure you that this matter will not result in further complaints, regulatory inquiries or future proceedings.

RS at p. 52 (ECF 54-4 at p. 66)

Plaintiff alleges the RS positively discussed the importance of Expensify's reputation, brand, and bottom-up business model. Amended Class Action Complaint (ECF 32) at ¶ 129. Accordingly, plaintiff asserts Expensify provided materially false statements because the email had already severely damaged Expensify's reputation and brand. Id. at ¶ 130. Plaintiff offers customer complaints from October 2020, from purported Expensify customers, about betrayal of trust, embarrassment as a customer, intention to no longer recommend the company, intention to sever ties, dropping Expensify, canceling accounts, leaving Expensify, terminating business, etc. Id. at ¶¶ 66-77. Plaintiff again cites the apparent delay in cancelations due to the non-cancelable contracts to assert that more cancelations would come later. Id. at ¶ 79, 80-81. Plaintiff further cites a January 2021 complaint:

> "[t]hey seem to think that they mainly lost a small number of non-paying customers. Maybe that is correct but pretty soon they are going to feel the effect when the company I work for dumps them" adding that Barrett's email prompted a "companywide email apologizing for it" and notified employees of the company's "displeasure" with Expensify and their plans to "replace them as a vendor." This customer explained that at their company, "the search began to find an alternative" in October 2020, "but given the fact that there are more than 31,000 employees I'm sure it takes time."

Id. at ¶ 83.

Defendants argue these complaints do not demonstrate a false statement because they are

Page 17 – FINDINGS & RECOMMENDATION

anonymous and there is no allegation they establish a representative sample or what portion of the user base was lost. Courts typically reject the argument that "customer complaints alleging circumstances that are contrary to defendant's representations independently suffice to establish the falsity of those representations." Curry v. Yelp, Inc., 2015 WL 7454137, at *7 (N.D. Cal. Nov. 24, 2015). Nonetheless, plaintiff also offers confidential witness testimony that:

> Barrett's October 2020 political email offended many customers, causing a catastrophe and exodus from the Company's customer base. CW1 explained that almost immediately, messages began pouring in from customers who were incredulous or angry about Barrett's political spam email. CW1 estimated that Barrett's email offended about 5 million of the 10 million recipients. CW6 echoed CW4 and CW1 stating, Barrett's email hurt the business, Expensify experienced a huge backlash from customers, and said it lost quite a bit of customers, in the small and midmarket group, because of it.

Amended Class Action Complaint (ECF 32) at ¶ 71.

Defendants also argue that following the October 2020 email paid users actually increased from 630,000 paid members in the quarter ending September 30, 2020, to 645,000 in the quarter ending December 31, 2020. Plaintiff's falsity argument depends on the alleged fact that the RS only stated negative reactions that could occur when they already had occurred. While the subscriber numbers in the quarter ending March 31, 2021, again dropped to 631,000, in the last quarter before the IPO they rebounded to 639,000. As such, the subscriber numbers were indeed higher than prior to the period the email was released. RS at p. 19 (ECF 54-4 at p. 33). Accordingly, the complaint fails to allege defendants made a misstatement in the RS by only noting potential impact.

Plaintiff also asserts the RS failed to disclose the precise contents of the email. However, the email generated significant attention in the media. E.g., CBS News article entitled "CEO emails 10 million customers to tell them to vote for Biden," by Aimee Picchi, dated October 24, 2020 (ECF 54-1). Details of the email were publicly available. Section 11 does not require the disclosure

Page 18 – FINDINGS & RECOMMENDATION

of publicly available information. Rubke v. Capitol Bancorp, 2006 WL 1699569, at *13 (N.D. Cal. June 16, 2006). A defendant has no duty to disclose information that is within the public domain through publication in the news media. Barilli v. Sky Solar Holdings, Ltd., 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019).[7] Accordingly, plaintiff's Securities Act claims based on the failure to disclose the contents of the political email, or the actual repercussions of that email are dismissed.

## C.    From the Bottom-up to the Top-Down

Plaintiff alleges Expensify repeatedly lauded its bottom-up business model in the RS while failing to disclose that the model was broken and already replaced by a traditional top-down marketing strategy. Plaintiff alleges Expensify had to abandon the strategy because of the impact of the price increase and political email had on its "happy customer" base impacting its reputation and brand. Defendants contend that plaintiff pleads no facts demonstrating that it did abandon its bottom-up strategy.

The RS states:

We support this powerful word-of-mouth marketing with large-scale brand advertising to build market consensus that Expensify is the software of choice for expense management. This includes active participation in industry conferences, partnerships with industry influencers, partner marketing and hosting our own conference, ExpensiCon. We believe that these activities to drive awareness are crucial given our focus on individual employees and the fact that expense management touches every employee and spans every layer of an organization.

RS at p. 124 (ECF 54-4 at p. 138).

However, plaintiff alleges, prior to the IPO, Expensify abandoned this model when it hired 60 sales development representatives, shifted focus from promoting existing customer retention and expansion to the number of people it could onboard per month, and made a big push in new

---

[7] Plaintiff suggests defendants have the burden of proof on this issue as a truth on the market defense. Defendants are not asserting such a defense; they assert only that the publicly available information negates the materiality of the purported omission.

Page 19 – FINDINGS & RECOMMENDATION

advertising. Amended Class Action Complaint (ECF 32) at ¶¶ 92, 93, 94. Plaintiff asserts according to confidential witness 3, "there was a notable downward shift in demand for brand content after the Company went public." Id. at ¶ 94. Indeed, plaintiff notes the shift as nearly doubling from pre-IPO advertising expenditures and continuing through the quarter ending September 30, 2023. Id. at ¶ 96. For context, plaintiff compares the expenditures to the out-of-character Super Bowl advertising campaign in 2019 which immediately scaled back after the campaign. Id. at ¶ 97. These expenses plausibly allege a change in the business model and strategy. While development of the record may demonstrate Expensify continued its bottom-up model, at this stage of the proceedings, the Court takes the allegations as true, and the allegations allow for a plausible inference in a shift in strategy.[8]

Defendants also assert the allegations of liability under sections S-K, items 101, 105, and 303 are deficient. These regulations require disclosure of material changes in a previously disclosed business strategy, disclosure of salient risks concerning an investment, and disclosure of trends or uncertainties.

While Expensify did explain in the RS the uncharacteristic advertising costs associated with the Super Bowl campaign, it did not explain a shift to a top-down strategy. As noted above, plaintiff has plausibly alleged such a shift prior to the IPO. Accordingly, plaintiff adequately alleges an item 101 violation. See In re CarLotz, Inc. Sec. Litig., 2024 WL 1348749, at *12 (S.D.N.Y. Mar. 29, 2024) (plausibly allege item 101 violation where the majority of company's business was not on the consignment-to-retail model it had repeatedly emphasized). The motion

---

[8] Defendants again take issue with the credibility and knowledge of the confidential witnesses. However, plaintiff sufficiently alleges the witnesses have knowledge over the matters they address. E.g., Amended Class Action Complaint (ECF 32) at ¶¶ 33-34 (witness worked as marketing designer from April 2019 to May 2022 on advertising campaigns). The adequacy of the allegations does not depend on each CW possessing inside knowledge about corporate-level trends; plaintiff need only provide a basis for each witness's knowledge about the specific statements made. Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 771 (9th Cir. 2023).

Page 20 – FINDINGS & RECOMMENDATION

to dismiss this claim is denied.

Defendants argue the RS contained robust risk disclosures. Indeed, the RS, as noted above, noted risks associated with the price increase. The motion to dismiss the item 105 claim is granted.

Plaintiff alleges the price increases caused an adverse trend compromising Expensify's customer base necessitating a disclosure under item 303. However, as noted above, plaintiff relies on purported delay for the impact of the price increase even though he does allege a current loss in customers at the time of the IPO. The allegations show both increases and decreases in the customer base around the time of the IPO. Plaintiff does not plausibly allege a trend in this regard. See In re Restoration Robotics, Inc. Sec. Litig., 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019) (A trend under Item 303 requires an observed pattern that accurately reflects persistent conditions of the particular registrant's business environment.). Accordingly, the motion to dismiss the item 303 claim is granted.

### D.    Loss Causation

Defendants assert the allegations establish the losses in 2023 are not caused by the alleged misstatements or omissions. Defendants contend plaintiff fails to identify anything to tie disclosures about the developments in 2023 to any challenged statement or omission about the May 2020 price increase or marketing strategies. As noted above, loss causation is not an element of a Section 11 cause of action.  Defendants may, nonetheless, obtain dismissal if they can show that, on the face of the complaint, the absence of loss causation is apparent. See, e.g., In re WorldCom, Inc. Sec. Litig., 388 F.Supp.2d 319, 346 n. 39 (S.D.N.Y.2005) (loss causation in Section 11 is the "mirror image" of the plaintiffs' burden on loss causation in Section 10(b)). While the loss causation analysis is fact intensive and often more appropriate at the summary judgment phase, courts in the Ninth Circuit routinely apply Rule 12(b)(6) when the face of the complaint

demonstrates that plaintiff cannot establish loss causation. See, e.g., In re Shoretel Inc., Sec. Litig., 2009 WL 248326, at *4–6 (N.D.Cal. Feb.2, 2009).

Plaintiff alleges, during an earnings call with investors to discuss second quarter 2023 losses, defendant Anu Muralidharan stated:

> We **haven't been in stable condition since 2020** with this or that or the other. Like first there was a pandemic, then there was concerns of the global recession, then there was a global recession. There still is, like I'm fuzzy on the details, but very chaotic.

Amended Class Action Complaint (ECF 32) at ¶ 108.

Plaintiff further alleges following the Muralidharan disclosure:

> JMP issued an analyst report on August 9, 2023 titled, "Expensify, Inc. (EXFY) 'In a Bit of a Rebuilding Phase' with GAAP Revenue Down 10% Y/Y; Downgrading to MP." In this report, JMP downgraded the Company to Market Perform from Market Outperform citing the following reasons:

>> 1) we do not see a clear inflection point for the business within the next year after revenue has shrunk in each of the last two quarters, both year over year and sequentially on a GAAP basis, with the declining top line affecting profitability and cash flow in 2Q; 2) our impression is the company remains in investment mode and is prioritizing the longer-term product roadmap, rather than incremental monetization in an increasingly competitive space, which is unlikely to get public market investors excited in the near term, in our opinion; and 3) the company disclosed that paid member count came in at 719K in July, down from the three-month average of 742K in 2Q.

Id. at ¶ 109. Indeed, plaintiff alleges JMP "highlighted that, beginning in the three-month period ended September 30, 2021 ("Q3 2021") (just before the November 2021 IPO) and continuing through to the present day, Expensify's revenue growth has slowed dramatically." Id. at ¶ 110.

Plaintiff also alleges:

> Similarly, on August 9, 2023, Loop issued an analyst report titled "Not Working Out Like We Hoped; Downgrade to Hold," in which Loop cited primary risks to investment to include inter alia, risks related to the Company's "**pricing strategy** to drive adoption of the Expensify Card," the change in Expensify's long-term

Page 22 – FINDINGS & RECOMMENDATION

revenue growth targets, and the Company's "**change in the current go-to-market and sales strategies** and inconsistent sales execution."

Id. at ¶ 111 (emphasis added).

Plaintiff also cites a September 15, 2023, J.P. Morgan report stating:

Much of the EXFY **customer acquisition model relies on existing customers spreading the word on EXFY value proposition to more senior officers with decision-making authority**. Additionally, EXFY revenue model envisages having almost 1/3 of its revenue being generated from Pay-Per-Use contracts vs. a more predictable annual subscriptions. However, in a challenging macro environment the combination of the above factors lead to lower visibility into revenue trends and adversely impact paying customer growth as companies tighten expenses, while employees favor job security and are therefore not changing jobs as frequently to promote EXFY through the word-of-mouth model.

Id. at ¶ 113 (emphasis added).

Plaintiff notes another earnings call in November 2023, in which Expensify noted a decrease in the customer base and cites a Piper Sandler analyst report showing that the number of active subscribers is roughly one third of the total installed base. Id. at ¶¶ 116, 117.

Arguably, plaintiff alleges disclosure of the realized risks of the RS failure to properly disclose the purported response to the price increases and change in marketing strategy underway at the time of the IPO. The complaint does not, as a matter of law, establish another cause of the loss. Such inquiry is indeed fact intensive necessitating further development of the record beyond the pleading stage.

E.      Control Person Liability

Defendants argue that plaintiff fails to allege a Section 11 violation and therefore his Section 15 claim necessarily fails. However, as noted above, plaintiff has adequately pleaded a claim for relief under Section 11. The motion to dismiss the Section 15 claim is denied.

CONCLUSION

Defendants' request for judicial notice (ECF 55) should be granted and their motion to dismiss (ECF 53) should be granted to the extent plaintiff's Securities Act claims based on the failure to disclose the contents of an October 2020 political email or the actual repercussions of it should be dismissed as well as the claims asserting liability under SEC regulations S-K, items 105 and 303. The motion should be otherwise denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 30th day of December, 2024.

_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge