FOSTER GARVEY PC
Eryn Karpinski Hoerster, OSB #106126
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: +1.503.228.3939
Facsimile: +1.503. 226.0259
*eryn.hoerster@foster.com*

LATHAM & WATKINS LLP
Melanie M. Blunschi (*pro hac vice*)
Daniel R. Gherardi (*pro hac vice*)
140 Scott Drive
Menlo Park, California 94025
Telephone: +1.650.328.4600
Facsimile: +1.650.463.2600
*melanie.blunschi@lw.com*
*daniel.gherardi@lw.com*

*Attorneys for Defendants Expensify, Inc., David
Barrett, Ryan Schaffer, Blake Bartlett, Robert Lent,
Anu Muralidharan, Jason Mills, Daniel Vidal,
Timothy L. Christen, Ying (Vivian) Liu, and Ellen Pao*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CODY WILHITE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXPENSIFY, INC., DAVID BARRETT, RYAN SCHAFFER, BLAKE BARTLETT, ROBERT LENT, ANU MURALIDHARAN, JASON MILLS, DANIEL VIDAL, TIMOTHY L. CHRISTEN, YING (VIVIAN) LIU, ELLEN PAO, J.P. MORGAN SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., BofA SECURITIES, INC., PIPER SANDLER & CO., JMP SECURITIES LLC, and LOOP CAPITAL MARKETS LLC, <br> Defendants. | Case No. 3:23-cv-01784-JR <br><br> **DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE RUSSO'S FINDINGS AND RECOMMENDATION** <br><br><br> <u>ORAL ARGUMENT REQUESTED</u> |

**DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................2

II.     BACKGROUND ..........................................................................................................4

        A.      Defendants .......................................................................................................4

        B.      Expensify Prepares To Become A Public Company ................................................4

        C.      Expensify Goes Public In 2021.........................................................................6

                1.      Expensify Disclosed The May 2020 Price Increase ...................................6

                2.      Expensify Disclosed Its Marketing Efforts And Strategy............................8

        D.      Expensify's Stock Price Declines In 2023.............................................................10

        E.      This Lawsuit And Magistrate Judge Russo's Findings And
                Recommendation ...........................................................................................10

III.    LEGAL STANDARDS ...............................................................................................11

        A.      Standard of Review..........................................................................................11

        B.      Section 11 Claim.............................................................................................11

        C.      Rule 9(b)'s Heightened Pleading Standard...........................................................13

IV.     ARGUMENT...............................................................................................................14

        A.      The Registration Statement Did Not Omit Any Material Fact Regarding
                The May 2020 Price Increase ...........................................................................14

                1.      Expensify Was Not Required To Disclose The Specific Dollar
                        Amounts Or Percentages Of The Price Increase.......................................14

                2.      Expensify Was Not Required To Disclose More About Alleged
                        Negative Impacts From The May 2020 Price Increase.............................18

                        a.      Expensify Adequately Warned Of Customer Or Revenue
                                Loss...............................................................................................19

                        b.      There Is No Well-Pled Allegation That Risks Of Customer
                                Or Revenue Loss Had Materialized At The Time Of The
                                IPO ................................................................................................19

                        c.      The Confidential Witnesses Cannot Save This Theory Of
                                Liability.........................................................................................24

B.     The Registration Statement's Discussions Of Expensify's Marketing Strategy Were Not False Or Misleading...................................................25

     1.     Plaintiff Does Not Plead Facts Indicating That Expensify "Abandoned" Its "Bottom-Up" Business Model Before The IPO.............25

     2.     Plaintiff Cannot Salvage His Deficient Falsity Allegations By Repurposing Them As An Item 101 Claim ................................................31

C.     Plaintiff's Purported Losses Were Not Caused By Any Revelation Of The "Truth" Of Any Challenged Statement...................................................32

D.     Plaintiff Does Not State A Section 15 Claim.........................................................35

V.     CONCLUSION................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Brody v. Transitional Hosp. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................... 12, 15, 18

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)........................................................ 32, 35

*Costanzo v. DXC Tech. Co.*,
2021 WL 5908385 (N.D. Cal. Dec. 14, 2021).......................................................... 21

*Dawson v. Marshall*,
561 F.3d 930 (9th Cir. 2009) .......................................................................... 11

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) .......................................................................... 32

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023)........................................................... 29

*Hoang v. ContextLogic, Inc.*,
2023 WL 8879263 (N.D. Cal. Dec. 22, 2023)........................................................... 28

*In re Anchor Gaming Sec. Litig.*,
33 F. Supp. 2d 889 (D. Nev. 1999)..................................................................... 29

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) .......................................................................... 22

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ........................................................... 32

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) ................................................................... 13, 14

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).......................................................... 30

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)........................................................... 15

*In re Infonet Servs. Corp. Sec. Litig.*,
310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................... 20

*In re Interlink Elecs. Sec. Litig.*,
2007 WL 9857528 (C.D. Cal. Sept. 26, 2007) ....................................................................... 30

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
2021 WL 5530949 (D. Or. Nov. 24, 2021)...................................................................... 24, 35

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001).................................................................................. 22

*In re Lyft Inc. Sec. Litig.*,
484 F. Supp. 3d 758 (N.D. Cal. 2020) ...................................................................... 13, 18, 23

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................................ 12, 23

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005) ...................................................................... 16

*In re ON24, Inc. Sec. Litig.*,
2024 WL 979951 (N.D. Cal. Mar. 5, 2024), *appeal filed sub nom. Leadersel
Innotech ESG v. ON24*, No. 24-2204 (9th Cir.)...................................................................... 22

*In re Orange21 Inc. Sec. Litig.*,
2006 WL 8455352 (S.D. Cal. Mar. 30, 2006) ...................................................................... 13

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ........................................................................................... 2, 12

*In re Shoretel Inc., Sec. Litig.*,
2009 WL 248326 (N.D. Cal. Feb. 2, 2009) .................................................................... 33, 35

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ........................................................................................... 12, 13

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022)........................................................... 20, 24, 25

*In re Textainer P'ship Sec. Litig.*,
2005 WL 3801596 (N.D. Cal. Dec. 12, 2005)........................................................... 15, 17, 18

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)................................................................ 13, 22

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994)................................................................................................ 19

*Jedrzejczyk v. Skillz Inc.*,
2023 WL 2333891 (N.D. Cal. Mar. 1, 2023), *aff'd*, 2024 WL 1635568 (9th
Cir. Apr. 16, 2024) ........................................................................................................ 15

*Jones v. City of Hillsboro*,
2015 WL 5737647 (D. Or. Sept. 29, 2015) ................................................................... 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ......................................................................................... 22

*Lau v. Opera Ltd.*,
527 F. Supp. 3d 537 (S.D.N.Y. 2021) ............................................................................ 32

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012) .......................................................................... 29

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................................. passim

*McKenna v. Smart Techs. Inc.*,
2012 WL 1131935 (S.D.N.Y. Apr. 3, 2012) ................................................................. 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ....................................................................................................... 12

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
2023 WL 3569068 (S.D.N.Y. May 19, 2023) ............................................................... 16

*Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ....................................................................................... 16

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ....................................................................................... 12

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) ............................................................................................ 16

*Waswick v. Torrid Holdings, Inc.*,
2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) ................................................................ 31

*Willard v. UP Fintech Holding Ltd.*,
527 F. Supp. 3d 609 (S.D.N.Y. 2021) ........................................................................... 13

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .................................................................................. 24, 30

**STATUTES**

15 U.S.C. § 77k.................................................................................................... 12, 14, 25

15 U.S.C. § 77k(a) ......................................................................................................... 12

28 U.S.C. § 636(b)(1) .................................................................................................... 11

**RULES**

Fed. R. Civ. P. 72(b)(3)................................................................................................. 11

Fed. R. Civ. P. 9(b) ................................................................................................. 13, 14

**REGULATIONS**

17 C.F.R. § 229.101 ...................................................................................................... 31

**GLOSSARY**

| Term | Definition |
|---|---|
| Amended Complaint or AC | Amended Class Action Complaint for Violations of Federal Securities Laws (Dkt. No. 32) |
| ¶ | Refers to the paragraphs of the Amended Complaint |
| CW | Confidential Witness |
| Expensify or the Company | Expensify, Inc. |
| Expensify Defendants | Defendants Expensify, Inc., David Barrett, Ryan Schaffer, Blake Bartlett, Robert Lent, Anu Muralidharan, Jason Mills, Daniel Vidal, Timothy Christen, Ying (Vivian) Liu, and Ellen Pao |
| Motion or Mot. | Expensify Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 53) |
| Ex. | Exhibits attached to the Declaration of Daniel R. Gherardi filed in support of Expensify Defendants' Motion to Dismiss the Amended Complaint (Dkt. Nos. 54-1 through 54-6) |
| F&R | Findings and Recommendation issued by Magistrate Judge Jolie A. Russo (Dkt. No. 62) |
| IPO | Expensify's November 2021 initial public offering |
| Opp. | Plaintiff's Opposition to Defendants' Motion to Dismiss (Dkt. No. 59) |
| Plaintiff | Lead Plaintiff Aleem Kanji |
| Q2 | Second quarter |
| Q3 | Third quarter |
| Registration Statement or RS | Expensify's registration statement on Form S-1 and prospectus on Form 424(b)(4), both as amended and filed with the SEC in October and November 2021 (Dkt. No. 54-4) |
| SMB | Small or medium sized business |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77k *et seq.* |
| Underwriter Defendants | Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., BofA Securities, Inc., Piper Sandler & Co., Citizens JMP Securities, LLC, and Loop Capital Markets LLC |

## I.    INTRODUCTION

Plaintiff's Amended Complaint works backward from a 2023 industry-wide stock market decline to accuse Expensify of misleading investors because Expensify's November 2021 IPO Registration Statement purportedly concealed various "facts" that Plaintiff argues in hindsight he would have liked to have known earlier.  But to the extent any of the information Plaintiff complains about existed at the time of the IPO, it was appropriately disclosed—and in any event, the securities laws do not require disclosure of every detail about a company's business just because an investor "would consider the omitted information significant."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).  Rather Plaintiff must plead that specific, then-existing facts were omitted from the Registration Statement that would have "significantly altered the total mix of the information made available" if they had been disclosed.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Expensify submits that Plaintiff has not met this standard with respect to any of the allegedly omitted information.

When Judge Russo issued the Findings and Recommendation on Defendants' Motion to Dismiss, she properly rejected multiple of Plaintiff's grievances, including by concluding that the Registration Statement adequately disclosed an email from Expensify's CEO supporting President Biden, as well as the risks associated with Expensify's May 2020 price increase and an alleged trend of declining users.  F&R at 18-21.  But Defendants respectfully submit that Judge Russo erred in concluding that two of Plaintiff's theories presented a question of fact that could not be resolved on a motion to dismiss.  Specifically, Defendants object to Judge Russo's recommendation that Plaintiff pled enough to move past the pleading stage by alleging that the Registration Statement should have disclosed (1) more about the magnitude of a May 2020 price increase and that the price increase had allegedly caused customers to leave Expensify (*id.* at 13-16) and (2) that Expensify had allegedly "abandoned" a "bottom-up" business model before the

Page 2 –   **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

IPO (*id.* at 19-21). Both theories must be rejected as a matter of law in light of the robust disclosures in the Registration Statement about both the price increase and Expensify's continued investments in "bottom-up" marketing (*i.e.*, advertising to build brand awareness and then relying on existing users to expand use of Expensify's products at their employer). Plaintiff pleads no facts indicating that other material information even existed at the time of the IPO, let alone that it was required to be disclosed to prevent the Registration Statement's disclosures on these topics from being misleading. Indeed, given the variation in pricing across customers, it would not have been feasible to disclose dollar or percentage price changes across the customer population (let alone required, given the extent of the disclosures about the price change Defendants did make), and no well-pled allegation supports Plaintiff's theory that Expensify had actually changed its marketing strategy as of 2021. Certainly investors and Expensify alike wish they had foreseen the 2023 stock price decrease—but that does not mean there was more that should (or could) have been disclosed about Expensify's price increase or marketing strategy at the time of the IPO.

Judge Russo also erred by rejecting Defendants' negative causation defense. The events Plaintiff claims disclosed the "truth" about the purported misstatements and omissions in the Registration Statement have nothing to do with the May 2020 price increase or Expensify's marketing strategies at the time of the IPO. Instead, they demonstrate that the declines in Expensify's stock price were due to global economic headwinds that affected most of Expensify's customers and, in turn, Expensify's financial results two years *after* the IPO, in 2023. Where, as here, there is a complete mismatch between the alleged corrective disclosures and the allegedly misleading statements, courts in the Ninth Circuit grant motions to dismiss.

Respectfully, Defendants submit that portions of Judge Russo's F&R were in error and should be corrected on this Court's *de novo* review. The Amended Complaint should be dismissed.

## II.    BACKGROUND

### A.    Defendants

Expensify provides streamlined expense-management software to help employees and businesses track and process reimbursements.  ¶¶ 42, 45.  Expensify generates most of its revenue from subscriptions with fees based, in part, on the number of employees using the product.  ¶ 50.

David Barrett, Ryan Schaffer, Blake Bartlett, Robert Lent, Anu Muralidharan, Jason Mills, Daniel Vidal, Timothy L. Christen, Ying (Vivian) Liu, and Ellen Pao are current and former officers and/or directors of Expensify.  ¶¶ 12–21.  J.P. Morgan Securities LLC, Citigroup Global Markets Inc., BofA Securities, Inc., Piper Sandler & Co., Citizens JMP Securities, LLC, and Loop Capital Markets LLC were underwriters on Expensify's IPO.  ¶ 26.

### B.    Expensify Prepares To Become A Public Company

Expensify operated as a private company for over a decade.  *See* Ex. 4 (RS) at 1.  In October 2021, Expensify filed a draft registration statement describing its business to potential investors as it prepared to become a public company.  ¶ 99.

In May 2020, Expensify updated its pricing, which had been constant for over a decade.  ¶ 54.  From 2009 to May 2020, Expensify offered four subscription plans at the same fee structure.  *Id.*  The Track and Submit plans can be used for up to 25 receipts per month for free or unlimited receipts for a fee.  ¶¶ 45, 50; Ex. 4 (RS) at 83.  The Collect and Control plans are paid plans that allow users to design expense approval workflows, reimburse via direct deposit, and integrate with accounting, travel, and HR applications commonly used by Expensify's customers.  ¶ 45.

In May 2020, Expensify increased prices for its Collect and Control plans.  *See* ¶¶ 55, 121; Ex. 4 (RS) at 91.  At the same time, Expensify changed its terms of service to make annual contracts non-cancelable.  Ex. 4 (RS) at 87.  Expensify continued to offer free Track and Submit plans for certain usage levels (*see* ¶¶ 50, 55), and for paid customers, the contractual price per

member was "based on either negotiated fees or rates published on the Company's website." Ex. 4 (RS) at 87. Expensify advised investors that its first price increase in over a decade was important to mitigate lost revenue from reduced business expense processing and decreased business travel caused by the COVID-19 pandemic. *Id.* at 85; ¶ 54.

Expensify has long benefitted from a viral, bottom-up marketing model that prioritizes its existing users' experiences in the hope those users will encourage broader use of Expensify's platform at their employers. ¶¶ 47-48. Expensify's "bottom-up" business strategy involves the Company using traditional direct marketing methods (such as Expensify's Super Bowl ad in 2019 (¶ 97)) to increase awareness of the Expensify brand. Ex. 4 (RS) at 5-6 ("We support this powerful word-of-mouth marketing with large-scale brand advertising to build market consensus that Expensify is the software of choice for expense management."); *see also id.* at 24 (disclosing that Expensify's growth depends on its ability to "grow or maintain [its] brand through marketing, advertising campaigns, partnerships and other methods"). Once a user becomes aware of Expensify's products including through marketing campaigns, Expensify depends on those users to build broader adoption at the user's employer from the bottom-up. *Id.*; *see also* ¶ 48. Expensify has always incurred marketing and advertising expenses as part of its "bottom-up" strategy, given the importance of brand awareness to the model. *See* ¶ 96 (providing Expensify's quarterly spend on sales and marketing from March 31, 2019 to end of 2023).

Leading up to its IPO, Expensify continued to invest in marketing and advertising efforts that fueled its bottom-up business model. Ex. 4 (RS) at 97. Although it dialed its marketing expenditure back during the COVID-19 pandemic, Expensify renewed its focus on marketing as the effects of the pandemic eased. *Id.* For example, it hired sixty sales representatives to develop its customer base and commissioned new advertising, significantly expanding its sales and

Page 5 –  **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

marketing expenditure.[1]  ¶¶ 92-96.  Expensify disclosed its intent to continue investing—and indeed did invest—in marketing after the IPO.  Ex. 4 (RS) at 34, 88;  ¶¶ 96-97.

### C.    Expensify Goes Public In 2021

Expensify completed its initial public offering on November 15, 2021.  ¶ 101.  Expensify publicly filed an initial registration statement on October 15, 2021, and amendments on October 18, November 1, and November 8, 2021.  ¶ 99.  Expensify filed its final IPO prospectus on November 12, 2021.  *Id.*  These documents provided potential investors with detailed information about Expensify's business and its associated risks.  *E.g.*, Ex. 4 (RS) at 21-65, 115-50.

### 1.    Expensify Disclosed The May 2020 Price Increase

In the Registration Statement, Expensify repeatedly emphasized that it began increasing prices in May 2020 for the first time since its founding and that the Company did not fully know how the price increase would affect its revenues and customer retention.  *E.g.*, Ex. 4 (RS) at 27, 85, 91, 93, 96, 104, F-15.  Expensify explained that it had increased prices effective immediately for *new* customers and that it would apply the increase gradually for existing customers who did not use Expensify's credit card for a majority of their business expenses.  *E.g.*, *id.* at 91, 93, 96, 104, F-15.  The Registration Statement did not disclose the specific dollar amounts associated with the price increase because, as Expensify explained, "[t]he contractual price per member is based on either negotiated fees or rates published on our website."  *Id.* at 104.  That is, the new pricing structure would vary from customer-to-customer.  *See id.*  Nonetheless, the Registration Statement disclosed that the price increase drove a substantial increase in revenues and helped Expensify

---

[1] In October 2020, Mr. Barrett emailed users encouraging them to vote to protect democracy.  ¶ 64; Ex. 4 (RS) at 52-53.  Plaintiff alleges Expensify misled investors about the impact of the email, including that it supposedly caused user departures.  *E.g.*, ¶¶ 126-30.  Judge Russo recommended dismissal of Plaintiff's claims regarding the email, noting that it was publicly available and widely reported and Expensify had no duty to repeat public information.  F&R at 18-19.  Defendants do not object to this portion of Judge Russo's F&R.

overcome the drop in revenue caused by the COVID-19 pandemic:

- "The initial adverse impact on revenue was mitigated by the prevalence of our annual contracts and the user requirements in those contracts *as well as a price change that became effective in May 2020*." *Id.* at 85.[2]

- "Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, *primarily due to a pricing change implemented in May 2020*." *Id.* at 91; *see also id.* at 96.

The Registration Statement also highlighted the risks associated with the May 2020 price increase. ¶¶ 121, 124. Expensify repeatedly warned investors that its pricing system, including the May 2020 price increase, could have an adverse impact on customers and the business:

- "*We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business*." ¶ 124; Ex. 4 (RS) at 27.

- "Customers may or may not renew their subscriptions as a result of a number of factors, including . . . changes we may implement in our pricing or structure, *such as the pricing change implemented in May 2020*." *Id.* at 28.

- "While we do and will attempt to set prices based on our prior experiences and customer feedback, our assessments may not be accurate and we *could be underpricing or overpricing our platform*." ¶ 124; Ex. 4 (RS) at 29.

- "*Pricing pressures and decisions* could result in reduced sales, reduced margins, losses or the failure of our platform to achieve or maintain more widespread market acceptance, *any of which could negatively impact our overall business*." ¶ 124; Ex. 4 (RS) at 29.

- "Our quarterly and annual financial results may fluctuate due to a variety of factors," including "*ineffective pricing strategies that could limit customer base expansion, revenue growth and subscription renewals*." Ex. 4 (RS) at 22-23.

- "We believe our growth depends on a number of factors," including "*our ability to . . . price our subscription plans effectively and competitively*." ¶ 146; Ex. 4 (RS) at 24.

- "*If we . . . do not price our subscriptions optimally or make changes to our subscription or pricing models that are not accepted by the market* . . . our business, results of operations, financial condition and growth prospects will suffer." ¶ 124; Ex. 4 (RS) at 27.

Alongside these warnings about the potential impacts of Expensify's new pricing structure, Expensify also disclosed its user numbers in the years leading up to the IPO. Expensify disclosed

---

[2] All emphases are added unless otherwise stated.

Page 7 –    **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

that its user numbers declined in Q2 2020, the quarter in which the price increase was introduced and the first full quarter to occur during the COVID-19 pandemic and lockdowns. *Id.* at 138 ("We believe the decline in 2020, which was the first year in our history where we experienced an overall decline in the number of our customers, was due to the impact of the COVID-19 pandemic."). It also revealed that Expensify's user base then ***increased*** for the next two quarters. *Id.* at 11, 80.

### 2. Expensify Disclosed Its Marketing Efforts And Strategy

Expensify also informed investors of its marketing strategy in the Registration Statement, including its marketing efforts and investment in the years leading up to the IPO. The Registration Statement highlighted that extensive marketing expenditure was a part of and essential to Expensify's bottom-up growth strategy. ¶ 135; Ex. 4 (RS) at 145 ("Our marketing efforts are designed to support the bottom-up viral nature of our platform by establishing our brand as the premiere option in preaccounting software."). It explained:

> Our viral and word-of-mouth adoption model is effective in part because we have established ourselves as a recognized leader in expense management for SMBs. ***We deploy large scale brand advertising to promote our platform superiority and create market consensus that Expensify is the category leader for expense management software.*** We believe this enables us to focus on creating great viral features for our members rather than relying on low-margin, unscalable activities of traditional sales and marketing to drive customer acquisition.

¶ 135; Ex. 4 (RS) at 5-6, 84, 120.

The Registration Statement informed investors that Expensify's bottom-up, word-of-mouth growth strategy depended on significant sales and marketing investment, including through "brand and platform promotion through partners, conference participation, thought leadership, direct marketing and advertising and content development to educate the market about the benefits of [Expensify's] platform and create market consensus." *Id.* at 145 .

The Registration Statement disclosed that this sales and marketing activity was crucial to Expensify's business, including disclosing that "[s]ubstantial advertising expenditures may be

Page 8 –   **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

required to maintain and enhance our brand" (¶ 129; Ex. 4 (RS) at 35), and that Expensify's growth depended, in part, on its ability to "grow or maintain [its] brand through marketing, advertising campaigns . . . and other methods" (¶ 146; Ex. 4 (RS) at 24).

The Registration Statement also disclosed Expensify's marketing history, including the increase in marketing expenses in the months before the IPO. *See* ¶ 96. It traced Expensify's substantial marketing expenses throughout 2019 and early 2020, before COVID forced it to cut back, and it highlighted the resumption in Expensify's sales and marketing activity before the IPO:

> Our sales and marketing expenses in the first two quarters of 2019 reflect an increase in costs associated with our Super Bowl campaign. The first quarter of 2020 reflects an increase in expenses associated with product advertising campaigns, however starting in the second quarter of 2020, we aggressively reduced our advertising and other sales and marketing expenses due to the impact of the COVID-19 pandemic. ***In 2021, quarters presented reflect an increase in expenses associated with advertising campaigns targeted towards brand awareness***.

Ex. 4 (RS) at 97.

Expensify also told investors that it planned to continue increasing those efforts after the IPO:

- "[W]e will need ***to continue to make substantial investments and expenditures to, among other things . . . expand our sales and marketing activities***, including to obtain channel partners and to expand our SMB and consumer advertising." *Id.* at 34.

- "***We expect sales and marketing expenses will increase as we expand our sales efforts to pursue our market opportunity***." *Id.* at 88.

And the Amended Complaint illustrates that after the IPO, it did just that, with spending climbing from about $7.6 million in the quarter before the IPO (3Q 2021) to about $13.1 million in the quarter that included the IPO (4Q 2021), where it remained roughly steady for the next two years (with only two quarters meaningfully lower, and none below about $7.6 million). ¶ 96.

In other words, Expensify expected to (and did) continue to invest in the sorts of marketing and advertising that was critical to its bottom-up strategy. Plaintiff does not allege any of those investments waned at the time of the IPO or after. *Id.* Indeed, the 2023 analyst report Plaintiff

Page 9 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

claims revealed "the truth" about Expensify's purported move away from a bottom-up strategy actually reflects Expensify's unwavering commitment to its "viral, bottom-up business model." Ex. 5 at 23; *see also id.* at 2-3, 5-7, 21, 28, 48. Nowhere does it suggest that Expensify had abandoned this strategy. *See generally* Ex. 5.

### D.    Expensify's Stock Price Declines In 2023

Two years after the IPO, Expensify announced financial results for Q2 and Q3 2023 that included decreasing revenue and user numbers in connection with the challenging macroeconomic environment and subsequent global recession. *See* ¶¶ 107-08, 115-16. Also in 2023, certain Expensify competitors began offering products similar to those offered by Expensify. ¶ 105. Throughout 2023, Expensify's stock price declined from its IPO levels. ¶¶ 103-19.

At the same time, certain analysts following Expensify reduced their price target estimates for the Company's stock price due to changes in the macroeconomic environment that the analysts expected would impact Expensify's business. ¶¶ 103, 109-11, 113, 117. One analyst report discussed risks related to Expensify's then-recent "pricing strategy to drive adoption of the Expensify Card" and a "change in the current go-to-market and sales strategies," but it made no mention of the May 2020 price increase or alleged change in marketing strategy in 2021. ¶ 111. Another analyst report described Expensify's enduring bottom-up growth strategy in 2023 without suggesting that Expensify ever departed from it. ¶ 113 ("Much of the [Expensify] customer acquisition model relies on existing customers spreading the word on [Expensify] value proposition to more senior officers with decision-making authority."); *see also* Ex. 5.

### E.    This Lawsuit And Magistrate Judge Russo's Findings And Recommendation

This lawsuit was filed in November 2023, alleging that the November 2021 Registration Statement contained various materially misleading statements and omissions. Dkt. No. 1. Plaintiff filed the Amended Complaint asserting substantively the same allegations on May 10, 2024. Dkt.

Page 10 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

No. 32.  The Expensify Defendants filed a Motion to Dismiss the Amended Complaint on July 9, 2024, (Dkt. No. 53), which the Underwriter Defendants joined (Dkt. No. 57).

On December 30, 2024, Magistrate Judge Russo issued her F&R, recommending that the District Court grant Defendants' Motion in part and deny it in part.  F&R at 2.  Judge Russo recommended that the District Court grant the Motion to the extent Plaintiff's claims rely on allegations surrounding the October 2020 Biden email or alleged violations of Items 105 and 303 of Regulation S-K.  *Id.* at 24.  However, Judge Russo recommended that the District Court deny the motion to the extent Plaintiff's claims rely on allegations related to the May 2020 price increase and an alleged shift in Expensify's business model, as well as Item 101 of Regulation S-K.  *Id.* Judge Russo also recommended that the District Court deny the Motion as it relates to Defendants' negative causation argument by finding that Plaintiff adequately alleged a causal connection between stock price declines in 2023 and the Registration Statement in 2021.  *Id.* at 23.

## III.    LEGAL STANDARDS

### A.    Standard of Review

This Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  Under the required *de novo* review, *Jones v. City of Hillsboro*, 2015 WL 5737647, at *1 (D. Or. Sept. 29, 2015), "the reviewing court 'do[es] not defer to the [magistrate judge's] ruling but freely consider[s] the matter anew, as if no decision had been rendered below.'"  *Dawson v. Marshall*, 561 F.3d 930, 933 (9th Cir. 2009).

### B.    Section 11 Claim

To state a claim under Section 11 of the Securities Act, a plaintiff must adequately allege that the Registration Statement either "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not

Page 11 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

misleading." 15 U.S.C. § 77k(a). Companies are not required to disclose all information about their business "even if investors would consider the omitted information significant." *Rigel*, 697 F.3d at 880 n.8. Instead, a plaintiff must plead that the omitted fact was material ***and*** disclosure of the omitted fact was "necessary to make the statements therein not misleading." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178, 194 (2015). That is, a plaintiff must adequately plead that by making a statement that did not include the allegedly omitted information, defendant "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A fact is only material if "a reasonable investor would have viewed the nondisclosed information as having significantly altered the 'total mix' of the information made available." *Matrixx*, 563 U.S. at 44. Therefore, when determining whether an omitted fact is material, the court must consider the "full text of the [Registration Statement], including portions which were not mentioned in the complaint," *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996), as well as information that was publicly available, *see Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162-63 (9th Cir. 2009).[3]

Judge Russo correctly articulated this standard, but does not appear to have considered Plaintiff's challenged statements in the full context of the Registration Statement. *Infra* §§ IV.A, IV.B.1. Judge Russo also erroneously concluded that a court cannot assess an omission's materiality on a motion to dismiss. F&R at 15-16. Courts routinely dismiss Section 11 claims where a plaintiff fails to plead that a challenged statement is material, particularly in light of the full context of the Registration Statement. *E.g.*, *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.

---

[3] The Court may also consider documents that are subject to judicial notice and/or incorporated by reference into the complaint on a motion to dismiss. F&R at 9-10. Judge Russo granted Expensify Defendants' Request for Judicial Notice, Dkt. No. 55, which Plaintiff did not oppose. *Id.*

Page 12 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

Supp. 2d 1248, 1260-61 (N.D. Cal. 2000) (dismissing Section 11 claim because alleged misstatements "could not have been material in the context of the McKesson November Registration Statement"); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 772 (N.D. Cal. 2020) (dismissing Section 11 claim "for failure to plead material falsity" where company disclosed what plaintiff claimed was omitted); *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *17 (N.D. Cal. Oct. 31, 2014) (dismissing Section 11 claim because omitted fact was not material); *see also Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 621-25 (S.D.N.Y. 2021) (dismissing Section 11 claim on materiality grounds after "considering the Registration Statement as a whole"). The same result is required here.

### C.      Rule 9(b)'s Heightened Pleading Standard

Section 11 claims like those here that are "grounded in fraud" must meet the heightened pleading requirements of Rule 9(b). *Stac*, 89 F.3d at 1404-05 ("[T]he particularity requirements of Rule 9(b) apply to claims brought under Section 11 when, as here, they are grounded in fraud"); *In re Orange21 Inc. Sec. Litig.*, 2006 WL 8455352, at *2-3 (S.D. Cal. Mar. 30, 2006) (applying Rule 9(b) to Section 11 complaint where plaintiffs "charge Defendants with having knowledge of certain adverse facts yet 'failing' to disclose those facts in the Registration Statement"). As Judge Russo recognized, this heightened pleading requirements must apply in this case because "[a]t heart" Plaintiff's allegation is that the Registration Statement promoted Expensify's "technology and savvy, cost-effective bottom-up business model to mislead potential investors." F&R at 12. Rule 9(b) represents a departure from the lower Rule 8 pleading standard that courts ordinarily apply in civil cases, which merely requires "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024). Rule 9(b) "imposes a higher pleading standard," requiring Plaintiff to "state with particularity the circumstances constituting fraud and mistake" by explaining "what is false or

misleading about the [challenged] statement, and why it is false." *Id.* at 1186-87. Importantly, the complaint "cannot rely on hindsight; rather, it must explain 'why the statements were false or misleading at the time they were made.'" *Id.* at 1187.

While Judge Russo recognized Rule 9(b) governs claims like those here that sound in fraud (F&R at 12), it appears at least some of her analysis is framed by the lower "plausibility" standard rather than the heightened "particularity" standard (*e.g.*, *id.* at 16 & n.5-6, 20, 21). When reviewed under the correct standard, Defendants respectfully submit that Plaintiff's conclusory allegations fall short.

## IV.    ARGUMENT

Plaintiff challenges three categories of statements in the Registration Statement: (1) Expensify's discussion of the May 2020 price increase and its impact on the Company and customers; (2) Mr. Barrett's October 2020 email and its impact on the Company's reputation and customers; and (3) Expensify's marketing expenses and strategy before the IPO. Judge Russo erred in recommending denial of Defendants' Motion as it relates to the first and third categories: the May 2020 price increase and Expensify's marketing strategy. The allegedly omitted facts related to these topics were disclosed in the Registration Statement, are not material, and/or Plaintiff fails to plead that they existed or were known to Defendants at the time of the IPO. Judge Russo also erred in recommending denial of Defendants' Motion as it relates to negative causation. Plaintiff's own allegations establish that Expensify's stock price declines in 2023 were wholly unrelated to any statement or alleged omission in the 2021 Registration Statement.

### A.    The Registration Statement Did Not Omit Any Material Fact Regarding The May 2020 Price Increase

#### 1.    Expensify Was Not Required To Disclose The Specific Dollar Amounts Or Percentages Of The Price Increase

Plaintiff alleges that Expensify should have disclosed "the actual per member prices, for

any of the Company's subscriptions, on any rate, from before or after the May 2020 price increase." ¶ 57. Although Judge Russo agreed with Defendants that "exact numbers may not need to be provided," she recommended denying Defendants' Motion as it relates to the May 2020 price increase because the "percentages" of hypothetical customer price increases should have been. F&R at 15. However, in light of "the total mix of the information made available" about the price increase, *Matrixx*, 563 U.S. at 44, Defendants respectfully submit that the failure to expressly state percentage increases did not "create an impression of a state of affairs that differs in a material way from the one that actually exist[ed]," *Brody*, 280 F.3d at 1006, and thus there was no obligation to disclose them. *See In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (dismissing Section 11 claim because omission of a particular metric did not "create a materially different impression of [company's] financial health" in light of other disclosed metrics); *In re Textainer P'ship Sec. Litig.*, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005) (dismissing securities claims because omission of "precise amount" of increase and "degree of increase" was not materially misleading in light of other disclosures); *Jedrzejczyk v. Skillz Inc.*, 2023 WL 2333891, at *4 (N.D. Cal. Mar. 1, 2023) (dismissing securities claims for failure to plead materially misleading omission, emphasizing that "Defendants were not obligated to disclose any and all metrics relevant to their business"), *aff'd*, 2024 WL 1635568 (9th Cir. Apr. 16, 2024).

When viewed as a whole, the Registration Statement's disclosures did not create a misleading impression of the May 2020 price increase just because Expensify did not also include "actual per member prices" or the potential percentage increase of customer prices:

***First***, the Registration Statement disclosed the fact that there was a price increase in May 2020 at least nine times, thus emphasizing that this was a significant development. *See* Ex. 4 (RS) at 104 (the May 2020 "pricing change . . . led to an increase in the per member price for paid

Page 15 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

members"); *id.* at 26, 27, 85, 91, 93, 96, 97, 105.

**Second**, Expensify disclosed that each customer's pricing is based on a negotiated fee or based on prices listed on Expensify's public website. *See id.* at 87. Requiring Expensify to disclose new prices for each customer is not what the securities laws require and would overwhelm investors with immaterial minutiae. *See Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (rejecting a "rule of completeness" for disclosures because "[n]o matter how detailed and accurate . . . there are likely to be additional details that could have been disclosed but were not"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810 (2d Cir. 1996) (affirming dismissal based on failure to disclose reduced prices because securities laws do not require "bury[ing] the shareholders in an avalanche of trivial information"); *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *19 (S.D.N.Y. May 19, 2023) (holding securities laws do not require disclosure of "minutiae" because such information is immaterial "given the total mix of information available to investors").

**Third**, Expensify emphasized the magnitude of the price increase by repeatedly explaining that the price increases were a primary driver of revenue growth in periods leading up to the IPO:

- "Revenue increased $24.4 million, or 60%, for the six months ended June 30, 2021 compared to the same period in 2020, ***primarily due to a pricing change implemented in May 2020***." Ex. 4 (RS) at 91.

- "Revenue increased $7.6 million, or 9%, in 2020 compared to 2019, ***primarily due to . . . a pricing change implemented in May 2020***." *Id.* at 93.

- For quarterly revenue trends from the quarter ended March 31, 2019 to the quarter ended June 30, 2021, the Registration Statement stated that "[o]ur revenue in each of the quarters presented predominantly increased consecutively over periods presented ***primarily due to . . . a pricing change implemented in May 2020***." *Id.* at 96.

In quantifying increased revenues driven by the May 2020 price change, Expensify in essence quantified the magnitude of the price increase. *See In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *6 (N.D. Cal. June 28, 2005) (omission of "number of subscriber cancellations" was

Page 16 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

not false or misleading in light of "other numbers that were disclosed").

**Fourth**, the Registration Statement warned investors that price increases, including specifically the May 2020 price increase, could negatively impact revenue and paid membership:

- "We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business." Ex. 4 (RS) at 26.

- "Customers may or may not renew their subscriptions as a result of a number of factors, including . . . changes we may implement in our pricing or structure, such as the pricing change implemented in May 2020 . . . . If customers do not renew their subscriptions, . . . our revenue may decline or grow less quickly than anticipated." *Id.* at 27.

- "Our quarterly and annual financial results may fluctuate due to a variety of factors, . . . including, but not limited to: . . . ineffective pricing strategies that could limit customer base expansion, revenue growth and subscription renewals." *Id.* at 21-22.

Considering the full context of the Registration Statement and its robust discussion of the price increase and its impact and risks, the alleged omission of "actual per member prices" or the percentage increases for unnamed customers did not give investors a misleading impression.

The decision dismissing securities claims against Textainer following a price increase is instructive here. *See Textainer*, 2005 WL 3801596. There, plaintiff similarly complained that defendant "omitted to state the precise amount" and "the degree of increase" in the market price of its leased shipping containers in a proxy statement. *Id.* at *6. The Court concluded that neither the amount nor degree of increase had to be disclosed given that defendant disclosed there was a "significant increase in container prices" and the prices were public information. *Id.* The same is true here: the fact of the price increase was disclosed. Expensify explained the price increase was the primary reason for a significant increase in revenues (while noting that the increase per customer varied) and warned that the price increases might lead to customer loss. While each customer's pricing is based on a negotiated fee, illustrative prices were listed on Expensify's public website. *See* Ex. 4 (RS) at 87. Against that backdrop, a reasonable investor would read these disclosures to mean the price increases were significant, and the omission of the exact percentage

Page 17 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

of the price increase for hypothetical customers would not have "significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 44; *Brody*, 280 F.3d at 1006. The additional information Plaintiff seeks would not have materially affected investors' impressions.

Judge Russo agreed that the exact prices did not have to be disclosed, but concluded that "the substantial percentages allegedly should have been" because she determined the Registration Statement may have implied that no customer experienced an increase "as much as 300%." F&R at 15. Setting aside that Plaintiff has no well-pled allegation that prices increased by 300%—none of Plaintiff's allegations reflect a 300% increase, *see* ¶ 55—Judge Russo does not appear to have considered the Registration Statement's multiple disclosures that the May 2020 price increase was significant enough to be the primary driver of increased revenues, and that the specific increases and prices could be different for each customer. *See* Ex. 4 (RS) at 87, 91, 93, 96; *Lyft*, 484 F. Supp. 3d at 772 (dismissing Section 11 claim because defendant disclosed what plaintiff claimed "was obscured"). Given these disclosures, Plaintiff cannot state a Section 11 violation for failure to disclose specific prices or percentages of price increases. *Textainer*, 2005 WL 3801596, at *6 (omission of precise amount or degree of price increase not misleading when defendant disclosed there was a "significant increase" in prices).

### 2.    Expensify Was Not Required To Disclose More About Alleged Negative Impacts From The May 2020 Price Increase

Plaintiff's claim that the Registration Statement should have disclosed that the May 2020 price increase purportedly caused "a material negative impact on customer retention and member expansion" (¶ 3), which in turn "materially adversely affected revenues" (¶¶ 122-23), likewise founders. While *future* negative impacts were possible, Expensify provided robust disclosures about the risks posed by the price increases. Plaintiff has not pled any cognizable *facts* sufficient to conclude that such risks had materialized, *i.e.*, that Expensify had actually suffered a material

(or any) loss of customers (much less a material adverse effect on revenues) as of the IPO.

### a. *Expensify Adequately Warned Of Customer Or Revenue Loss*

The Registration Statement warned of the risks associated with increased prices generally, as well as the risks specifically associated with the recent May 2020 price increase, including the potential for adverse effects on customer subscriptions and revenue:

- "Customers may or may not renew their subscriptions as a result of a number of factors, including . . . changes we may implement in our pricing or structure, such as the pricing change implemented in May 2020 . . . . If customers do not renew their subscriptions, . . . our revenue may decline or grow less quickly than anticipated." Ex. 4 (RS) at 27.

- "We recently increased our subscription prices, and we do not know if these price increases will adversely affect our business." *Id.* at 26.

- "We may fail to accurately predict the optimal pricing strategies necessary to attract new customers, [and] retain existing customers." *Id.* at 9.

- "Our quarterly and annual financial results may fluctuate due to a variety of factors, . . . including, but not limited to: . . . ineffective pricing strategies that could limit customer base expansion, revenue growth and subscription renewals." *Id.* at 21-22.

- "Any such changes to our pricing strategies or our ability to efficiently price our offerings could adversely affect our business, operating results and financial condition." *Id.* at 28.

Expensify thus disclosed the risks Plaintiff claims should have been disclosed. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1417 (9th Cir. 1994) (holding that prospectus was not misleading given disclosures directly related to what plaintiffs alleged was materially misleading). Judge Russo emphasized the robust disclosures related to the price increase, concluding that these comprehensive disclosures supported dismissal of Plaintiff's Item 105 claim (which centered on allegations that Expensify's risk disclosures were somehow inadequate). F&R at 21.

### b. *There Is No Well-Pled Allegation That Risks Of Customer Or Revenue Loss Had Materialized At The Time Of The IPO*

Plaintiff claims the risk of losing users due to the May 2020 price increase materialized after the IPO because the pricing changes made certain contracts non-cancelable and the effects were delayed. ¶¶ 58, 79. However, for this to be the basis of a Section 11 omission claim, Plaintiff

Page 19 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

must plead facts demonstrating that the risk of customer departures due to the price increase had *already materialized* as of the IPO, or that Defendants knew or should have known *at the time of the IPO* that the risk of losing customers due to the May 2020 price increase would materialize after the IPO. *See In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *12 (N.D. Cal. Dec. 9, 2022) ("To state a claim under Section 11, plaintiffs must show that the challenged statement was false at the time of the offering") (citation omitted); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1097 n.13 (C.D. Cal. 2003) (rejecting allegations that did not "establish that Defendants knew at the time of the IPO"). Plaintiff pleads no allegations to support his conclusory assertion.

Contrary to Plaintiff's claims of concealment, Expensify disclosed the quarterly number of paid users from March 31, 2018 through June 30, 2021, numbers Plaintiff does not challenge:

The following table sets forth the average number of paid members for the quarters ended March 31, 2018 through June 30, 2021.

| Quarter ended | Paid members (in thousands) |
|---|---|
| March 31, 2018 | 406 |
| June 30, 2018 | 447 |
| September 30, 2018 | 486 |
| December 31, 2018 | 535 |
| March 31, 2019 | 577 |
| June 30, 2019 | 623 |
| September 30, 2019 | 662 |
| December 31, 2019 | 714 |
| March 31, 2020 | 742 |
| June 30, 2020 | 630 |
| September 30, 2020 | 633 |
| December 31, 2020 | 645 |
| March 31, 2021 | 631 |
| June 30, 2021 | 639 |

Ex. 4 (RS) at 86. While user numbers declined in the second quarter of 2020, the Company explained such decline was caused by the COVID-19 pandemic during which lockdowns eliminated many customers' needs for reimbursement processing and business travel. *Id.* at 85, 91, 138. Other than this temporary decline, Expensify's user numbers fluctuated around a fairly steady average in the quarters leading up to the IPO. *Id.* at 86. Expensify also disclosed—and Plaintiff does not challenge—that the revenue decline in Q2 2020 was due to the COVID-19 pandemic and resulting decrease in business travel. *Id.* at 91. Plaintiff thus cannot claim that any

Page 20 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

loss in customers or revenue before the IPO was not disclosed in the Registration Statement.

Plaintiff's allegation that user number declines in Q2 2020 is evidence of an adverse impact from the May 2020 price increase is all the more deficient because Plaintiff himself concedes that the impact of the price increases was delayed "for months and/or years." Opp. at 10; *see* ¶¶ 58, 79. Taking Plaintiff's allegations as true, the declines in paid users and revenue in the periods ended June 30, 2020 (when the May 2020 price increase had been in effect for, at most, two months) could not have been a result of the price increases. *Costanzo v. DXC Tech. Co.*, 2021 WL 5908385, at *3 (N.D. Cal. Dec. 14, 2021) (court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

Moreover, Expensify ***disclosed*** that negative effects due to the May 2020 price increase, if any, could be delayed. Expensify stated that, as part of the price increase, some existing contracts and new contracts—all of which were for definite periods of time, Ex. 4 (RS) at 27—would become non-cancelable. *Id.* at 87. Expensify also disclosed that any price increase, including specifically the May 2020 price changes, could negatively impact customer retention and revenue. *Id.* at 21-22, 26-29. And, as noted above, the Registration Statement disclosed user numbers and revenues for the time period between the May 2020 price increase and the IPO. Reasonable investors, reading the full Registration Statement, would understand that any negative effects on Expensify's members and revenue due to the May 2020 price increase could be delayed and they could see for themselves the Company's user and revenue performance after the May 2020 price increase. *See McKenna v. Smart Techs. Inc.*, 2012 WL 1131935, at *16-17 (S.D.N.Y. Apr. 3, 2012) (dismissing Section 11 claim based on allegation that prospectus "does not include enough language about the continuing problems" because a "reasonable investor, reading the full [] disclosure, would understand" that the prospectus disclosed continuing issues).

Page 21 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

In any case, Plaintiff cannot allege that the May 2020 price increases caused a loss of customers and revenue in the quarter ending June 30, 2020—the same quarter in which the prices were increased and contracts became non-cancelable (¶¶ 58, 123)—and at the same time claim that customer loss due to the May 2020 price increases "lagged" "for months and/or years" because the contracts were non-cancelable (¶ 58; Opp. at 10). In concluding Plaintiff adequately alleged users had "left Expensify at the time of the IPO" because "contracts became non-cancelable at the time of the price increase allowing for the plausible inference of a delay of the full impact of the increase" (F&R at 16), Judge Russo improperly accepted and relied on Plaintiff's inconsistent allegations. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *In re ON24, Inc. Sec. Litig.*, 2024 WL 979951, at *6 (N.D. Cal. Mar. 5, 2024) (dismissing Section 11 claim where complaint was "'internally inconsistent' and itself undermine[d] plaintiff's theory of the case, rendering it implausible"), *appeal filed sub nom. Leadersel Innotech ESG v. ON24*, No. 24-2204 (9th Cir.); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (courts need not accept "conflicting pleadings" or allegations "contradicted by statements in the complaint itself" or in documents properly considered by the court).

Judge Russo also declined to consider the increase in users after the initial dip in Q2 2020 because "the Court is not in a position to weigh the materiality of the alleged omission at this stage." F&R at 16. But courts regularly dismiss Section 11 claims if a plaintiff fails to plead materiality. *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) ("Where a complaint contains only 'conclusory allegations of law and unwarranted inferences,' dismissal of the complaint on materiality grounds is appropriate."); *Violin Memory*, 2014 WL 5525946, at *16-17 (dismissing Section 11 claim where plaintiff alleged no facts suggesting disclosure of specific number of non-cancelable orders "would have materially altered the 'total mix' of

Page 22 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

information available"); *McKesson*, 126 F. Supp. 2d at 1260-61 (dismissing Section 11 claim because alleged misstatements "could not have been material" when read in context); *Lyft*, 484 F. Supp. 3d at 772 (dismissing Section 11 claim because defendant disclosed alleged omissions). More importantly, the rebound in user numbers after Q2 2020 is not a question of materiality; materiality relates to whether a reasonable investor would consider an omitted fact as "having significantly altered the 'total mix' of the information made available." *Matrixx*, 563 U.S. at 44. Instead, the subsequent increase in paid members is relevant because Plaintiff alleges the price increase caused Expensify to lose users pre-IPO, which Expensify allegedly omitted from the Registration Statement, but on the contrary, paid users actually increased after the quarter in which the price increase was implemented. Judge Russo recognized as much, correctly recommending dismissal of Plaintiff's Item 303 claim (based on allegations of omitting a purported trend of declining users) because Plaintiff's argument that the price increase caused delayed customer defections was inconsistent with the actual user numbers between the price increase and the IPO. F&R at 21. Judge Russo overlooked this contradiction in her Section 11 analysis, but it applies equally to Plaintiff's Section 11 claim. Plaintiff fails to adequately plead that the price increase caused a decline in users before the IPO, so his Section 11 claim based on omission of this information from the Registration Statement must fail.[4]

---

[4] Defendants also explained that revenue increased year over year for the six months ended June 30, 2021 (Ex. 4 (RS) at 86, 91), which controverts Plaintiff's theory that the price increase had an adverse impact on revenue (¶ 123). Judge Russo rejected this argument, reasoning that "the price increase itself increased revenues and the locked in contracts plausibly had the effect of delaying defections." F&R at 16 n.6. Judge Russo's conclusion is in error because (1) her observation that "the price increase itself increased revenues" demonstrates that the price increase could not have had a negative impact on revenue before the IPO, as Plaintiff suggests; and (2) Judge Russo did not find that Plaintiff pled that Defendants knew as of the IPO that any adverse revenue impact from delayed user departures would materialize, which is necessary to support Plaintiff's claim.

Page 23 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

c.    *The Confidential Witnesses Cannot Save This Theory Of Liability*

Plaintiff's threadbare allegations of user loss rely entirely on inadequate claims from CWs 1 and 7, which Judge Russo improperly credited. *See* F&R at 16 n. 6 (relying on ¶¶ 58, 60). The Ninth Circuit imposes high standards for relying on anonymous sources: confidential witness "must be described with sufficient particularity to establish their reliability and personal knowledge" and the allegations must be indicative of the challenged statements' falsity. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7 (D. Or. Nov. 24, 2021) (applying the *Zucco* standard and finding CWs did not establish falsity). CWs 1 and 7 do not meet this standard. Mot. at 15-16.

Judge Russo erred by concluding that CWs 1 and 7 were "in positions within the company such that, though not having been in the best position to know about customer retention, it is not implausible they would have sufficient information." F&R at 16 n.6. CW1 allegedly handled "customer onboarding and platform demonstrations" (¶ 30), and CW7 "answered customer support calls from a queue" (¶¶ 41, 60). Judge Russo noted CW1 was "in a position to speak with existing customers outraged by the price increase" and that the CWs alleged "adverse impacts on customer retention." F&R at 16 n.6. But Plaintiff does not plead any facts establishing that either of these CWs had any insight into or awareness of Expensify's total user base and how it responded to the price increases. Neither CW is alleged to have been involved in customer terminations— just onboarding *new* customers and providing *support* to existing ones—and there is no allegation connecting whatever anecdotal "outrage" they might have encountered at unspecified periods of time with material user losses as of the IPO. *See Talis*, 2022 WL 17551984, at *12 (rejecting CW allegations that were "vague or silent as to time period" because they do not plead that "the challenged statements were false or misleading at the time of the IPO"). Had Judge Russo applied the well-settled *Zucco* standard requiring particularized allegations to support CWs' reliability and

Page 24 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

personal knowledge, the CW allegations would not have been credited at all.

Even if the CWs were considered reliable, they offer no support as to what Defendants knew as of the IPO. CW7 alleges Expensify's customer support did not improve with the price increase (¶ 60) but does not allege that Expensify lost users as of the IPO or what impact the price increase had on customer retention. CW1 claims that some unknown customers were "outraged" and the price increase "cost the Company customers but the full extent of the resulting loss was lagged." ¶ 58. Both CWs' claims are "conclusory," "vague or silent as to time period," and do not "show[] that the challenged statements were false or misleading at the time of the IPO." *Talis*, 2022 WL 17551984, at *12 (holding Section 11 claims, mostly based on CWs, failed even under Rule 8).

### B.    The Registration Statement's Discussions Of Expensify's Marketing Strategy Were Not False Or Misleading

#### 1.    Plaintiff Does Not Plead Facts Indicating That Expensify "Abandoned" Its "Bottom-Up" Business Model Before The IPO

Plaintiff claims the Registration Statement failed to disclose that Expensify had purportedly "abandoned its 'bottom-up' marketing strategy at the time of the IPO and transitioned to a traditional top-down marketing strategy." ¶ 132. In support, Plaintiff alleges Expensify hired sales representatives (¶ 92), measured job performance by new user acquisitions (¶ 93), and increased sales and marketing expenses in the quarters leading up to the IPO (¶¶ 94, 97). But none of these allegations is inconsistent with a "bottom-up" marketing strategy and none renders any discussion of Expensify's business model in the Registration Statement false or misleading. Expensify was transparent that it employed traditional marketing tools and advertising to support its "bottom-up" business model (*e.g.*, Ex. 4 (RS) at 84, 97, 128, 145), that its business depended on acquiring new customers (*see id.* at 21, 26, 128), that it was increasing its sales and marketing expenses before the IPO (*see id.* at 92, 97), and that it planned to invest more in sales and marketing after the IPO

Page 25 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

(*see id.* at 34, 88, 92, 97).  Plaintiff's allegations do not suggest the model was abandoned; on the contrary, each maps directly onto Expensify's explanation of its approach to its bottom-up business model.

Plaintiff implies that hiring sales personnel and spending on advertising are irreconcilable with a bottom-up strategy.  ¶¶ 92, 94, 132.  But that would have the Court ignore the Registration Statement's repeated discussion of Expensify's consistent investment in sales personnel and advertising as a critical element ***supporting*** its bottom-up model:

- "Our sales and marketing expenses in the first two quarters of 2019 reflect an increase in costs associated with our Super Bowl campaign.  The first quarter of 2020 reflects an increase in expenses associated with product advertising campaigns, however, starting in the second quarter of 2020, we aggressively reduced our advertising and other sales and marketing expenses due to the impact of the COVID-19 pandemic.  ***In 2021, quarters presented reflect an increase in expenses associated with advertising campaigns targeted towards brand awareness***."  Ex. 4 (RS) at 97.

- "***Our marketing efforts are designed to support the bottom-up viral nature of our platform by establishing our brand as the premiere option in preaccounting software***.  We invest in brand and platform promotion through partners, conference participation, thought leadership, direct marketing and advertising and content development to educate the market about the benefits of our platform and create market consensus."  *Id.* at 145.

- "***We deploy large scale brand advertising to promote our platform superiority and create market consensus that Expensify is the category leader for expense management software***.  We believe this enables us to focus on creating great viral features for our members . . . ."  *Id.* at 84.

- "***We leverage a variety of targeted marketing strategies*** that involve industry conferences, industry influencers, partner marketing, our own conference and more ***to achieve market consensus that Expensify is the premier, industry standard expense management platform***.  ***This is essential to our viral and word-of-mouth business model***.  We plan to reinforce the market consensus surrounding our platform, as well as expand on these strategies across new feature verticals and markets."  *Id.* at 128.

Plaintiff concedes as much in alleging that Expensify had paid millions of dollars to run an advertisement during the 2019 Super Bowl, years before the IPO. ¶ 97.  And Plaintiff cannot point to anything in the Registration Statement (or any prior statement) where Expensify stated that it only relied on the "bottom-up" business model.

Page 26 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

Plaintiff does not plead facts showing that Expensify changed its marketing strategy before the IPO but concealed it.  The Registration Statement not only disclosed that Expensify had increased sales and marketing expenses leading up to the IPO (like in 2019) to drive brand awareness, but also that Expensify expected to increase such expenses after the IPO:

- "Sales and marketing expenses remained relatively flat, increasing by only $0.6 million, or 10%, for the six months ended June 30, 2021 compared to the same period in 2020.  The increase was predominantly driven by increased advertising spend *to gain further brand awareness*."  Ex. 4 (RS) at 92.

- "*In 2021*, the [quarterly consolidated statements of income] reflect an increase in [sales and marketing] expenses associated with advertising campaigns *targeted towards brand awareness*."  *Id.* at 97.

- "Sales and marketing expenses primarily consist of personnel-related expenses, including stock-based compensation, advertising expenses, branding and public relations expenses and referral fees for strategic partners and other benefits that we provide to our referral and affiliate partners.  *We expect sales and marketing expenses will increase as we expand our sales efforts to pursue our market opportunity.  We anticipate an increase in sales and marketing expenses during the year in which we complete our initial public offering*."  *Id.* at 88.

- "[W]e will need to continue to make substantial investments and expenditures to, among other things: . . . expand our sales and marketing activities, including to obtain channel partners and to expand our SMB and consumer advertising."  *Id.* at 34.

- "We leverage a variety of targeted marketing strategies . . . .  We plan to reinforce the market consensus surrounding our platform, as well as expand on these strategies across new feature verticals and markets."  *Id.* at 128.

Expensify did not state that it only adhered to a "bottom-up" model and disclosed its traditional "direct marketing and advertising" methods (*id.* at 145), consistent marketing expenses, and a plan to continue investing in marketing to increase brand awareness.  Plaintiff's theory that Expensify "abandoned" its bottom-up model for a top-down marketing strategy at the time of the IPO fails.

Judge Russo erroneously recommended denying Defendants' Motion as it relates to the marketing strategy statements by concluding that Plaintiff adequately alleged the Registration Statement omitted the Company's change in its marketing strategy before the IPO.  F&R at 19-20.  Judge Russo based her recommendation on Plaintiff's allegations that Expensify (1) "hired 60

Page 27 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

sales development representatives" (*id.* at 19), (2) "shifted focus from promoting existing customer retention and expansion to the number of people it could onboard per month" (*id.*), and (3) "made a big push in new advertising" (*id.* at 19-20), including that "there was a notable downward shift in demand for brand content after the Company went public" (*id.* at 20), which "allow[ed] for a plausible inference in a shift in strategy" (*id.*). But Judge Russo did not consider the robust disclosures about Expensify's business strategy in the Registration Statement, including explanations of how the "bottom-up" strategy worked and Expensify's plans to increase marketing investments, and instead credited Plaintiff's conclusory and contradictory allegations.

*First*, Plaintiff does not allege any fact demonstrating that Expensify's decision to hire additional sales development representatives means that it abandoned its "bottom-up" business model. ¶ 92. Plaintiff alleges that Expensify had employed sales representatives as part of its marketing strategy to support the "bottom-up" business model long before the IPO (*e.g.*, ¶¶ 29-30 (CW1 was a sales manager as early as June 2020 who managed a team of sales representatives)), and Expensify adding more members to the sales representative team is consistent with Expensify's disclosures in the Registration Statement that acquiring new customers was fundamental to the Company's success and that Expensify increased its sales and marketing expenses leading up to the IPO to increase brand awareness in support of the "bottom-up" model. Ex. 4 (RS) at 34, 88, 92, 97, 128. Plaintiff cannot ignore the unchallenged disclosures in the Registration Statement that make clear traditional sales strategies and acquiring new customers are part and parcel of a bottom-up model, not evidence of abandonment of such a strategy. *See Hoang v. ContextLogic, Inc.*, 2023 WL 8879263, at *8 (N.D. Cal. Dec. 22, 2023) (statements regarding business plans were not misleading because "[r]educed advertising spend in certain countries is not inconsistent with [company's] plan to grow its user base around the world").

Page 28 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

***Second***, Plaintiff does not plead facts demonstrating how an alleged change in job performance measurements means that Expensify abandoned its "bottom-up" business strategy. ¶ 93. Expensify's "bottom-up" model involved convincing one user to use the Expensify platform (often through traditional advertising), and then acquiring new members through word-of-mouth from those initial users. *See* Ex. 4 (RS) at 5 (the viral, bottom-up business model allows "our enthusiastic members [to] champion our platform internally, spreading it via word-of-mouth to other employees and convincing decision makers to adopt Expensify company-wide"). Expensify reviewing its sales personnel's success in acquiring "new user[s]" (¶ 93) is consistent with Expensify's disclosed strategy: each new user is a potential advocate for bottom-up expansion.

***Third***, Plaintiff alleges "there was a big push in new advertising before the IPO" (¶ 94), but Expensify disclosed this very fact in the Registration Statement. *See* Ex. 4 (RS) at 34, 88, 97. Expensify told investors that it was increasing its sales and marketing efforts to strengthen "brand awareness" further serving its bottom-up, viral expansion model. *Id.* at 97; *see also id.* at 92, 99-100. Plaintiff cannot state an omission-based Section 11 claim when the very fact Plaintiff alleges was omitted was repeatedly disclosed in the Registration Statement. *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *11-12 (N.D. Cal. Mar. 10, 2023) (dismissing Section 11 claims where defendants disclosed what plaintiffs claim was omitted); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1127 (S.D. Cal. 2012) (dismissing Section 11 claim where defendants "did disclose" what plaintiffs claim was omitted). Further, allegations that "there was a notable downward shift in demand for brand content ***after*** the Company went public" (¶ 94), says nothing about the truth of any challenged statement ***at the time of the IPO***. *In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d 889, 894 (D. Nev. 1999) ("[A]ny information revealed [after the prospectus became effective] cannot serve to establish that Anchor's information regarding its business

Page 29 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

model, as of the effective date of the Prospectus, was false or misleading.").

*Fourth*, Judge Russo based her recommendation that Plaintiff adequately pled Expensify's abandonment of its "bottom-up" business model entirely on allegations from Plaintiff's CWs. F&R at 19-20 (citing ¶¶ 92-94); *see* ¶ 92 (CW4), ¶ 93 (CW7), ¶ 94 (CW3). As discussed above, Plaintiff does not meet the *Zucco* standard for alleging particularized facts to establish his CWs' reliability and personal knowledge. *Supra* § IV.A.2.c. CW4 claims to have been an "events marketing and operations project lead" who "directed and executed multiple high-value third-party industry and partner conference sponsorships." ¶ 35. There are no allegations that support the probability that CW4 was in a position to know anything about Expensify's Company-wide growth strategy.[5] *In re Interlink Elecs. Sec. Litig.*, 2007 WL 9857528, at *4 (C.D. Cal. Sept. 26, 2007) (CWs must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). CW7 is alleged only to have been a "customer success manager" who answered existing "customer support calls from a queue," and is not alleged to have participated in marketing or new customer acquisition. ¶ 41. CW3 was a marketing designer who designed brand merchandise and promotional materials for Expensify's marketing campaigns. ¶¶ 33-34. All that CW3 alleges is that Expensify pushed out more advertising content in the lead-up to the IPO (¶ 94), which is consistent with Expensify's disclosures in the Registration Statement that it increased its sales and marketing expenses before the IPO to enhance brand awareness. Ex. 4 (RS) at 92, 97. In any event, even if these CW

---

[5] CW4's allegations are also inconsistent with CW1's allegations. CW1 was allegedly a sales manager at Expensify who managed sales representatives starting in June 2020. ¶ 35. But CW4, who was hired by Expensify in March 2018, claims that the Company "around March 2021, *for the first time*" discussed hiring and subsequently hired sales representatives. ¶ 92; *see In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (rejecting CW allegations that "lack corroboration, and, in fact, contradict one another").

allegations were considered reliable, none of these allegations plead that Expensify had "abandoned" the "bottom-up" business model before the IPO. *Supra* pp. 28-30.

**Finally**, Judge Russo erred in holding that Plaintiff's allegations that Expensify "shifted" its business strategy were sufficient to plead that Expensify "abandoned" its business model. F&R at 19-20. A supposed "shift" in business strategy, even if it were adequately alleged (it is not), does not equate to facts demonstrating an "abandonment" of Expensify's bottom-up business model. *See Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563, at *4-5 (C.D. Cal. Dec. 1, 2023) (dismissing Section 11 claim because "none [of the allegations] plausibly pleads that Defendants had wholesale abandoned the use of a data-driven approach before the IPO").

### 2.    Plaintiff Cannot Salvage His Deficient Falsity Allegations By Repurposing Them As An Item 101 Claim

For similar reasons, Plaintiff's claim of liability under Regulation S-K Item 101 fails, and Judge Russo erroneously recommended that the Court deny Defendants' Motion as to that claim. F&R at 20-21. Item 101 requires a company to describe its business, including "material changes to a previously disclosed business strategy," and "the business done and intended to be done" by the company as of the time of the IPO. 17 C.F.R. § 229.101. Plaintiff claims that Expensify omitted that it had "materially changed its business model to a more traditional outbound or go-to-market and sales approach" from a "bottom-up" marketing strategy. ¶ 138. Plaintiff points to the same allegations as discussed above, *supra* § IV.B.1, in support of this claim. But Expensify *disclosed* its business strategy, which consistently included using traditional marketing tools to support its "bottom-up" business model. Ex. 4 (RS) at 84, 97, 128, 145. And Expensify disclosed that it had increased sales and marketing expenses leading up to the IPO and planned to continue investing in sales and marketing activities after the IPO. *E.g.*, *id.* at 34, 88, 92, 100. None of Plaintiff's allegations pleads "material changes to a previously disclosed business strategy" that

Page 31 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

were not already disclosed in the Registration Statement. *See Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 554-55 (S.D.N.Y. 2021) (rejecting Item 101 claim where company disclosed required information and had no duty to disclose plaintiff's desired details).

Judge Russo's reliance on *In re CarLotz, Inc. Securities Litigation*, 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) is misplaced. F&R at 20-21. The plaintiffs in *CarLotz* pled particularized facts demonstrating that most of CarLotz's business was not based on the consignment model publicly touted by the company. *Id.* at \*10. The plaintiffs alleged that the company "did not return unsold vehicles to its corporate sourcing partner (which accounted for the majority of the company's inventory)," as would be expected in a consignment model, and instead "would buy any vehicles from this partner that did not sell within the contractual period." *Id.* That is, the plaintiffs alleged that "in practice, CarLotz, Inc. operated not on a consignment model but on the traditional model of buying and reselling cars." *Id.* Here, Plaintiff offers no allegations suggesting that Expensify abandoned its bottom-up business model, or even changed its marketing strategy in any way before the IPO. On the contrary, Plaintiff's allegations and the documents incorporated into the AC by reference repeatedly describe Expensify's consistent investment in marketing and advertising as part of its "bottom-up" business model.

## C.    Plaintiff's Purported Losses Were Not Caused By Any Revelation Of The "Truth" Of Any Challenged Statement

Plaintiff's Section 11 claim fails for the independent reason that the Amended Complaint and documents incorporated by reference demonstrate that Plaintiff's purported losses were not caused by the revelation of any improperly omitted fact. *See Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (affirming dismissal of Section 11 claim based on negative causation defense); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at \*14-16 (C.D. Cal. Feb. 6, 2014) (dismissing Section 11 claim where alleged corrective disclosures "do not reasonably reveal

anything about the purported misrepresentations"); *In re Shoretel Inc., Sec. Litig.*, 2009 WL 248326, at \*5 (N.D. Cal. Feb. 2, 2009) (same).  There is a complete mismatch between the challenged statements and the disclosures that Plaintiff alleges revealed the "truth":  the three categories of so-called corrective disclosures reflect new developments affecting the market in 2023, ***not*** any revelation of facts that could (much less should) have been revealed back in 2021. Plaintiff points to (1) 2023 analyst reports about Expensify (¶¶ 104, 109-11, 113, 117); (2) a competitor's 2023 new product launch (¶ 105); and (3) Expensify's Q2 and Q3 2023 financial results (¶¶ 107-08, 115-16) as corrective disclosures—but none even mentions Expensify's May 2020 price increase or suggests that Expensify "abandoned" its "bottom-up" business model.

*The 2023 analyst reports*, issued nearly two years after the IPO, reduced price targets for Expensify's stock—but expressly attributed the changes to "challenges" in the "near-term" (*i.e.*, 2023 and beyond) due to headwinds affecting the SMBs that then comprised the majority of Expensify's customer base.  For example, Morgan Stanley stated in June 2023 that it "***expect[ed]*** [Expensify] to face challenges ***near-term*** as the core business works through structural and macro-related headwinds."  ¶ 103.  J.P. Morgan stated in September 2023 that "macroeconomic effects synergize to produce a less favorable environment than years prior for [SMBs] and subsequently, the chance for Expensify to grow."  Ex. 5 at 4 (cited ¶ 113).  And Piper Sandler noted in November 2023 that Expensify had an "[o]utsized exposure to" SMBs and that "[m]acro headwinds have clearly elevated during September and October."  Ex. 6 at 1 (cited ¶ 117).

*The 2023 competitor announcement* of a free product in August 2023, ¶ 105, is completely unrelated to any challenged statement in the Registration Statement in November 2021.

*Expensify's August and November 2023 earnings announcements* (¶¶ 107, 116) again relate to Q2 and Q3 ***2023***, not 2021.  And both announcements only confirm that the decline in

revenue and paid membership in 2023 were caused by a broad economic downturn. For example, during the August 2023 earnings call, Ms. Muralidharan stated Expensify's Q2 2023 financial results were impacted by a "chaotic" economic environment and explained that "first there was a pandemic, then there was concerns of the global recession, then there was a global recession." ¶ 108. On Expensify's November 7, 2023 earnings call, Defendant Schaffer noted that earnings were impacted by a "decrease in activity and our user base" which had "only happened twice, once with in COVID and once it's right now." ¶ 116. The disclosures never mention the price increase or the alleged change in marketing strategy; rather, they attribute the lower 2023 financial results to macroeconomic headwinds Expensify and its customers were then facing.

Judge Russo erroneously relied on Plaintiff's speculation to recommend that "[a]rguably, [P]laintiff alleges disclosures of the realized risks of the [Registration Statement's] failure to properly disclose the purported response to the price increases and change in marketing strategy underway at the time of the IPO." F&R at 23. But while Plaintiff surmises that lower financial results were due to the May 2020 price increase or marketing strategy as of the IPO, the "corrective disclosures" say no such thing. Each points to a different cause: macroeconomic headwinds *in 2023* were adversely impacting Expensify's revenue and users *in 2023*.[6] Judge Russo rightly noted that the August 2023 Loop report addressed Expensify's "pricing strategy" and "change in the current go-to-market and sales strategies" (F&R at 22-23), but appears to have overlooked that the report addresses entirely different issues than those at play in 2021: the pricing discussion relates to a *2023* strategy "to drive adoption of the Expensify Card," not the May 2020 price increase (*id.*;

---

[6] *See, e.g.*, ¶ 103 (analyst anticipating challenges as Expensify "works through structural and macro-related headwinds"); ¶ 113 (analyst noting "challenging macro environment" in "combination" with factors unrelated to price increase or alleged change in marketing strategy); ¶ 117 (analyst opining "[a]dditional macro pressures are now resulting in more SMB customers downsizing and in some cases going under (macro headwinds = external challenge)").

Page 34 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

¶ 111), and the "*current* go-to market and sales strategy" refers to the strategy as of August 2023. Nothing in the reports or Plaintiff's allegations ties 2023 strategy to marketing strategy in November 2021. These disclosures "do not reasonably reveal anything about the purported misrepresentations." *Shoretel*, 2009 WL 248326, at *5; *Brown*, 2014 WL 523166, at *14-16.

Judge Russo overlooked that the analyst reports point to a different cause of Plaintiff's alleged losses: Plaintiff's own alleged disclosures of the "truth" demonstrate that the declines in Expensify's stock price in 2023 were caused by circumstances that existed *in 2023*, not the revelation of some truth in existence in 2021. Defendants respectfully submit that Judge Russo erred in recommending denial of Defendants' negative causation defense.

### D.      Plaintiff Does Not State A Section 15 Claim

Because Section 15 claims require a predicate claim, Plaintiff's failure to plead a violation of Section 11 or Items 101, 105, or 303 means he has not stated a Section 15 claim either. *LexinFintech*, 2021 WL 5530949, at *20-21.

## V.      CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court sustain their objections to the Findings and Recommendation and grant dismissal of the Amended Complaint.

January 21, 2025

FOSTER GARVEY PC

By: */s/ Eryn Karpinski Hoerster*
Eryn Karpinski Hoerster, OSB #106126
121 SW Morrison Street, Eleventh Floor
Portland, Oregon 97204-3141
Telephone: +1.503.228.3939
Facsimile:  +1.503. 226.0259
eryn.hoerster@foster.com

LATHAM & WATKINS LLP
Melanie M. Blunschi (*pro hac vice*)
Daniel R. Gherardi (*pro hac vice*)
140 Scott Drive
Menlo Park, California 94025
Telephone:  +1.650.328.4600
Facsimile:  +1.650.463.2600
matt.rawlinson@lw.com
melanie.blunschi@lw.com
daniel.gherardi@lw.com

*Attorneys for Expensify Defendants*

January 21, 2025

MORGAN, LEWIS & BOCKIUS LLP

By: */s/ Damon C. Elder*
Damon C. Elder, OSB No. 085313
MORGAN, LEWIS & BOCKIUS LLP
1301 Second Avenue, Suite 3000
Seattle, WA 98101-3808
Telephone:  +1.206.274.6400
Facsimile:  +1.206.274.6401
damon.elder@morganlewis.com

Charlene S. Shimada (*pro hac vice*)
Kevin M. Papay (*pro hac vice*)
Robert H. O'Leary (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone:  +1.415.442.1000
Facsimile:  +1.415.442.1001
charlene.shimada@morganlewis.com
kevin.papay@morganlewis.com
bob.oleary@morganlewis.com

*Attorneys for Underwriter Defendants*

Page 36 – **DEFENDANTS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

**CERTIFICATE OF COMPLIANCE**

Defendants' Objections to Magistrate Judge Russo's Findings and Recommendation complies with the applicable word-count limitation under LR 7-2(b) because it is under 35 pages, excluding the caption, table of contents, table of cases and authorities, motion, signature block, exhibits, and any certificates of counsel.

*/s/ Eryn Karpinski Hoerster*
Eryn Karpinski Hoerster, OSB #106126
